UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------X

UNITED STATES OF AMERICA,

      - against -

CHRISTOPHER FINAZZO and
DOUGLAS DEY,
                  Defendants.

---------------------------------------------------------X

**MEMORANDUM AND ORDER**
10-CR-457 (RRM)(RML)

ROSLYNN R. MAUSKOPF, United States District Judge.

Christopher Finazzo is charged by second superseding indictment ("S-2") with multiple

counts, including (i) conspiracy to commit mail fraud and wire fraud and conspiracy to violate

the Travel Act (Count One); (ii) mail fraud (Counts Two through Fifteen); (iii) wire fraud (Count

Sixteen); and (iv) making a false statement in a report required to be filed with the United States

Securities and Exchange Commission (Count Seventeen).  (Doc. No. 62.)  Finazzo moves *in*

*limine* for an order precluding the government from introducing at trial an allegedly privileged e-

mail and from using any information derived from its improper disclosure.  (Doc. No. 103.)  For

the reasons that follow, Finazzo's motion is DENIED.

## BACKGROUND

The Court assumes the parties' familiarity with the factual background and procedural

history of the case, and will address only those aspects that are relevant to the instant motion.  In

the second superseding indictment, filed September 6, 2011, the government charged a

"[f]raudulent [s]cheme" in which Finazzo, an executive at the clothing retailer Aéropostale, Inc.

("Aéropostale"), secretly received a portion of the profits from certain transactions between

Aéropostale and South Bay Apparel, Inc. ("South Bay"), a clothing vendor controlled by

Douglas Dey.  (S-2 at ¶¶ 4, 8.)  The second superseding indictment charges that Finazzo

"defrauded" Aéropostale by, "(1) depriving Aéropostale of the opportunity to make informed decisions, thereby preventing Aéropostale from seeking lower prices for merchandise it purchased from South Bay and the opportunity to select other vendors based upon price, quality and timely delivery; and (2) causing Aéropostale to pay higher prices on merchandise it purchased from South Bay than were available from other vendors, thereby increasing South Bay's profits and the amounts Dey paid Finazzo." (S-2 at ¶ 9.)[1]

I.  **Discovery of the Siegel E-mail and Finazzo's Termination**

Although the indictment charges that the scheme began in 1996, Aéropostale appears not to have learned of its existence until some point after early November of 2006. (S-2 at ¶ 8.) In 2006, during an unrelated internal investigation, Kroll, Inc. ("Kroll"), an investigative firm hired by Aéropostale, uncovered an e-mail in Finazzo's Aéropostale work account from his personal attorney, Angela Siegel. Def's. Mem. (Doc. No. 103-1) at 3.) The e-mail, dated August 24, 2006, attached a list of Finazzo's assets that his attorney had prepared for the purpose of creating a will. (Ex. A to Zito Decl. (Doc. No. 103-3) ("Siegel e-mail").) In the e-mail, Siegel asked Finazzo to review the values listed in the attachment and indicated that she would produce "revised wills" based upon them. (*Id.*) The assets listed in the e-mail attachment included several companies Finazzo co-owned with Dey, including South Bay, a company that served as a primary vendor of Aéropostale merchandise. (*Id.*; S-2 at ¶ 6.) Although Finazzo admits that he "may have," prior to the Siegel e-mail, corresponded with Siegel via his Aéropostale e-mail account, he denies having ever "asked or authorized" her to send "any information or written materials of a confidential, sensitive or privileged character" to his Aéropostale e-mail address.

---

[1] The second superseding indictment also charged Dey in Counts One through Sixteen of the Indictment. (S-2 at 6-12.) Dey pled guilty to Count One on September 27, 2012. (*See* Minute Entry (Doc. No. 148).)

(Finazzo Decl. (Doc. No. 115-1) at ¶ 5.)  He asserts that, when he received the e-mail, he "forwarded it to a non-Aéropostale email account, deleted the email from [his] inbox and . . . instructed Attorney Siegel to send confidential information only to another email address [he] had previously given her and not to [his] Aéropostale email address."  (*Id.* at ¶ 8.)

Upon learning that Finazzo had undisclosed ownership interests in companies owned by one of Aéropostale's primary vendors, Aéropostale decided to terminate Finazzo for cause. (Def.'s Mot. in Limine (Doc. No. 103-1) at 3.)  On November 7, 2006, Aéropostale's Chief Executive Officer, Julian Geiger, and General Counsel, Edward Slezak, summoned Finazzo to a meeting in order to inform him of his termination.  (Ex. A to Zito Decl. (Doc. No. 109-2) ("Finazzo Tr.").)  Geiger began the meeting by presenting Finazzo with a set of materials, including a schedule of assets that had been set forth in the Siegel e-mail, and telling him "[y]ou need to explain it to us."  (Finazzo Tr. at 1.)  Finazzo then went, virtually line-by-line, through the list of assets attached to the Siegel e-mail.  He admitted joint ownership of assets with Dey and explained what each entry in the Siegel e-mail's attachment represented.  (*Id.* at 1-4.) Finazzo expressed surprise when Geiger and Slezak told him that his failure to disclose the joint-ownership interests with Dey violated company policy and would require Aéropostale to restate its SEC filings.  (*Id.* at 3.)  After this short initial discussion, and in response to Finazzo's question about what he should "do now," Geiger informed Finazzo that he was being "terminated for cause."  (*Id.* at 4-5.)

The meeting continued for some time after Finazzo was informed of his termination. During the ensuing conversation, Finazzo insisted that he had merely made an honest disclosure mistake (*id.* at 7 (". . . I always had Aéropostale's best interest in mind. . . .  I didn't think I was doing anything incorrect.")), and encouraged Aéropostale to continue purchasing from Dey (*id.*

at 17 ("I don't want anything to happen to [Dey], that'll hurt [Dey]. . . . I don't think that he's done anything that has been inconsistent with the best wishes of Aéropostale.")).  It is clear that Aéropostale was unaware of the kickback scheme now alleged in the indictment.  (*Id.* at 12 ("Slezak:  So like when we bought from Vertical Line you didn't get any dividends or distributions or anything like that?  Finazzo:  No, No."), 20 ("Geiger:  I would bet my reputation on Chris never having overpaid or overbought anything from Doug.").)  Indeed, that appears to be the precise purpose of most of Finazzo's statements during the meeting.  (*See, e.g.*, *id.* at 20 ("Have I ever done anything at Aéropostale to ruin our integrity or buy something intentionally.  Never, would never do that.").)

At one point during the meeting, Finazzo also volunteered additional context about the Siegel e-mail and its attachment.  As he was reviewing the attachment, Finazzo attempted to downplay the values it listed for various properties he owned together with Dey, saying "I'm not sure where the value of all this is coming from but if it was this value I wouldn't be working [at] Aéropostale."  (*Id.* at 11.)  Slezak told Finazzo that it came from Finazzo's own Aéropostale e-mail account; he stated, "This was an email that came to you."  (*Id.*)  Finazzo responded, "Oh, this is, this is from um, this is from a lawyer right?  Angela Seagal [sic], from the uh, properties for the will. . . . these numbers are not real numbers, this was done for a will in case something happened."  (*Id.* at 12.)  Finazzo made explicit that the schedule of assets "is what Angela Seagal [sic] sent to me."  (*Id.* at 14.)  Finazzo elaborated as follows:

> [W]hat [Siegel] said was that you have so many loose ends with so many things that are not like, yours but not yours.  What happens if something happens to you, what happens with these properties, with 660 Mass Avenue, and even your property in Queens, what happens with that because it's in, in your name and Annie's parents live there and they don't pay any rent so what do you, what do you do.  I mean pretty much, how do you, what do you do.  I said that's a good point so she said list all the things that you would have, you know, and [] email them to me and then she spoke to [] Paul Conefry and Paul said well I think [],

4

these are rough estimates about what maybe they'll be worth when you know Chris dies, if Chris dies in the next 10 years it might be worth this money but those are just guestimates. There are things on there that aren't even closed yet, like the condo and the and the property on Central Park West, they're not even closed yet . . . .

(*Id.* at 19-20.)[2]

The overall tenor of the meeting was that of three very close co-workers, making the best of a difficult situation. Although some parts of the meeting were somewhat confrontational, (*id.* at 1 ("Sit down Mr. Finazzo")), the general tone of the meeting was friendly. Before Finazzo began discussing the assets listed on the Siegel e-mail, Geiger indicated that "[T]here's a group of evidence here that's very damaging to you. . . . I need your help to figure out what the hell is going [on] . . . . You need to explain it to us." (*Id.* at 1.) After Finazzo began explaining the assets, Geiger told him "You are the sweetest man I've ever met in my life, and you know that. . . . And you know, I've always said you are my brother. What you've done is shown terrible judgement [sic]." (*Id.* at 2-3.) When it came time to tell Finazzo he was being terminated, Geiger again was empathetic:

I mean the words coming out of my mouth can't even come out, you're my brother. . . . Chris, I'm your brother. I love you. Have I ever steered you wrong. . . . I mean my heart is broken. . . . I don't know what to do. We've been fighting to see if there's anything we could do.

(*Id.* at 4-5.)

---

[2] During the first phases of briefing on this motion, the parties appeared to agree that the Siegel e-mail in its entirety was shown to Finazzo at the beginning of this meeting. (Def.'s Reply Mem. (Doc. No. 109) at 9; Gov't Mem. (Doc. No. 105) at 3.) Finazzo later submitted a letter to the Court indicating that he believed only the schedule of assets contained in the Siegel e-mail, and not the e-mail itself, were put before him at his termination meeting. As such, Finazzo argues that he could not have knowingly and intentionally waived his attorney-client privilege, as Aéropostale never disclosed to him that it had uncovered the Siegel e-mail. This argument fails. As laid out above, the uncontroverted facts set forth in the transcript of the termination meeting clearly establish that Finazzo recognized the schedule of assets was sent via an e-mail from Siegel to him.

At one point Geiger even calls Finazzo "my key partner and key friend in life" and begins to cry. (*Id.* at 16, 18.) And when the meeting ends, the transcript indicates that it "sounds like they are exchanging hugs." (*Id.* at 32.)

## II. Aéropostale's Technology Policies

Because the Siegel e-mail was sent to Finazzo's Aéropostale address, much of this motion, as discussed in some detail below, will turn on Finazzo's expectation of privacy in that account. Relevant to that expectation are Aéropostale's policies regarding the use of its e-mail accounts. Therefore, the Court will briefly summarize the record as established by the parties.

Aéropostale had policies governing its employees' use of company e-mail as early as 1999. The government has offered into evidence a number of those policies, as they have evolved through the years. In 1999, Finazzo signed one such policy, which was entitled "Electronic Technologies Agreement." (Ex. A to Govt.'s Mem. in Opp'n (Doc. No. 105-1) ("1999 Policy").) The agreement defined "Company Systems" as including "email." (*Id.* at 1.) It provided, in pertinent part:

> Systems are provided to serve business purposes only and are considered assets of the Company.
>
> You should have no expectation of privacy when using Company Systems. All information on the Systems may be monitored, accessed, deleted or disclosed at any time without your permission. The Company further has the right to limit, block, track, remove and/or record access by any employee when using Company Systems and when accessing any information on the Internet or Intranet.

(*Id.* at 2.)

In addition, the policy set out certain standards for the use of "Web/Internet Email." In pertinent part:

> The Web/Internet Email may be used for Company business only. Any limited exceptions to this rule must be approved through the MIS department. In any event, no personal use for personal gain or profit is allowed.

. . .

> You should have no expectation of privacy when using the Web/Internet Email. Your use may be monitored or disclosed at any time without your permission. This may include monitoring of web sites visited, material downloaded or uploaded and the amount of time spent on-line.

(*Id.* at 4.)  On February 16, 1999, Finazzo signed and acknowledged that he had a "responsibility to read the contents" of the policy, and that he "accept[ed] responsibility for learning and following all rules." (*Id.* at 5.)

The government provided the 2004 Aéropostale Employee Handbook, as well. (Ex. B to Govt.'s Supp. Resp. in Opp'n (Doc. No. 159-1) ("2004 Policy").) The 2004 Policy is similar to the 1999 Policy. The 2004 Policy defined "Company Systems" as including "internal and external email." (*Id.* at 10.) Like the 1999 Policy, it stated:

> Company systems are provided to serve business purposes only and are considered assets of the Company.
>
> You should have no expectation of privacy when using Company Systems. All information on the Company Systems may be monitored, accessed, deleted or disclosed at any time without your permission. This may include monitoring of web sites visited, material downloaded or uploaded and the amount of time spent on-line. The Company further has the right to limit, block, track, remove and/or record access by any employee when using Company Systems and when accessing any information on the Internet or Intranet.

(*Id.* at 11.)

The government has also submitted various items evidencing acknowledgement of the contents of the Aéropostale Employee Handbook. It submitted slips, two for 2002, one for 2004, and one for 2005, wherein Finazzo acknowledged that he "read the Company's Employee Handbook." (Ex. B to Govt.'s Mem. in Opp'n (Doc. No. 105-2) ("Finazzo Acknowledgements").) And it submitted representation letters that Finazzo signed quarterly

between 2002 and 2006, wherein Finazzo attests that he is "familiar with the contents of the Employee Handbook." (Ex. C to Gov't Mem. in Opp'n (Doc. No. 105-3) ("Rep. Letters").)[3]

Finazzo submitted the Aéropostale Corporate Employee Handbook for 2007. (Ex. A to Finazzo Decl. (Doc. No. 115-1) ("2007 Policy").) Finazzo references that handbook as the relevant one "[d]uring [his] employment." (Finazzo Decl. at ¶ 2.) Similar to the policy from 1999 and 2004, the 2007 Policy defines "Company Systems" as including "internal and external email." (2007 Policy at 10.) It states as follows:

> Except for limited and reasonable personal use (e.g., occasional personal phone calls or e-mails), Company Systems should be used for Company business only. Any limited exceptions to this rule must be approved through the IT department. Under no circumstances may Company Systems be used for personal gain or profit; solicitations for commercial ventures; religious or political issues; or outside organizations. Company Systems may not be used to distribute chain letters or copyrighted or otherwise protected materials.
>
> . . .
>
> You should have no expectation of privacy when using Company Systems. The Company may monitor, access, delete or disclose all use of the Company Systems, including e-mail, web sites visited, material downloaded or uploaded and the amount of time spent on-line, at any time without notification or your consent.

(*Id.* at 11.)

### III.    Current Motion

Finazzo filed the present motion seeking to preclude the government from using at trial the August 24, 2006 Siegel e-mail and its attachment, and any other information derived therefrom. (Def. Mem. at 13.) The government responded (Doc. No. 105), and Finazzo replied (Doc. No. 109). Following a court conference regarding the motion, Finazzo filed an addendum

---

[3] Finazzo also challenges the acknowledgement slips, the representation letters and the 1999 Policy on the basis that the government did not attach them to a declaration to establish an "evidentiary foundation." (Def. Reply Mem. at 4.)

to his motion asserting additional information.  (Doc. No. 115.)  The government submitted additional information as well.  (Doc. No. 159.)  Finazzo then requested that the Court hold an evidentiary hearing to determine which e-mail policy was actually in effect when he corresponded with Siegel and whether Aéropostale enforced the e-mail policy.  (Doc. No. 162.)  The government opposed the request for the evidentiary hearing, (Doc. No. 169), to which Finazzo replied (Doc No. 171).  Having considered all of the foregoing submissions, Finazzo's motion and request for an evidentiary hearing are DENIED.[4]

## LEGAL STANDARD

The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice.  *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007).  The privilege's underlying purpose has long been "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  In order to balance this protection of confidentiality with the competing value of public disclosure, however, courts "apply [the privilege] 'only where necessary to achieve its purpose'" and "construe the privilege narrowly because it renders relevant information

---

[4] The Court denies Finazzo's request for an evidentiary hearing for two reasons.  First, no matter what policy was in effect in 2006, none accorded Finazzo an expectation of privacy in his Aéropostale e-mail account.  Moreover, even if such hearing were required to determine what e-mail policy was in effect in 2006 and whether that policy was enforced, Finazzo knowingly and intentionally waived his attorney-client privilege when discussing the Siegel e-mail at his termination meeting.  There is no factual dispute as to what occurred at that meeting.  Therefore, holding an evidentiary hearing would be futile.  *See United States v. Carbonaro*, 186 Fed. App'x 41, 44 (2d Cir. 2006) (summary order) (finding that a district court did not abuse its discretion in declining to hold an evidentiary hearing where so doing would be futile); *United States v. Abcasis*, 811 F. Supp. 828, 835 n.7 (E.D.N.Y. 1992) (declining to hold an evidentiary hearing when one would be futile).

undiscoverable." *In re County of Erie*, 473 F.3d at 418 (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)). The party asserting the privilege, in this case Finazzo, bears the burden of establishing its essential elements. *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011).

Absent certain limited exceptions, "disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed, whether because disclosure is viewed as an indication that confidentiality is no longer intended, or as a waiver of the privilege." *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973); *see also Nat'l Immigration Project of the Nat'l Lawyers Guild v. United States Dep't of Homeland Sec.*, 842 F. Supp. 2d 720, 728 (S.D.N.Y. 2012) ("[A] party can waive attorney-client privilege by making 'a deliberate decision to disclose privileged materials in a forum where disclosure was voluntary and calculated to benefit the disclosing party.'") (quoting *In re Grand Jury Proceedings*, 219 F.3d 175, 184 (2d Cir. 2000)); *Diversified Group, Inc. v. Daugerdas*, 304 F. Supp. 2d 507, 515 (S.D.N.Y. 2003) ("It is axiomatic that voluntary disclosure of confidential communications constitutes a waiver of the attorney-client privilege.").

Finazzo suggests that he "does not bear any burden on the question of waiver." (Def. Supp. Mem. (Doc. No. 115) at 2-3.) The Court disagrees. Although there is some mixed authority, the Second Circuit recently reaffirmed, "'it is vital to a claim of privilege that the communications between client and attorney were made in confidence *and have been maintained in confidence*.'" *Mejia*, 655 F.3d at 134 (quoting *In re Horowitz*, 482 F.2d at 81-82 (emphasis added). Moreover, the "person invoking the privilege must have taken steps to ensure that it was not waived." *Id.* (finding burden was on prisoner to establish that he had "kept confidential" his privileged communications). Because "maintaining confidentiality is an element of the privilege itself," the burden is on the party seeking to assert it. *United States v. Hatfield*, No. 06-CR-0550,

2009 WL 3806300, at *3 (E.D.N.Y. Nov. 13, 2009) (identifying this as the "majority view"); *see also In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 255 (S.D.N.Y. 2005) ("The person asserting the privilege has the burden of proving . . . that the privilege was not waived."); *Denney v. Jenkins & Gilchrist*, 362 F. Supp. 2d 407, 412 (S.D.N.Y. 2004) (finding that it is the burden of party seeking to avoid waiver to demonstrate "that its privilege was not waived through disclosure").

Finazzo is mistaken because he seems to construe the fact that the government must demonstrate "preliminary facts" regarding waiver as requiring the government to prove waiver. 24 Charles Alan Wright, Federal Practice & Procedure § 5507 (2007). In other words, Finazzo need not take on "the burdensome (and borderline impossible) task of showing" he has not waived privilege until the government demonstrates facts suggesting there was a waiver, for example, "that a third party gained possession" of the communication. *Hatfield*, 2009 WL 3806300 at *3; *see also Business Integration Servs., Inc. v. AT&T Corp.*, 251 F.R.D. 121, 124 (S.D.N.Y. 2008) (finding that where the "disclosure of [] privileged information has in fact taken place" it is the privilege-claiming party's burden to "show that its privilege was not waived through disclosure"), aff'd 2008 WL 5159781 (S.D.N.Y. Dec. 9, 2008).[5]

Here, the mere posture of this case is sufficient to satisfy any burden the government may have. Both parties agree that the Siegel E-mail was "disclosed" to third parties; when Kroll searched Finazzo's Aéropostale e-mail account and when Geiger and Slezak confronted Finazzo

---

[5] The cases cited by Finazzo do not compel any other conclusion. (Def. Supp. Mem. at 2-3.) For example, although Magistrate Judge Katz, in *JA Apparel Corp. v. Abboud*, No. 07-CV-7787, 2008 WL 111006, at *2 n.1 (S.D.N.Y. Jan. 10, 2008), suggested "the burden of showing a waiver rests with the opponent of the privilege" he did so with reference to a showing of "preliminary facts." There, the opponent of the privilege had only speculated that the privileged document in question "may" have been shown to a third-party, and that a third-party whose presence would "not necessarily waive the privilege" was present when the document was discussed. *Id.* at *2.

with the e-mail on November 7, 2006. (Gov't Mem. at 1-4; Def. Mem. at 3; Def. Reply Mem. at 8-9.) The question is whether either of those "disclosures" defeat the privilege. That question is for Finazzo to answer.

## DISCUSSION

### I.    The Receipt of the Siegel E-mail to Finazzo's Aéropostale Account

On August 24, 2006, Finazzo received the Siegel e-mail in his Aéropostale e-mail account.[6] Finazzo asserts that such receipt did not defeat any privilege he had in that e-mail because (1) Aéropostale's policy regarding its corporate e-mail accounts did not defeat his reasonable expectation of privacy; and (2) in any event, he did not ask for the Siegel e-mail to be sent to his Aéropostale account and "mere receipt of a privileged e-mail" cannot waive the privilege. (Def. Mem. at 7-10; Def. Reply Mem. at 3-5; Def. Supp. Mem. at 3.)

As discussed above, paramount to the maintenance of a claim of attorney-client privilege is that the communication "was intended to be and was in fact kept confidential." *In re County of Erie*, 473 F.3d at 419. A communication cannot be "intended" to remain confidential, however, when made through a medium that subjects it to disclosure to third parties. *Mejia*, 655 F.3d at 130, 134 (finding that no privilege attached to phone call made by prisoner when he had been made warned that it "may be recorded"). Sending and receiving e-mails via an employer e-mail account, such as Finazzo's Aéropostale account here, is one such example. If Finazzo was aware, or should have been aware, that third parties had access to any e-mails sent or received via his Aéropostale account, he cannot assert privilege over them. In other words, Finazzo's claim of privilege turns on whether he had a "reasonable expectation that the attorney-

---

[6] The Court will assume for the sake of this motion, without deciding, that the Siegel e-mail would have been privileged other than for the reasons suggested here.

client communications would remain confidential despite being stored on" his employer's servers. *Hatfield*, 2009 WL 3806300, at *8.

In assessing an employee's reasonable expectation of privacy in a work computer or e-mail account, courts have increasingly turned to a set of four factors: "'(1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?'" *In re the Reserve Fund Secs. & Deriv. Litig.*, 275 F.R.D. 154, 160 (S.D.N.Y. 2011) (quoting *In re Asia Global Crossing, LTD.*, 322 B.R. 247, 257 (Bankr. S.D.N.Y. 2005)). Although the test is only advisory, because it is "widely adopted" by many courts, it is a good framework with which to conduct this highly fact-dependent analysis. *In re the Reserve Fund Secs. & Deriv. Litig.*, 275 F.R.D. at 160 & n.2 (collecting cases).

As may be apparent from this test, Aéropostale's policies governing the e-mail accounts it provided to its employees are vital to an assessment of Finazzo's reasonable expectation. But neither party has presented Aéropostale's policies from 2006, the year the privileged e-mail was sent. Rather, as discussed above, the government has provided policies from 1999 and 2004. Finazzo has provided the 2007 policy. There is no representation from either side that the 2004 Policy was the policy in effect when Finazzo received the Siegel e-mail. The government has also provided, however, various representation letters and acknowledgements by Finazzo indicating that he was aware of the contents of Aéropostale's Employee Handbook, including one signed in August of 2006, only a few months before the Siegel e-mail. (Rep. Letters at 37-38; Finazzo Acknowledgements.)

Finazzo would have the Court hold the absence of a 2006 policy as fatal to the government's opposition to his privilege claim. That position is somewhat puzzling as Finazzo represents that the 2007 Policy was in effect "[d]uring [his] employment," despite the fact his employment ended in 2006. (Finazzo Decl. at ¶ 2.) Whether the 2004 or 2007 Policy was in effect during the relevant time period, moreover, is of no consequence. Rather, because Finazzo does not have an expectation of privacy in his work e-mails under either the 2004 or 2007 Policy, he has not alleged that any different policy was in effect in 2006, as is his burden, and he certified many times that he was aware of the contents of the policy, his privilege claim fails.

Turning to the first factor, the 2004 and 2007 policies differ somewhat on Aéropostale's rules regarding personal use of its system. The 2004 Policy severely restricted personal use of Aéropostale's computer systems. It stated that Aéropostale's e-mail "[s]ystems are provided to serve business purposes only." (2004 Policy at 11.) It also stated that "Company Systems may be used for Company business only. Any limited exceptions to this rule must be approved through the MIS department. In any event, no personal use for personal gain or profit is allowed." (*Id*. at 12.) The 2007 Policy is more permissive, stating that "Except for limited and reasonable personal use (e.g., occasional personal phone calls or e-mails), Company Systems should be used for Company business only." (2007 Policy at 11.) Both policies stated that certain specific instances of use that are always impermissible, such as, "solicitations for commercial ventures; religious or political issues; or outside organizations" and it banned the "distribut[ion] of chain letters or copyrighted or otherwise protected materials." (2007 Policy at 11; 2004 Policy at 12.) And most importantly, both policies state that a user has no expectation of privacy in his or her use of Company Systems. (2007 Policy at 11; 2004 Policy at 11.)

Even assuming that the more lenient personal use policy was in place in 2006, this factor still weighs against Finazzo. Although an outright ban on personal use would likely end the privilege inquiry at the start, the fact that Aéropostale placed restrictions both limiting personal use generally and outright banning certain types of personal use lowers an employee's expectation of privacy in the system. That is, where a "third party can dictate the means of communication, an employee is less reasonable in believing it secure." *Goldstein v. Colborne Acquisition Co.*, 873 F. Supp. 2d 932, 937 (N.D. Ill. 2012); *see also Aventa Learning, Inc.* v. *K12, Inc.*, 830 F. Supp. 2d 1083, 1109 (W.D. Wash. 2011) (finding no reasonable expectation of privacy where company "discouraged" personal use through a policy stating its systems "should generally be used only for [company] business"); *Hanson v. First Nat'l Bank*, No.5:10-0906, 2011 WL 5201430, at *6 (S.D. W. Va. Oct 31, 2011) (finding no reasonable expectation of privacy despite policy allowing "[i]ncidental and occasional personal use" of its systems).

The second element also weighs against Finazzo. Although there is no evidence that Aéropostale had a practice of actually reviewing employees' e-mails, both the 2004 and 2007 policies reserve that right to do so. The 2004 Policy warned employees that when using company e-mail "[y]ou should have no expectation of privacy" and that "[a]ll information . . . may be monitored, accessed, deleted, or disclosed at any time without your permission." (2004 Policy at 11.) The 2007 Policy is also clear, warning employees they "should have no expectation of privacy when using Company Systems. The Company may monitor, access, delete or disclose all use of the Company Systems, including e-mail . . . at any time without notification or your consent." (2007 Policy at 11.)

Most courts have concluded such reservation of the right to review destroys any reasonable expectation of privacy, whether or not the employer routinely reviews reviewing the

e-mails. *See In re the Reserve Fund*, 275 F.R.D. at 163-164 (applying the marital communication privilege and finding no expectation of privacy where the employer's policy reserved the right to access employee's e-mail, even though the policy also told employees they will not "routinely" engage in such monitoring and will attempt to protect employee's privacy in their e-mail and there was no evidence of such monitoring); *Long v. Marubeni Am. Corp.*, No. 05-CV-639, 2006 WL 2998671, at *3 (S.D.N.Y. Oct. 19, 2006) (finding no expectation of privacy where employer's policy instructed employees they had "no right of personal privacy" and the employer reserved the right to monitor its systems); *Scott v. Beth Israel Med. Ctr. Inc.*, 847 N.Y.S.2d 436, 442 (N.Y. Sup. Ct. 2007) (finding no expectation of privacy where "[a]lthough [the employer] acknowledges that it did not monitor the [employee's] e-mail, it retain[ed] the right to do so."); *see also Muick v. Glenayre Electronics*, 280 F.3d 741, 743 (7th Cir. 2002) ("[The employer] announced that it could inspect the laptops that it furnished for the use of its employees, and this destroyed any reasonable expectation of privacy that [the employee] might have had and so scotches his claim."); *Hanson*, 2011 WL 5201430, at *6 (finding no expectation of privacy where employer reserved right to monitor, even though there was no evidence of actual monitoring as "most Courts have not required evidence" of actual monitoring). Courts are not in universal agreement on the matter, however. *See Hatfield*, 2009 WL 3806300, at *9 (finding that where the employer reserved the right to review an employee's hard drive, but never actually did so, there could still be a reasonable expectation of privacy); *see also Goldstein*, 2012 WL 1969369, at *5 (finding that a mere policy rather than practice of monitoring weighed in favor of finding no waiver).

Although evidence of actual monitoring would make an expectation of privacy even less reasonable, communicating in a setting where a third party has reserved the right to review it is

wholly inconsistent with the Second Circuit's requirement that the "person invoking the privilege must have taken steps to ensure that it was not waived" by "tak[ing] some affirmative action to preserve confidentiality." *Mejia*, 655 F.3d at 134. Therefore, this element also weighs against Finazzo.

Although termed "right of access," the third factor appears to be aimed at what sort of precautions the employee took, or whether obstacles hindered the employer in accessing the privileged communications despite having a policy or practice otherwise allowing the employer to do so.[7] *See Asia Global*, 322 B.R. at 257 & n.7 (stating, in reference to the third factor, "[a]n employee may take precautions to limit access; offices can be locked, computers can be password-protected, and e-mails can be encrypted."). In other words, the third factor takes into account steps the employee may have taken to protect communications to which the employer otherwise had physical or electronic access. *Cf. Leventhal v. Knapek*, 266 F.3d 64, 73-74 (2d Cir. 2001) (considering the fact employee's computer was in a private office that was exclusively his when assessing his expectation of privacy in that computer); *United States v. Slanina*, 283 F.3d 670, 675-76 (5th Cir. 2002) (considering the fact that employee's computer was in a locked office and password protected when determining reasonable expectation of privacy), *vacated on other grounds*, 537 U.S. 802 (2002).

The third factor weighs neither for nor against Finazzo. Although Finazzo has never alleged that his e-mails were in any way protected, he has alleged that he "deleted" the single e-mail in question immediately after he received it. (Finazzo Decl. at ¶ 8.) But he only did so after it had already passed through Aéropostale's e-mail servers and he has not established any record

---

[7] Interpreting this factor literally as written "do third parties have a right of access" would seem to be completely redundant with the first factor, which calls for analysis of the company's general monitoring policy and would have to include its right of access. *Goldstein*, 2012 WL 1969369, at *5.

with which to assess his belief—assuming that is what he believed—that his deletion would prevent Aéropostale from accessing his e-mail, *i.e.*, that a copy no longer remained on Aéropostale's server.[8]  Cases that take into account an employee's deletion efforts usually require more to render any expectation of privacy reasonable.  *See Convertino v. United States Dep't of Justice*, 674 F. Supp. 2d 97, 108-110 (D.D.C. 2009) (finding AUSA had reasonable expectation of privacy in e-mails sent by private attorney to his DOJ account where he "delete[d] the e-mails as they were coming into his account" and "was unaware that [the DOJ] would be regularly accessing and saving such e-mails"); *Curto v. Med. World Comm'ns, Inc*., No. 03-CV-6327, 2006 WL 1318387, at *5-6 (E.D.N.Y. May 15, 2006) (finding employee had reasonable expectation of privacy in her company-provided laptops where she attempted to delete the confidential files before returning them and the "laptops were not connected to [the employer's] computer server [and therefore the employer] was not able to monitor [her] activity . . . or intercept her e-mails at any time").

The fourth factor—Finazzo's awareness of Aéropostale's use and monitoring policy— weighs heavily against Finazzo.  Not only does Finazzo admit awareness of the policy (*see* Finazzo Decl. at ¶ 2), but the government has also provided compelling evidence both that Finazzo was required to acknowledge that he had read the policy each year, (*see* Finazzo Acknowledgements) and affirm in representation letters to Aéropostale's senior officers that he

---

[8] Finazzo's account on this matter is also somewhat incomplete in one additional way.  Although Finazzo alleges he "deleted the email from [his] inbox" after he forwarded it to a personal account, he does not indicate how he might have avoided Aéropostale's monitoring of the e-mail when he forwarded it using his same Aéropostale account.  That is, even if Finazzo reasonably thought his deletion of the copy of the e-mail in his inbox prevented Aéropostale's access to that e-mail, he does not indicate why or how he thought Aéropostale would be unable to monitor his forwarding that same e-mail back through its servers.  Indeed, nothing in the policy would lead Finazzo to believe that Aéropostale only monitored incoming e-mail.  Nor does Finazzo indicate that he deleted the forwarded copy of the e-mail from his "sent mail" or "outbox" folder.

was familiar with the policies each quarter (*see* Finazzo Rep. Letters).  Rather, Finazzo asserts that he was not aware of any actual monitoring, and that because Aéropostale's CEO regularly violated Aéropostale's policies on personal usage of its e-mail system without any consequences, he reasonably believed that Aéropostale did not monitor e-mail usage.  But, as discussed above, Finazzo was aware that Aéropostale explicitly reserved the right to monitor his work e-mail account, and it is his disregard of that explicit and not inconsequential risk—as demonstrated by the ultimate disclosure of Finazzo's e-mail—that waives the privilege.  *Long*, 2006 WL 2998671, at *3 (finding privilege waived where proponent "disregarded" the "clear and unambiguous" warning that company computer systems were not private and could be monitored).  Moreover, it was unreasonable for Finazzo to deduce that the company does not monitor its e-mail system merely because its CEO was never disciplined for violating Aéropostale's rules about personal usage of e-mail.  *See In re Reserve Fund*, 275 F.R.D. at 161-62 (rejecting suggestion that court should "ignore[]" an employer's policy about use of its e-mail system because it had "tacitly allowed employees to [breach its policy about personal use of its systems] and did not intervene") (quotation marks omitted).

Therefore, viewing the facts as a whole, the Court finds that Finazzo has no reasonable expectation of privacy or confidentiality in any communications he made through his Aéropostale e-mail account.  Aéropostale had a clear and long-consistent policy of limiting an employee's personal use of its systems, reserving its right to monitor an employee's usage of the system, and making abundantly clear to its employees, including Finazzo, that they had no right to privacy when using them.

Finazzo attempts to avoid the conclusion that using Aéropostale's e-mail system to communicate with his lawyer defeated any privilege by drawing a distinction between the nature

of the e-mails he sent to his attorney and the nature of the e-mails he received from his attorney.

That is, Finazzo admits that he communicated with his attorney via his Aéropostale e-mail

account, but asserts that because his communications did not contain anything confidential and

because he never intended for Siegel to send confidential information to his Aéropostale account,

he cannot be held responsible for the fact Siegel actually sent confidential information. As

support for his position, Finazzo cites a series of cases that stand for the well-established

proposition that an attorney cannot unilaterally waive the privilege. (Def. Reply Mem. at 7-8.)

But Finazzo's attempt to distance himself from any burden to ensure and preserve the

confidentiality of communications with his attorney is wholly unavailing.

Finazzo makes much of the fact that he did not know Siegel "was going to send him the

[e-mail]" and that he did not "consent[] to or encourage[] her to send it to his Aéropostale email

account." (Def. Reply Mem. at 6-7.) At the same time, however, he admits that he "may have

sent her some emails from [his] Aéropostale email account," the "primary purpose" of which

were to schedule appointments. (Finazzo Decl. at ¶ 5.) And although he asserts that he "never

asked or authorized" her to send privileged information to his Aéropostale account, he does not

allege that he gave her any instructions not to send such information, or that he otherwise took

steps to protect his communications to or from Siegel. (*Id.*) Indeed, it is only after he received

the Siegel e-mail that he alleges he told her not to do so again. (*Id.* at ¶ 8.)

The government submitted evidence which strongly contradicts Finazzo's declarations.

In June 2006, Finazzo e-mailed Siegel from his Aéropostale account. He stated that he would

like Dey to be the executor of his will, that shares should be divided equally among three

children, and that his sister should be the health care proxy. (Ex. D to Govt.'s Supp. Resp. in

Opp'n (Doc. No. 159-1).) This e-mail was in response to an e-mail from Siegel in which she

wrote, "If you prefer, in order to get started on preparing a revised will, you can just e-mail me the information I will need--i.e, how does the estate get divided up, who are the Executors, who do you want to be your agent for purposes of a health care proxy/living will, etctera" [sic]. (*Id.*) Moreover, Finazzo responded to the Siegel e-mail not at that moment with an instruction that she not e-mail him confidential information at his Aéropostale e-mail address. Rather, he wrote two months later, "Angela the account with don twist has 26 million in it not 6 million pls make the correction to the assets" [sic]. (Ex. E to Govt.'s Supp. Resp. in Opp'n (Doc. No. 159-1).)

As discussed above, in order for the attorney-client privilege to apply, the party asserting it must demonstrate that the communication "was intended to be, and in fact was kept confidential" by making a showing that they took "some affirmative action to preserve confidentiality." *Mejia*, 655 F.3d at 134 (quotation marks omitted); *see also United States v. DeFonte*, 441 F.3d 92, 94-95 (2d Cir. 2006) (finding it appropriate for a district court to consider whether otherwise privileged communications were treated in "such a careless manner as to negate [any] intent to keep them confidential"). In citing to cases about an attorney's unilateral waiver, however, Finazzo misconstrues the issue entirely. The Siegel e-mail was not sent as some unilateral action on the part of his attorney. Finazzo has not—because he cannot—allege that his attorney looked up his Aéropostale e-mail address and sent him confidential information. Rather, Finazzo chose to communicate with his lawyer through a medium in which he had no expectation of privacy, thus inviting responses via that same medium.

Finazzo asserts that the fact he received a confidential e-mail and did not *send* any such information distinguishes his case from the typical work e-mail case. First, the record evidence strongly suggests that Finazzo himself used his work e-mail to communication highly confidential information for the purpose of seeking legal advice. But even if he did not, the

cases themselves do not draw any such distinction. Indeed, cases frequently involve the production of e-mails the employee sent and received. *See In re Reserve Fund*, 275 F.R.D. at 164-65 (addressing e-mails exchanged between husband employee and wife non-employee using employee's work e-mail address and finding employee had no reasonable expectation of privacy in "emails he sent or received"); *see also Hanson*, 2011 WL 5201430, at *6 (finding no privilege over two e-mails the client received from his lawyer and one he sent); *Alamar Ranch, LLC v. County of Boise*, No. CV-09-004-S-BLW, 2009 WL 3669741 at *4 (D. Idaho Nov. 2, 2009) (finding both sent and received e-mails unprotected by attorney-client privilege); *Kaufman v. Sungard Invest. Sys.*, No. 05-CV-1236, 2006 WL 1307882, at *1 (D.N.J. May 10, 2006) (finding no expectation in privacy regarding e-mails "sent from and received on [employer's] e-mail system").

At best, Finazzo is alleging that he did not anticipate his communications with his attorney would escalate into confidential matters. But his vague references to the "primary" purpose of his previous e-mails with his attorney and his silence regarding how his attorney was supposed to communicate with him about confidential matters are insufficient to support any such assertion. In any event, to the extent Finazzo did not anticipate his e-mail correspondence taking a confidential turn, his obligation to protect the privilege required him to take action to prevent disclosure of any such material.

There is one other problem with Finazzo's carefully drawn distinction between sending and receiving e-mails via his Aéropostale e-mail account that bears some remark; it is not factually supported by his own affidavit. As Finazzo admits, when he received the Siegel e-mail, he "forwarded it to a non-Aéropostale e-mail account, deleted the e-mail from [his] inbox and . . . . instructed Attorney Siegel to send confidential information only to another email address."

(Finazzo Decl. at ¶ 8.)  In other words, Finazzo avers that, after he received the Siegel e-mail and recognized it as confidential, he then turned around and sent it back through Aéropostale's e-mail servers to another account.  In so doing, he allowed an "unsympathetic third party," Aéropostale, another opportunity to see the e-mail.  *Mejia*, 655 F.3d at 134.  Therefore, even if Finazzo were correct that his "mere receipt" creates some legally cognizable distinction, such would be unsupported by his own record.[9]  He both sent and received the privileged e-mail.

## II.    Waiver at the November 7, 2006 Meeting

Even assuming Finazzo's use of Aéropostale's e-mail system to communicate with his lawyer did not defeat his privilege claim over the Siegel e-mail, his hour-long discussion with Geiger and Slezak about that same e-mail certainly waived it.  As discussed above, Finazzo was called to a meeting on November 7, 2006, at which he was confronted with the privileged e-mail, asked to explain it, and then fired.  Finazzo argues that his extensive discussion about the contents of the e-mail did not waive any privilege because (1) Finazzo did not disclose anything, he "merely responded to questions" about an e-mail Geiger and Slezak already had, (2) that the disclosure was not "voluntary," and (3) Finazzo and Aéropostale had a joint interest in correcting the company's SEC disclosures.  (Def. Reply Mem. at 8-11.)  Each argument is without merit.

First, Finazzo's position that one cannot "waive" privilege in a document that has already been inadvertently disclosed by thereafter voluntarily disclosing it to the same person reflects a serious misunderstanding of the purpose of privilege.  Tellingly, Finazzo cites no support for his position whatsoever, and the Court's research has uncovered only authority holding the exact

---

[9] In some instances, taking these steps might be enough to protect one's attorney-client privilege. *Cf. Curto*, 2006 WL 1318387, at *3 (finding privilege protected where party attempted to delete the privileged information from her work computer).  But, as the facts discussed above indicate, Finazzo had many more opportunities to preserve his privilege, and he did not take them.  Therefore, his merely forwarding the Siegel e-mail, deleting it, and instructing Siegel not to use his work e-mail address again, was not sufficient to protect his attorney-client privilege.

opposite. *See Curto v. Med. World Comm'ns, Inc.*, 783 F. Supp. 2d 373, 379 (E.D.N.Y. 2011) (rejecting argument that "there has been no waiver because Defendants already saw the [privileged communication] when their computer forensic expert discovered [it previously]"). Rather, waiver occurs where the proponent of the privilege takes actions wholly inconsistent with any desire to maintain confidentiality in the communication, and is entirely independent of whether that action actually "reveals" the communication to anyone. *See* 24 Wright & Graham, Federal Practice & Procedure § 5507, 580 n.126 ("[I]f the client deposited his communications in the public library, the privilege would be waived, even though no one ever read them."). That is because the purpose of protecting the confidentiality of attorney-client communications is to foster "full and frank communication between attorneys and their clients." *Upjohn*, 449 U.S. at 389. Where the proponent evinces no concern for confidentiality, the privilege has no value and is lost. Therefore, where a proponent of a privilege is faced with the breach of confidentiality, he or she must object, and not partake in it. *See Mejia*, 655 F.3d at 132 (citing *Upjohn*, 449 U.S. at 389); *In re County of Erie*, 473 F.3d 413, 418 (2d Cir. 2007)).[10]

The Court's conclusion on this point is buttressed by the case law on inadvertent disclosures. Inadvertent disclosure can waive privilege. *Business Integration Servs., Inc. v. AT*

---

[10] Although Finazzo was not represented at the termination meeting, the crux of the privilege – confidentiality – does not require one to be a lawyer in order to understand and be required to assert it. Indeed, if one does not intend the communication to be confidential, and therefore object to discussing it with a third party, it is hard to imagine what purpose the privilege is even serving. Wright & Graham, Jr. Federal Practice & Procedure § 5507, 578 ("While the client need not intend to waive the privilege (or even be aware of its existence), he must disclose the privileged information or to consent to its disclosure. If the client intended to disclose certain matters he will not be heard to later say that he did not realize that he was disclosing privileged material or that such disclosure amounted to a waiver of the privilege.") Moreover, the Siegel e-mails themselves, as Finazzo now eagerly points out, contained language warning Finazzo of his rights. (*See, e.g.*, Siegel e-mail & Ex. D to Govt.'s Supp. Resp. in Opp'n (Doc. No. 159-1) ("*****PRIVILEGE AND CONFIDENTIALITY NOTICE***** The information contained in this e-mail is confidential and may be protected by the attorney-client privilege and/or work product doctrine.").)

& T Corp., 251 F.R.D. 121, 129 (S.D.N.Y. 2008); *see also Jacob v. Duane Reade, Inc.*, No. 11-CV-160, 2012 WL 651536, at *4 (S.D.N.Y. Feb 28, 2012). Frequently one of the most important factors in the waiver inquiry is the effort "taken to rectify the error," including the speed of such efforts. *Apionshiev v. Columbia Univ. in the City of N.Y.*, No. 09-CV-6471, 2012 WL 208998, at *11 (S.D.N.Y. Jan 23, 2012). And if the proponent of the privilege does not object quickly enough, generally the privilege is waived. *See Jacob*, 2012 WL 651536, at *5 (finding waiver where party did not assert privilege claim until two months after the document had been used and questioned about at a deposition); *Clarke v. J.P. Morgan Chase & Co.*, No. 08-CV-2400, 2009 WL 970940, at *6-7 (S.D.N.Y. Apr. 10, 2009) (finding waiver where over two months passed before proponent objected); *Business Integration Servs.*, 251 F.R.D. at 130 (finding waiver when proponent of privilege took several years to object to disclosure); *In re Philip Servs. Corp. Secs. Litig.*, No. 98-CV-835, 2005 WL 2482494, at *2 (S.D.N.Y. Oct. 7, 2005) (finding waiver for delay of nine months). If the proponent of a privilege can lose it by merely failing to object to an inadvertent disclosure to a third party, certainly the privilege can also be lost when the proponent not only fails to object, but actually openly discusses and explains the document.[11]

Second, Finazzo's assertion that the interview was so hostile and coercive as to render his waiver involuntary is meritless. As discussed above, a waiver must be a "deliberate decision to disclose privileged materials in a forum where disclosure was voluntary and calculated to benefit the disclosing party." *Nat'l Immigration Project*, 842 F. Supp. 2d at 728. Although the meeting was a stressful situation, Finazzo's so-called interrogators repeatedly expressed affection for him

---

[11] Finazzo's submissions painstakingly review his present fight to gain protection for the Siegel e-mail. However, it appears that, despite being made aware that Aéropostale had his privileged e-mail in November of 2006, it was not until things got "serious" with the SEC in January of 2008 that he suggests he objected to its disclosure.

and one of them even began crying.  (Finazzo Tr. at 16, 18.)  It would be hard to imagine a less hostile meeting at which an employee is fired.  Moreover, Finazzo's decision to discuss the issues raised in the Siegel e-mail was clearly calculated to his benefit.  Initially, Finazzo hoped to keep his job, but eventually Finazzo's focus switched to ensuring Aéropostale did not detect the kickback conspiracy.  (*Id*. at 17.)  Finazzo attempted to minimize and downplay his conflict issue.  Indeed, at one point he even volunteered additional information about Siegel's representation so he could distance himself from what he saw were damagingly high valuations of many of his joint-ownership assets.  (*Id*. at 12.)  All of this leads to the inescapable conclusion that Finazzo voluntarily discussed the contents of the Siegel e-mail.

Finally, Finazzo's suggestion that he did not waive privilege because he was under the impression that he had some sort of joint interest with Aéropostale in correcting its SEC disclosures is absurd.  In his motion, Finazzo repeatedly tip-toes around, without actually asserting, the idea that he thought Slezak, as Aéropostale's general counsel, was acting as his lawyer.  (*See* Def. Reply Mem. at 10-11 (arguing that the questioning "suggests a joint interest" and that "Mr. Slezak, an attorney and one of the interrogators, does not provide Mr. Finazzo with a so-called *Upjohn* or "corporate *Miranda*" warning).)  From the Court's review of the transcript, it is crystal clear that the meeting was not about Aéropostale collecting information or Aéropostale seeking Finazzo's help in any way.  Rather the purpose of the meeting was to confront Finazzo and fire him.  Aéropostale had already completed its investigation (*see* Finazzo Tr. at 1, 15-16), there had been discussions with Aéropostale's board of directors and others internally for several weeks prior (*see id.* at 5-6, 20), and Aéropostale had already drafted the press release announcing Finazzo's firing (*see id.* at 23, 27-29).  Although the meeting was friendly in tone and Geiger did give Finazzo some advice for his future after Aéropostale,

Finazzo could not have reasonably thought Slezak was present at the meeting as his lawyer or that his interests and Aéropostale's were aligned.

## CONCLUSION

For the reasons set forth above, Finazzo's motion *in limine* (Doc. No. 103) is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
     February 19, 2013

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge