# CARTER LEDYARD & MILBURN LLP
*Counselors at Law*

**Robert J.A. Zito**
Partner

Direct Dial: 212-238-8768
E-mail: zito@clm.com

2 Wall Street
New York, NY 10005-2072

Tel (212) 732-3200
Fax (212) 732-3232

*570 Lexington Avenue*
*New York, NY 10022-6856*
*(212) 371-2720*

September 13, 2013

**VIA EMAIL**

Angelica Deniz
United States Probation Officer
United States Probation Department
147 Pierrepont Street
Brooklyn, New York 11201-4201

      Re:    <u>US v. Christopher Finazzo</u>

Dear Officer Deniz:

      On behalf of our client, Christopher Finazzo, we make the following objections to the presentence investigation report ("PSR").

      There are four important points absent from the PSR as currently drafted.

1) The jury rendered a special verdict in which it found, as to every one of the 15 substantive counts of mail or wire fraud, that Mr. Finazzo did not intend to deprive Aéropostale, Inc. ("Aéropostale") of any money.

2) Aéropostale earned over $140 million in profits by reselling products that it purchased from South Bay Apparel, Inc. ("South Bay").

3) During the ten year period of time that Aéropostale purchased products from South Bay, Aéropostale's revenues grew from $123 million to $1.4 billion.

4) Several employees of Aéropostale – called by both the defense and the government - testified at trial that its business relationship with South Bay was highly beneficial to Aéropostale. They explained that Aéropostale's business was sensitive to changes in fashion trends and that South Bay was able to replenish Aéropostale's stores more quickly than any other vendor and that this aspect of South Bay's performance made it incomparable to any other vendor.

Probation Officer Deniz  
September 13, 2013
Page 2

## PART A: THE OFFENSE

*Paragraph 1:*

This paragraph does not mention that the New York State law whose violation was the object of Mr. Finazzo's agreement to violate the Travel Act, N.Y. Penal Law 180.05, is a misdemeanor. Indeed, the government did not charge Mr. Finazzo with intending to make New York's felony bribery statute the object of his Travel Act conspiracy. Nor would such a charge have resulted in a guilty verdict. As described below and as the jury found, Mr. Finazzo did not intend to deprive Aéropostale of any money or other tangible property. This is significant because, under New York criminal law, felony bribery (Penal Law § 180.08) requires proof of harm that is *tangible*. *See People v. Wolf,* 98 N.Y.2d 105, 111 (2002) (felony "commercial bribing cannot be established by proof of solely intangible, esoteric, or theoretical harm that would not result in additional costs increasing the price of goods or services to consumers").

*Paragraph 2-3:*

We object to paragraphs 2 and 3 because, in describing the conviction on counts two through sixteen for mail and wire fraud, the PSR fails to describe that a special verdict was rendered. Specifically, the jury found, as to each and every one of these counts, that Mr. Finazzo did *not* intend to deprive Aéropostale of *any* money. Rather, the convictions on counts two through sixteen (wire/mail fraud) were predicated on the deprivation of property based exclusively on a particular definition of that property as "intangible interests" such as Aéropostale's right to control the use of its assets. The PSR does not mention that Mr. Finazzo has a pending motion to dismiss the mail and wire fraud counts based on that definition of property and that Mr. Finazzo cites a recent Supreme Court decision, *United States v. Sekhar*, in support of that motion.

*Paragraph 5:*

This paragraph contains a typographical error. The amount of the forfeiture money judgment is $25,790,822.94, not $725,790,822.94.

### The Offense Conduct

The Defendants

*Paragraphs 8-10:*

Because the description of Mr. Finazzo's background is incomplete, we ask that it be supplemented with the following information.

Christopher Finazzo began his career in the fashion industry in the mid-1980s at Macy's. There, he met and befriended Julian Geiger, who ultimately hired Chris at Aéropostale.

Although Chris has worked for large established companies such as Macy's and Aéropostale, he is also an entrepreneur. He has started numerous companies, some more successful than others. Chris left Macy's to start one such company, In The Paint, Inc., a

7271647.8

clothing company that had licenses to sell NBA t-shirts. In The Paint was a joint venture with Ernie and Nancy Grunfield.

At the same time Chris started In The Paint, he also started C&E Marketing ("C&E"), a joint venture among Chris and Eric Luthro. C&E was similar to In The Paint except it handled apparel for individual NBA players through individual licenses with the players.

In 1991, Chris met Douglas Dey through a mutual friend. Chris and Doug's relationship began as a business relationship, before later becoming social and friendly. When Chris met Doug, Doug had a printing operation making t-shirts and caps, among other things. Doug became one of In The Paint's vendor-partners. Chris's impression was that Doug's products were reliable and delivered on a timely basis. Chris ultimately sold In The Paint. He maintained C&E and eventually Doug replaced Eric Luthro as Chris's partner in C&E.

In July 1996, Mr. Finazzo received a call at C&E's offices from Julian Geiger. Geiger was the newly-appointed head of Aéropostale, then a division of Federated, the owner of Macy's. Geiger had known Chris from their earlier work together at Macy's. As Chris recounted to Doug (who was at C&E's offices when the call came in), Geiger said he had recently arrived at Aéropostale, its merchandising programs were in complete disarray and he offered Chris a position at Aéropostale to reorganize the company's merchandizing strategy and vendor structure.

Chris is not a college graduate. Nor is Doug. Since their first business endeavors, they regarded themselves as "partners," whether or not the documents created for them by Russell C. Burcheri, Esq., and Paul Conefry, CPA, described them as such. In August 1996, Messrs. Bucheri and Conefry incorporated South Bay Apparel, Inc. ("South Bay") and then C&D Retail Consultants, Inc. ("C&D").

According to records of the NY Department of State, Division of Corporations, the principal offices of C&D were located *at the home of Paul Conefry*. Mr. Finazzo is listed as the Chief Executive Officer. No stock certificates, by-laws or other formation documents are known to exist. No officers or directors were known to have been appointed. According to banking documents, Paul Conefry was the Comptroller and Doug Dey was the President. Many C&D checks were signed by Doug Dey. Many checks that bear Chris's purported signature were not actually signed by him. Millions of dollars were transferred to C&D from South Bay and vice versa. C&D checks were made out to South Bay vendors. While approximately $21 million were transferred to C&D (and Chris paid the taxes on all such funds), the extent to which Chris received the benefit of such funds is unknown because many funds that were wired into C&D were wired back to South Bay and elsewhere and the documents to show how such funds were used are no longer available.

SEC Regulation and the Sarbanes–Oxley Act of 2002

*Paragraph 12:*

This paragraph should be stricken from the PSR because the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") has no relevance to the charges of which Mr. Finazzo was convicted. In making this assertion, we acknowledge that, as an employee of Aéropostale, Chris owed

7271647.8

Aéropostale a common law fiduciary duty of loyalty and should have disclosed his partnership with Doug. But Chris's common law fiduciary duty did not spring from, or was in any way enhanced by, the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), the Securities Act of 1933, the Securities Exchange Act of 1934 (the "Exchange Act") and/or the rules and regulations promulgated thereunder. In any event, Chris was not brought to trial on charges of violating any of these statutes.

While the government initially charged Chris with violations under Section 14 of the Exchange Act, the count was dismissed before trial, upon motion of the government.

The Offense

*Paragraphs 13-15:*

We object generally to the description of the offense conduct as set forth in these paragraphs. Fundamentally, the flaws are that the paragraphs make assertions of fact that are not implicit in the verdict and make other assertions of fact that are inconsistent with the verdict.

For example, paragraph 14 contends that South Bay's prices were "higher" and suggests that this caused financial harm to Aéropostale. This ignores the special verdict, which found Mr. Finazzo not guilty of intending to deprive Aéropostale of any money. It also ignores the testimony of many witnesses. For example, witnesses called by the government testified that there were only two domestic manufacturers of t-shirts from which Aéropostale was able to purchase t-shirts on a so-called "quick replenishment" basis. They testified further that the competing vendor, Mias, charged prices that were similar to South Bay's prices and that South Bay got the t-shirts to Aéropostale's stores faster than Mias, a considerable competitive advantage. South Bay was able to provide superior delivery than Mias, in part, because Mias was located on the west coast, while South Bay was located on the east coast, nearer to Aéropostale's distribution center in New Jersey and the majority of Aéropostale's stores. Other witnesses testified that while there were, of course, overseas vendors willing to print t-shirts at lower prices, the overseas vendors would have taken substantially longer to deliver their products to Aéropostale, causing Aéropostale to lose the benefits of "quick replenishment," as fully explained by Wade Mosteller at trial. Many witnesses testified that the teen fashion market was unpredictable and changed quickly and thus, quick replenishment allowed Aéropostale to quickly replenish items that were selling well without taking the risk of ordering large quantities of items that might not sell well.

Similarly, the PSR says that Mr. Finazzo withheld "economic information" from Aéropostale "necessary to properly determine whether or not to do business with South Bay." This statement suggests, incorrectly, that Mr. Finazzo hid information from Aéropostale about South Bay's products, prices or other aspects of its performance. He did not. Rather, the *only* information not disclosed by Mr. Finazzo to Aéropostale about South Bay was that Mr. Finazzo was Doug Dey's partner.

Paragraph 15 of the PSR states that because Aéropostale had to disclose in a press release and an amended annual report that Mr. Finazzo was terminated for not disclosing his interest in South Bay entities, that this caused "incalculable" damage to Aéropostale's reputation. This is

incorrect for two reasons. First, Aéropostale was not required to issue any press releases, although it was required to file a form with the Securities and Exchange Commission upon Chris's termination. Second, the PSR fails to explain the basis for this conclusion and in any event, because any such damage to the company's reputation is undocumented, unexplained, intangible and highly speculative, it should be deleted from the PSR.

These are examples of the flaws that we believe effect the accuracy of paragraphs 13 to 15 and suggest that the description of the offense be replaced with the following paragraphs, which describe the offense in a fashion that is consistent with the special verdict and the testimony:

Shortly after joining Aéropostale, Julian Geiger told Chris that the graphic t-shirt business at Aéropostale was in disarray and needed reengineering. Also during this period, Aéropostale was a credit risk to vendors, and, as a result, was limited in its vendor selection. In 1997, Aéropostale had only gross profits of $17 million and a net loss of $9 million and needed to recreate a vendor structure with vendors who were willing to finance Aéropostale with credit terms in exchange for Aéropostale's loyalty going forward and being made part of Aéropostale's restricted vendor matrix.

Geiger had asked Chris whether Doug could help them. Geiger had known about Doug's and Chris's C&E partnership from his interviews with Chris and Doug's capabilities before he was hired at Aéropostale. Geiger had asked Chris whether he thought Doug could help their failing graphic t-shirt business and wanted to meet him.

Doug met personally with Julian Geiger at Aéropostale's offices in late September 1996 and Doug showed Julian various graphic t-shirt samples. In that conversation, Geiger said he was impressed with the sample graphics and the promise of quick delivery. Geiger spoke of their current t-shirt supplier who was located in Ohio and could not be depended upon to supply fashion forward graphics and timely deliveries. Also, Aéropostale had to finance the entire blank t-shirt inventory held at the Ohio location. Geiger stressed how important it was that Aéropostale have favorable credit terms and asked if South Bay could handle the funding. Doug said credit would not be an issue as long as South Bay was paid on thirty day terms. (In fact, during the first six months payments came in 60 days.) Geiger said he would make sure the terms were adhered to.

*South Bay's Extraordinary Performance For Aéropostale*

Doug capitalized South Bay's first orders for Aéropostale with $40,000 he borrowed from an inheritance belonging to his wife Jane. South Bay's first delivery for Aéropostale consisted of men's graphic t-shirts, ordered in early October 1996. Initially, South Bay bought 500-600 units of t-shirts directly from distributors, paid contractors to sew in the Aéropostale labels, design and print the graphics. Aéropostale had impressive retail sales on the first order, which resulted in a reorder along with several other rush orders for holiday period. These early orders resulted in a payment of about $120,000, with very little profit to South Bay. (In addition, Geiger asked Doug to contract out the printing of the Ohio inventory, which took about a year to complete.) At that time, Doug was South Bay's sole employee and it was operating from his house in Southold, NY.

Probation Officer Deniz  
September 13, 2013  
Page 6

In 1997, Doug decided that in order to gain a competitive edge he would develop a rapid replenishment system by which South Bay would stock blank t-shirt inventory at its expense and then rapidly print t-shirts in men's styles and colors that were selling well. Doug developed the idea of a rapid replenishment system while supplying the US Open Tennis Tournament for which he had to print shirts and truck in deliveries six times a day during the two-week tournament at Flushing Meadows. This unique system distinguished South Bay from other vendors who were not willing to keep huge levels of inventory on board at their own expense. As a result of this innovative concept, South Bay began to receive more and more orders from Aéropostale and eventually became one of its top vendors.

South Bay's growth as a vendor to Aéropostale was a direct result of the innovation, investment and commitment South Bay delivered during the more than ten-year relationship. With the support of a long-term graphic t-shirt contract, South Bay was able to expand not only its infrastructure, but all aspects of its business. As the relationship grew over time South Bay became one of Aéropostale's largest and most profitable vendors. (South Bay eventually grew in size to 280 employees in 2006 in Long Island and Peru. By 2006, South Bay also employed another 180 workers through sub-contractors on Long Island.)

South Bay's success was built on three major factors:

- Quality: Aéropostale ranked South Bay first, with the lowest product return rate (damages) among all its vendors.

- Delivery: The replenishment program that South Bay developed and instituted saved Aéropostale from over-ordering in sizes that were not needed and capitalized on "peak" sales with 72-hour delivery to store from time of order.

- Maintaining Inventory: Keeping the inventory at South Bay's facility was the catalyst for the success of the replenishment system. The facility was linked with Aéropostale's software that enabled planning personnel and buyers from each department at Aéropostale to have real-time access to inventory levels and both incoming and outgoing purchase orders. Without the inventory in-stock at South Bay, 72-hour delivery time would not have been remotely possible.

Based upon these factors, Aéropostale granted South Bay more and more of the graphic t-shirt program which ultimately included the women's department. As Aéropostale grew, so did South Bay. After successfully delivering men's and women's graphic t-shirts with great success, Aéropostale next began expanding orders to South Bay that included an experiment regarding "quick turn" men's and women's hooded fleece program.

Although Doug's partner Chris Finazzo was the Chief Merchandising Officer at Aéropostale, it was Julian Geiger, the company's CEO, who had the greatest hand in promoting South Bay as a vendor, based upon the merits of South Bay's performance.

7271647.8

Probation Officer Deniz  
September 13, 2013
Page 7

*The Replenishment Program*

Julian Geiger believed that graphic t-shirts were the cornerstone of Aéropostale's business. However, by 2003 the company noticed that gross margins were dropping because stores were holding too much inventory in all styles. The shirts would stay in storage, would not be put out on the floor in a timely manner, and eventually would have to be sold at a discount. To alleviate this problem, Geiger asked Doug to refine the rapid replenishment system to free valuable inventory space in the stores. According to Geiger, expanding South Bay's replenishment system would allow Aéropostale to fill stores based on their sales by screen (design), color, and size, within 72 hours and in some instances 24 hours.

As part of Julian Geiger's efforts to design a quick replenishment supply-chain process for all men's and women's t-shirts, Aéropostale retained Claris Consulting, an independent industry consulting firm, to consider the merits of various top vendors. Claris interviewed four vendors: South Bay, Mias Fashions ("Mias"), Loyaltex, and Niteks. South Bay and Mias were printers/manufacturers, while Loyaltex and Niteks were agents that only booked factories and charged Aéropostale a fee for providing the goods. Loyaltex and Niteks backed out of consideration for the quick replenishment program because they could not perform the functions requested. Wade Mosteller of Claris advised Aéropostale that South Bay's quick replenishment system was effective and optimized Aéropostale's profit. Claris gave South Bay its highest approval rating. Claris advised and urged Aéropostale to use quick replenishment for all of its product lines. In May 2004, Claris presented the "Graphic Tee Business Strategy Implementation" report to Aéropostale, describing the results of the quick replenishment test at South Bay as largely successful. South Bay's performance was thus independently validated. The report identified substantial problems at Mias. As the Claris investigation began to identify Mias' problems with replenishment, Julian Geiger approved moving 30% of Mias' women's graphic t-shirt business to South Bay.

South Bay's replenishment system was extraordinarily successful and used as an effective marketing tool for both Aéropostale management and stock analysts' conferences. In addition, Aéropostale estimated that South Bay saved $2.5 to $3 million per year in handling fees and distribution costs by not over-burdening its own warehouses and distribution center.

Julian Geiger repeatedly and consistently touted South Bay's abilities at public sales calls, which were all recorded. Julian Geiger acknowledged the value that South Bay brought to Aéropostale. In a June 7, 2004 Business Week article, making reference to South Bay, Geiger stated:

> We have the ability to replenish more of our merchandise more quickly because such a large percent of our business is printed graphic T-shirts with our logo on it. Our goal is to be able to fill in by size, by color, by screen, by store, in 72 hours, which nobody else can do. . . . There are 16 vendors we have used since I started here. One of these guys, who shall remain nameless, has a printing plant in Long Island. At his risk, he stocks 2.5 million blank T-shirts at a time and is totally integrated into our systems. He has invested millions of dollars in infrastructure to be able to receive orders, print them, and get them out the door and to stores in 72

7271647.8

hours, except for California. That takes five days because of trucking time. Last year, we sold about 14 million graphic T-shirts. We sold 800 in 1996.

As Julian Geiger told Business Week in 2004, South Bay had invested millions of dollars in infrastructure to be able to receive orders from Aéropostale, print them, and get them to stores in 72 hours and to store millions of dollars in inventory right on Long Island. By 2006 South Bay was storing over 4 to 5 million blank t-shirts, at South Bay's expense and risk of loss, as well as maintaining facilities and equipment for printing, labeling, packing and shipping. South Bay also maintained a small office at Aéropostale's headquarters in New York City, at its own cost and expense, to permit Aéropostale employees to have ready access to South Bay's production staff. The office space was obtained by Julian Geiger's intervention with the landlord.

Julian Geiger repeatedly stated that Doug single-handedly had saved Aéropostale. In addition, Julian sent emails praising Doug and South Bay. Geiger was hardly unique in this respect. For example, Aéropostale employee Tom Carberry, a government witness, described South Bay's unique ability to rapidly replenish merchandise as "priceless." Doug and South Bay received several awards from Aéropostale, including the Vendor of the Year Award several times. Geiger constantly referred to Doug as "family" and made clear to other Aéropostale employees how valuable South Bay was to Aéropostale.

*Vendor Selection and Aéropostale's Public Filings*

Aéropostale limited its vendor list as part of its business plan, and not because of any "intimidation" or "extreme control" on the part of Chris (¶14), as indisputably evidenced by Aéropostale's public filings, which state, for example:

- "During the past three years, we have sought to *reduce* the number of vendors that we utilize *in order to streamline our sourcing operations and to exercise greater influence over our vendors*." (2002 Annual Report)(emphasis added).

- "Approximately 37% of our merchandise was directly sourced from our top three vendors….Two vendors supplied 17% and 10%, respectively, of our total merchandise during that period." (2002 Annual Report).

- "We rely on a *small* number of vendors to supply a significant amount of our merchandise….and our failure to maintain good relationships with one or more of them could harm our ability to source our products." (2003 Annual Report)(emphasis added).

*The Phenomenal Growth Of Aéropostale And South Bay*

When South Bay first became a vendor to Aéropostale in 1996, Aéropostale was a small division of Macy's, which was owned by Federated Department Stores, Inc. Aéropostale had about 110 stores nationwide, mostly in shopping malls. Its sales were modest: according to public filings, it had net sales of $124 million and gross profit of $17 million in the fiscal year ending August 2, 1997. Thereafter, Aéropostale's sales and profits remained low for a number of

7271647.8

years as the business grew. Macy's/Federated sold the company to Bear Stearns in 1998 and it remained a privately-owned company until it was sold to the public in May 2002 and its shares became listed on the New York Stock Exchange.

As noted above, Julian Geiger stated in 2004 that Aéropostale had sold as few as 800 graphic t-shirts in 1996 (when South Bay became a vendor) and 14 million in FY 2003. He credited Chris and Doug for the exceptional growth of Aéropostale's graphic t-shirt business. That success is reflected in Aéropostale's published sales and profits figures from $123 million in 1997 to $1.4 billion through 2007:



Aéropostale's sales grew over 10 times the amount in 1997

Aéropostale's growth is also reflected in its expanded number of stores. Public filings reflect, for example, that Aéropostale had 367 stores in 2002 and 742 by 2006. In short, Aéropostale could not have succeeded in this growth plan without the support of South Bay and its quick replenishment system.

The extraordinary increase from 2004 to 2005 was caused by Aéropostale's increased graphic t-shirt sales which resulted in part from South Bay's replenishment system, as well as by an increase in South Bay's participation in Aéropostale women's business (a result of the Claris Report) and South Bay's initial success with fleece.

South Bay also benefited from Aéropostale's corporate insistence on maintaining a small number of major vendors. This philosophy was expressed, for example, in Aéropostale's Annual Report for 2003: "During the past three years we have sought to reduce the number of vendors that we utilize in order to streamline our sourcing operations and to exercise greater influence over our vendors." That approach was echoed in Julian Geiger's interview with Business Week, singling out South Bay as one of only sixteen vendors that had been with Aéropostale since

Probation Officer Deniz  
September 13, 2013

Page 10

Geiger had come there in 1996. Aéropostale's philosophy, dictated by Geiger, was to give business to their loyal vendors, whom Geiger called "partners."

The Anchor Blue Alleged Scheme

*Paragraphs 17-18:*

We object to these paragraphs generally, for similar reasons. For example, paragraph 18 contends that Mr. Finazzo failed to "disclose[] his business relationship with Dey or South Bay," falsely suggesting that during the Anchor Blue years, Mr. Finazzo continued to split South Bay profits with Doug Dey. But he did not. Similarly, paragraph 18 asserts that Dey paid Mr. Finazzo almost $1.2 million "in commercial bribes" to obtain the Anchor Blue business. But there is no evidence that Mr. Finazzo received any monies from South Bay during or after the time that South Bay was a vendor to Anchor Blue. Because these are only examples in the flaws that affect the description of the so called "Anchor Blue Scheme", we ask that these paragraphs be replaced with the following, which accurately describe the evidence:

South Bay printed t-shirts for Anchor Blue. However, there is no evidence that South Bay ever over charged Anchor Blue. Chris received no personal benefit from these transactions. Doug Dey apparently transferred funds from South Bay to Vertical Line Apparel, Inc. to cover related South Bay payroll. Chris had no say in the operations of these companies and did not sign any checks. Chris had no knowledge of these transactions and there is no evidence showing that he did. Nor is there any evidence that Chris received any of the funds that Dey transferred to the Vertical Line bank accounts. Notably, FBI Special Agent Branconi testified there is no documentation evidencing that Chris Finazzo received any profits from South Bay at the time he was employed by Anchor Blue. Tr. 1526-27.

Other Alleged Schemes

*Paragraph 19:*

Shanna Finazzo, Chris's daughter, was employed by a company known as "Ms. Bubbles." Ms. Bubbles was one of Aéropostale's vendors. Shanna's employment was fully disclosed to Aéropostale. Tony Finazzo also worked for one of Aéropostale's vendors. Contrary to the claim made in this paragraph of the PSR, these were not "no show" jobs.

While the PSR alleges that Mr. Finazzo received cash bribes from a company named "Gertex," no details of such bribes are asserted and therefore, Mr. Finazzo is unable to provide more than a general objection. There was no testimony about this subject at trial and the PSR fails to explain the basis of its assertions about this subject.

7271647.8

<u>Guideline Calculation</u>

*Paragraphs 20-56:*

<u>The Loss Amount is $0, not, as the PSR asserts, $27,001,677.58</u>

While there is no dispute that Chris should have disclosed his partnership with Doug and that such failure violated his common law fiduciary duty to Aéropostale, his sharing in Doug's profits did not result in any loss to Aéropostale. Indeed, the jury's special verdict in this case on the wire/mail fraud counts was that Mr. Finazzo did *not* intend to cause Aéropostale to lose any money. The PSR never mentions the jury's acquittal on this issue. The only "loss" incurred by Aéropostale was intangible, the bruising of its corporate governance.

The jury's finding that Chris did not intend to "deprive Aéropostale of money" is dispositive of the fact that Aéropostale incurred no financial loss. The PSR claims that it is "impossible" to calculate the "actual or intended loss" in this case, and points to Chris's share in the profits of South Bay as the loss amount. However, the jury rejected the government's theory that there is a correlation between Chris's receipt of a portion of South Bay's profits and intended monetary harm to Aéropostale. The PSR is indeed correct that it is impossible to calculate the loss in this case, but that is because *there was no loss.*[1]

It is well-settled law that while the gain received by a defendant from a fraud may, under very limited circumstances, be used as an *alternative* measure of loss, "it is not a proxy for loss when there is none." *United States v. Chatterji,* 46 F.3d 1336, 1340 (4th 1995). *See also United States v. Andersen,* 45 F.3d 217, 221 (7th Cir. 1995) ("gain may be used only as an alternative method of calculation when *there is in fact a loss, and only if use of the gain results in a reasonable estimate of loss.*")(emphasis added). In other words, the principles of accounting and finance do not treat one parties' gain amount, in an economic transaction, as a loss amount to another contracting party, much less a third party.

The government carries the burden of proving that Aéropostale lost money. And yet, the uncontroverted proof at trial was that Aéropostale profited by at least $140 million from the goods sold to it by South Bay. There is no legal authority that allows hypothetical and speculative "lost additional profits" to be used as a "loss" calculation under the guidelines. Even if there is such a case, the government has failed to meet such a burden.

The PSR claims that Aéropostale sustained an actual loss of $25 million, apparently treating the PSR's calculation of the amount Mr. Finazzo received from South Bay as Aéropostale's loss, without explanation. The PSR vaguely refers to two theories to support this alleged "loss": (i) Chris alleged failure to move 25% of the graphic t-shirt business overseas over the course of "10 years on millions of t-shirts," and (ii) the consistently late deliveries by South Bay, causing Aéropostale to mark down millions of t-shirts.

The PSR's factual analysis is erroneous and does not comport with the evidence introduced at trial and the jury verdict for several reasons. First, Julian Geiger testified that he

---

[1] The PSR does not mention that there is currently pending a motion to set aside Chris's convictions on the wire/mail fraud counts, pursuant to Fed. R. Crim P. 29 et seq.

7271647.8

had a "theory" in 2006 – *ten years after* South Bay started providing Aéropostale with t-shirts on a quick replenishment basis – that 25% of the t-shirts might be able to be printed in Asia and that such *might* result in more profits to Aéropostale.

However, such testimony was fatally flawed, and properly rejected by the jury, for several reasons:

- Julian Geiger and no other witness could identify which company in Asia, or where in Asia for that matter, such t-shirts could be printed, or what the lead time would be to have such t-shirts printed and shipped to the United States in a manner that was as timely as that printed by South Bay.

- There were no written proposals.

- No Aéropostale vendor ever testified at trial that it could compete with South Bay.

- Doris Wilshere, who regularly attended Executive Committee meetings, had a recollection that differed from Julian Geiger's. Doris specifically testified that Julian expressed no such theories and that the stated business plan of Aéropostale was to quickly replenish t-shirts and not to order them from Asia.

- There are no emails, memoranda or any other documents evidencing that Julian expressed any such theory.

- No evidence or analysis was ever presented that showed *if* Aéropostale had printed t-shirts in Asia, whether Aéropostale would have been able to replenish sold-out items in time for the fashion season – which would have reduced Aéropostale's sales – while it was undisputed that South Bay consistently replenished sold-out items within 72 hours, and in some cases, 24 hours.

- Wade Mosteller testified – and the various reports issued by Claris Consulting reflected – that Aéropostale's business plan provided for 100% of all t-shirt replenishment to be conducted by two domestic vendors, not Asian vendors.

- No calculations or any other analyses were ever introduced to attempt to quantify any alleged lost profits.

With respect to the PSR's assertion that some unspecified loss was incurred through "consistently late deliveries by South Bay, causing Aéropostale to mark down millions of t-shirts," no such evidence was introduced at trial. Evidence was introduced that Aéropostale experimented with the production by South Bay of quick-turn fleece products, which were unsuccessful and then discontinued. While some of these products were delayed, various witnesses testified that (i) delayed shipments were common in the retail business, and (ii) the reasons for the delays, such as labor strikes and Aéropostale's intellectual property disputes, had no bearing on any particular wrongdoing on the part of South Bay. No evidence was introduced showing that Aéropostale incurred any alleged "loss" from these delays. Nor did the government's proof attempt to quantify any alleged lost profits. Again, the PSR offers no

7271647.8

analysis or numerical calculation to show how these alleged delays were due to wrongdoing on Chris's part or how the gain received by Chris approximates any alleged loss.

Ultimately, the proper calculation of Mr. Finazzo's guideline level under Section 2B1.1 is straightforward. The basic offense level is 7, to which two points may be added because Mr. Finazzo held a position of trust at Aéropostale. *See* § 3B1.3. While the PSR suggests that these two points should be added in paragraph 26, it neglects to include them in the calculation section, paragraphs 34-41.

No other specific offense characteristic or adjustment is applicable. Notably, there is no guideline loss amount. Loss, whether actual or intended, must be "*pecuniary* harm," which in turn is defined as "harm that is monetary or that is otherwise *readily measurable in money*." § 2B1.1, Application note 3(A)(i), (ii) and (iii) (emphasis added). Here, the jury found Mr. Finazzo *not guilty* of intending to deprive Aéropostale of any money and convicted him based on an intention to deprive Aéropostale of an the intangible right to control its own decisions. Thus, the interest of which Aéropostale was deprived is self-evidently not one that can be *measured in money*. Indeed, the government presented no proof whatsoever regarding the valuation of Aéropostale's intangible interests.

### Victim Impact

As stated above, Aéropostale incurred no tangible economic loss. In addition, the PSR fails to mention that Aéropostale has already received $5 million from Chris in connection with a civil settlement between the parties. Chris and Aéropostale were parties to a civil arbitration regarding Aéropostale's breach of fiduciary duty claims. Such arbitration was settled under the agreement that Chris pay Aéropostale $5 million, which he did, in exchange for a general release. Because Aéropostale received $5 million in connection with the civil matter and agreed to release Chris, Aéropostale is not entitled to any further restitution.

The PSR's conclusion in paragraph 21 that Aéropostale's restitution should include the over $25 million sum that Mr. Finazzo received from South Bay, because that was "the total bribe amount" is incorrect in light of recent Second Circuit precedent. In *United States v. Zangari*, 677 F.3d 86 (2d Cir. 2012), the Second Circuit held that "a sentencing court ordering restitution under the MVRA may not substitute a defendant's ill gotten-gains for the victim's actual loss." *Id.* at 93. Furthermore, the use of a defendant's gain as a proxy for a victim's loss is permitted only where there is proof of a "direct correlation" between the gain amount and those losses. *Id.* at 94. Testimonial speculation by witnesses that Aéropostale might have received a better bargain, absent Chris's profit distribution, in no way constitutes proof of any such direct correlation. Indeed, a victim's loss, to be subject to restitution, must be "pecuniary." 18 USC 3663A(c)(1)(B).

Paragraph 21 references an alleged $2.00 "mark-up" by South Bay. Such reference is misleading and should be stricken. The PSR fails to recognize that such alleged price differences, in addition to being entirely hypothetical, compared apples to oranges, and even the government's witnesses admitted as much. South Bay offered Aéropostale the opportunity to replenish its shelves by size, by color and by graphic within 72 hours and included other services that were not supplied by Asian vendors. There was a cost premium associated with delivering

such targeted and rapid service. This was not disputed at trial. Indeed, there was evidence at trial that Mias, the only other vendor producer that provided rapid replenishment to Aéropostale charged prices comparable to those charged by South Bay. There was never any suggestion that the hypothetical overseas vendors that allegedly would have charged lower prices would offer the rapid, targeted replenishment, and thus any comparison of the two products would be like comparing the value of a postage stamp to the value of delivery by Federal Express.

Additionally, paragraph 22 incorrectly concludes that Aéropostale should receive restitution from Mr. Finazzo of its payment of $1,145,384.30 to its lawyers. Aéropostale's lawyer, Jay Shapiro, made a request for such restitution in a letter to the Probation Department dated June 28, 2013, but his letter describes the amount of legal fees incurred "in connection with this criminal prosecution" as only $221,384.30. The PSR offers no analysis of the reasonableness of the fees charged to Aéropostale, or whether such fees were necessary.

Legal fees are recoverable only when the Court concludes that the expenses were "necessary", were "incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense" and where the fees do "not require unduly complicated determinations of fact." *United States v. Amato*, 540 F.3d 153, 159-60 (2d Cir. 2008). Here, Aéropostale has provided no documentation that would enable the Court to assess whether the fees incurred where necessary, whether they were reasonable and whether they were incurred in connection with "proceedings regarding the offense." In cases where legal fees have been included in a restitution award, the billing records have generally been provided to the Court, to enable it to assess these issues. *See United States v. Gupta*, 925 F. Supp. 2d 581 (S.D.N.Y. 2013) (the victim submitted "542 pages of billing records from its counsel" and those records "specify the work performed with sufficient particularity to assess what was done, how it was done and why it was done."). No such records have been submitted here, leaving the Court without a basis to include legal fees in any restitution award.

### Defendant's Participation

*Paragraphs 25-31*

There is no proof that Chris's employment "damaged the reputation of Aéropostale." Nor is there any proof that Chris "cost the company millions of dollars per year by not enabling them to engage in other more financially advantageous contracts with different vendors." Again, graphic t-shirt production was limited to two domestic vendors, not Asian vendors. Not a single vendor testified at trial that it was capable of performing the tasks performed by South Bay or it otherwise was capable of competing with South Bay.

Guideline Analysis for Counts 1(a)(2), (b) and 2 through 16

As demonstrated above, Chris did not violate the securities laws, and therefore, the 4 point enhancement for a securities violation is not warranted. In addition, Aéropostale did not incur any "loss" from its relationship with South Bay, and therefore, the 22 point enhancement for such is similarly not warranted. When these enhancements are deducted from the PSR tally of 33, and the two missing points for abuse of trust are added back, 9 points remain. Under Category Level I, a 9 point offense level translates into a sentence of 4-10 months. In the event

7271647.8

Probation Officer Deniz  
September 13, 2013

Page 15

that Mr. Finazzo is also awarded two point deduction for acceptance of responsibility, see below, the resulting guideline level is 7, yielding a recommended sentence of 0 to 6 months.

Moreover, because level 9 falls within Zone B, U.S.S.G. 5B1.1 authorizes a sentence of probation, so long as that sentence is accompanied by intermittent confinement, community confinement or home confinement.

Guideline Analysis for Counts 1(c)

The PSR fails to mention that the object of the Travel Act conspiracy is a state law misdemeanor. See N.Y. Penal Law § 180.05. It also fails to mention that when, as here, the statutory custodial sentence is capped at a level lower than the initial guideline calculation, the recommended guideline sentence is also the statutory maximum sentence. Thus, both the statutory cap and the recommended guideline sentence are five years.

Paragraph 33: Adjustment of Acceptance of Responsibility

While this paragraph correctly notes that Mr. Finazzo was found guilty at trial, its conclusion that "therefore" he is not entitled to a reduction for acceptance of responsibility ignores application note 2 to USSG 3E1.1. It reads, in pertinent part

> In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or *a challenge to the applicability of a statute to his conduct*) (emphasis added).

The awarding of a reduction for acceptance of responsibility is a "rare" exception for a defendant who goes to trial. Chris conveyed to the government his offer to plead guilty to Count I and there were extensive plea negotiations in this case. The main stumbling block to the plea negotiations were the government's insistence upon a mail/wire fraud count. Chris has always believed that the South Bay relationship was beneficial to Aéropostale, his undisclosed relationship with Doug was not intended to deprive Aéropostale of any money and that "intangible interests" are not property for purposes of the mail and wire fraud statutes. And Chris was found *not guilty* of intending to deprive Aéropostale of any money. In other words, he was substantially vindicated by the jury's verdict. Two points should be deducted for acceptance of responsibility.

## PART C. OFFENDER CHARACTERISTICS

### Employment Record

*Paragraph 78:*

Chris was not requested to provide documentation relating to his current, part-time consulting assignment. Chris regularly has been providing pay stubs to Pretrial Services.

*Paragraphs 79-93:*

7271647.8

Chris was not employed by 4 Jacks Corp., South Bay Ticketing, Inc., South BayRecreation, Inc., South Bay Trade Fixtures, Inc., the Cotton Market, Inc., Box Car Design, Inc., South Bay Knitting, Inc., Vertical Line Apparel III, Inc., Vertical Line Apparel II, Inc., South Bay Sportsplex, Inc., and Vertical Line Apparel, Inc. and, accordingly, did not report any such employment. Other than the Cotton Market, Inc., Chris had no control or management over such entities, which were operated and controlled by Doug Dey.

### Financial Condition

*Paragraphs 94-99:*

Chris's net worth statement is attached as Exhibit A. Chris is now bankrupt. The US Marshall's service has seized approximately $7 million in assets. He has no cash or securities. His only remaining assets are various residences that he jointly owns with his wife and others and that are heavily mortgaged. Chris's bankrupt condition makes it impossible for him to make any further payments.

### Forfeiture

*Paragraph 107:*

Chris is not liable for $725,790,822.94, as stated previously, rather the verdict was for $25,790,822.94. Other than the assets already seized, Chris has no ability to pay any further forfeiture.

### Restitution

*Paragraph 114:*

As stated above, the jury determined that Mr. Finazzo did not intend to cause Aéropostale tangible financial injury, and therefore, principles of restitution are inapplicable under 18 U.S.C § 3663A, as Aéropostale is not a victim. Moreover, the restitution award, if any, should be merged into the forfeiture judgment.

### PART E: FACTORS THAT WARRANT DEPARTURE

*Paragraph 116:*

Again, the PSR does not discuss the misdemeanor nature of the bribery related conviction and the fact that the jury in this case acquitted Chris of not having intended to deprive Aéropostale of any money. Nor does it consider the substantial evidence that Aéropostale benefitted substantially and tangibly, earning large and measurable profits from its relationship with South Bay.

Notably, the recommendation of the Probation Department represents a downward variance from the guideline sentence, as presently calculated by the Probation Department.

Probation Officer Deniz  Page 17
September 13, 2013

## PART F: FACTORS THAT WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM

*Paragraph 117:*

Still again, the PSR does not discuss the misdemeanor nature of the bribery related conviction and the fact that the jury in this case acquitted Chris of not having intended to deprive Aéropostale of any money.

Again, the recommendation of the Probation Department represents a variance from the guideline sentence, as presently calculated by the Probation Department.

Respectfully submitted,

Robert J.A. Zito

RJAZ:ma
Enclosure

7271647.8

**EXHIBIT A**

Finazzo, Christopher
Net Worth As of 6/30/2013

**Assets**

Bank Accounts

| | | FMV |
|---|---|---|
| NYS 529 - beneficiary Valentina Iula | PO Box 55440 Boston MA 02205-8323 | 35,419.63 |

Life Insurance

| | | Cash Surrender |
|---|---|---|
| | Liberty Mutual 7 Hanover Square NY NY 10004 | 80,498.82 |

Motor Vehicles

| | Year & Make | FMV |
|---|---|---|
| | 2006 Nissan Ultima | 4,000.00 |
| | 2008 Ford Explorer | 14,000.00 |

Real Estate

| | Real Estate Address | FMV |
|---|---|---|
| | 49 Chestnut Street Garden City NY 11530 - Chase | 501,905.00 |
| | Condo at The Reef Atlantis Bahamas | 325,000.00 |
| | Southold - 25% Ownership | 229,823.00 |
| | 12417 9th Avenue College Point, NY 11356 - CitiMortgage 5 | 249,000.00 |

Other Assets

| | Watches | 5,000.00 |
|---|---|---|

Business Holdings

| | Name | FMV |
|---|---|---|
| | South Bay Sportsplex | - |
| | Vertical Line Apparel I | 1,700,000.00 |
| | Vertical Line Apparel II | 1,720,582.80 |
| | **Total Assets** | **4,865,229.25** |

**Liabilities**

Charge Accounts and Lines of Credit

| | Name and Address of Creditor | Amount Owed |
|---|---|---|
| | Chase Freedom PO Box 15153 Wilmington DE 19886-5153 | 2,953.34 |
| | Bank of America PO Box 982235 El Paso TX 79992235 | 3,829.00 |

Other Debts

| | Address | Amount Owed |
|---|---|---|
| | | 299,595.41 |
| | | 140,162.03 |
| | | 128,134.93 |
| | 400 Garden City Plaza Garden City NY 11530 | 64,805.00 |

| Judgment | US Federal Government | 21,688,748.45 |
|---|---|---|
| | **Total Liabilities** | **22,328,228.16** |

| Net Worth | | (17,462,998.91) |
|---|---|---|