Robert J.A. Zito (RZ-6990)
Alan S. Lewis (AL-2828)
CARTER LEDYARD & MILBURN LLP
Two Wall Street
New York, NY 10005
Tel.: (212) 732-3200

*Attorneys for Defendant Christopher Finazzo*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                        :

UNITED STATES OF AMERICA,         :   Cr. No. 10-457 (RRM)
                        :

       -against-                :

CHRISTOPHER FINAZZO,          :

               Defendant.     :
------------------------------------------------------------X

## SENTENCING MEMORANDUM OF CHRISTOPHER FINAZZO

CARTER LEDYARD & MILBURN LLP
COUNSELORS AT LAW
2 WALL STREET
NEW YORK, N.Y. 10005
————
(212) 732-3200

# TABLE OF CONTENTS

                                                                                    **Page(s)**

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................... 1

Letters in Support of Christopher Finazzo ......................................................... 1

    Josephine Class .............................................................................................. 2

    Anthony Finazzo ............................................................................................ 2

    Donna Laecca ................................................................................................. 3

    Bryan Iula ...................................................................................................... 3

    Eric Luthro ..................................................................................................... 3

    Artie Hazan .................................................................................................... 4

    Sal Finazzo .................................................................................................... 4

I.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE
     HISTORY and CHARACTERISTICS OF THE DEFENDANT (18 U.S.C. §
     3553(a)(1)) ................................................................................................... 5

    A.  The Nature and Circumstances of the Offense ............................................. 5

       (i)   There Was Substantial Evidence that South Bay's Quick Replenishment,
          Though More Expensive, Allowed Aéropostale to Sell More Shirts and
          Was, as a Result, More Profitable for Aéropostale than Buying Lower
          Priced Shirts from Overseas .......................................................................... 8

       (ii)  There Was Substantial Evidence of South Bay's Superiority to Mias ................... 10

       (iii) Fleece ........................................................................................................ 10

       (iv) The Advice of Paul Conefry ....................................................................... 13

    B.  History and Characteristics of Mr. Finazzo ................................................. 13

II.  18 U.S.C. § 3553(a)(2) ................................................................................ 14

III. 18 U.S.C. § 3553(a)(3): KINDS OF SENTENCES AVAILABLE ..................... 16

IV. THE SENTENCING GUIDELINES CALCULATION UNDER 18 U.S.C.
     3553(a)(4) ................................................................................................... 16

A. The Government Fails to Point to Specific Evidence Proving a Loss of $27 Million ................................................................................17

B. The Evidence Does Not Establish that Aéropostale Sustained any Tangible, Pecuniary Loss Under the Guidelines ........................................18

C. Acceptance of Responsibility ................................................................23

V.  A GUIDELINE SENTENCE SHOULD NOT BE IMPOSED  IN THE COURT'S DISCRETION UNDER 18 U.S.C. § 3553(a)(4) AND (b) ................................23

A. The Court Has Discretion to Reject the Fraud Guidelines Due to the Lack of Empirical Data ................................................................................25

B. The Guideline Range Substantially Overstates the Seriousness of the Offenses ..........28

VI.  APPLICATION OF THE GUIDELINES REFLECTS A  UNWARRANTED SENTENCE DISPARITY UNDER 18 U.S.C. § 3553 (a)(6) ................................36

VII.  THE NEED TO PROVIDE RESTITUTION (18 U.S.C. § 3553 (a)(7)) ............................38

VIII. ADDITIONAL SENTENCING CONSIDERATIONS ........................................................39

IX.  CONCLUSION – THE PARSIMONY PROVISION ........................................................39

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Kimbrough v. United States*,
   552 U.S. 85 (2007) ................................................................................ 1, 25, 39

*Rita v. United States*,
   551 U.S. 338 (2007) ....................................................................................... 25

*Spears v. United States*,
   555 U.S. 261 (2009) ....................................................................................... 25

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) (Rakoff, J.), *sentence aff'd*,
   301 Fed. Appx. 93 (2d Cir. 2008) ......................................................... 32, 33, 35

*United States v. Andersen*,
   45 F.3d 217 (7th Cir. 1995) ........................................................................... 19

*United States v. Bannister*,
   786 F. Supp. 2d 617 (E.D.N.Y. 2011) ............................................................ 26

*United States v. Chatterji*,
   46 F.3d 1336 (4th Cir. 1995) ......................................................................... 19

*United States v. Cheng*,
   96 F.3d 654 (2d Cir. 1996) ............................................................................ 25

*United States v. Corsey*,
   723 F.3d 366 (2d Cir. 2013) (Underhill, J., concurring) ............................... *passim*

*United States v. Dorvee*,
   616 F.3d 174 (2d Cir. 2010) ..................................................................... 25, 27

*United States v. Ebrahim*,
   2013 U.S. Dist. LEXIS 72072 (S.D.N.Y. May 21, 2013) ................................ 21

*United States v. Emmenegger*,
   329 F. Supp. 2d 416 (S.D.N.Y. 2004) ............................................................ 32

*United States v. Ferguson*,
   No. 3:06-cr-137, ECF No. 1199 (D. Conn. Dec. 31, 2008) .............................. 35

*United States v. Frias*,
   521 F.3d 229 (2d Cir. 2008) .......................................................................... 36

*United States v. Gallant,*
   537 F.3d 1202 (10th Cir. 2008) ..........................................................20

*United States v. Galloway,*
   509 F.3d 1246 (10th Cir. 2007)......................................................19, 20

*United States v. Ghavami,*
   No. 10-cr-1217 (2d Cir. July 23, 2013) ....................................22, 37, 38

*United States v. Gupta,*
   904 F. Supp. 2d 349 (S.D.N.Y. 2012)................................................32

*United States v. Jaber,*
   362 F. Supp. 2d 365 (D. Mass. 2005) ...............................................27

*United States v. Milton,*
   No. 3:06-cr-137, ECF No. 1216 (D. Conn. Jan. 30, 2009) ................34

*United States v. Ovid,*
   No. 09-CR-216 (JG), 2010 WL 3940724 (E.D.N.Y. Oct. 1, 2010)........32

*United States v. Parris,*
   573 F. Supp. 2d 744 (E.D.N.Y. 2008) ..............................................35

*United States v. Ranum,*
   353 F. Supp. 2d 984 (E.D. Wis. 2005)..............................................32

*United States v. Skowron,*
   839 F. Supp. 2d (S.D.N.Y. 2012) .....................................................21

*United States v. Stoupis,*
   530 F.3d 82 (1st Cir. 2008).............................................................20

*United States v. Treacy,*
   No. 08-cr-366 (S.D.N.Y. Sept. 2, 2009) ...........................................34

*United States v. Turkcan,*
   No. 08-cr-428, ECF No. 52 (E.D. Mo. June 11, 2009)......................34

*United States v. Zangari,*
   677 F.3d 86 (2d Cir. 2012).............................................................21

**STATUTES**

18 U.S.C. § 3553(a) ...................................................................................16

18 U.S.C. § 3563(b) ...................................................................................16

iv

18 U.S.C. § 3583(d) .................................................................................................16

**OTHER AUTHORITIES**

AM. CRIM. L. REV. 289, 319-20 (1989) ...................................................................27

Bloomberg Business Week, *Targeting the Universal American Kid*, June 6, 2004 .......................6

Booker, 20 FED. SENT. R. 167 (Feb. 2008) .....................................................30, 34

Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After* Booker,
20 FED. SENT. R. 167, 171 (Feb. 2008) ...........................................................30, 34

Jeffrey S. Parker & Michael K. Block, *The Sentencing Commission, P.M. (Post-Mistretta): Sunshine or Sunset?*, 27 AM. CRIM. L. REV. 289, 319-20 (1989) .........................27

Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 HOFSTRA L. REV. 1, 23 (1988) ....................................26

Notice of Proposed Guideline Revisions and Request for Public Comment, 77 Fed. Reg.
2778, 2783 (Jan. 19, 2012) ....................................................................................35

Speech of Hon. Jed S. Rakoff, U.S. District Judge for the Southern District of New York,
"Why the Federal Sentencing Guidelines Should Be Scrapped," American Bar
Association 27th Annual National Institute on White Collar Crime, Las Vegas,
Nevada, Mar. 7, 2013 ...........................................................................................15

Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006) ............26

U.S.S.G. App. C, Amend. 154 (1989) .......................................................................27

U.S.S.G. App. C, Amend. 317 (1990) .......................................................................27

U.S.S.G. App. C, Amend. 551 (1997) .......................................................................27

U.S.S.G. App. C, Amend. 576 (1997) .......................................................................27

U.S.S.G. App. C, Amend. 596 (2000) .......................................................................27

U.S.S.G. App. C, Amend. 617 (2001) .......................................................................27

U.S.S.G. App. C, Amends. 647 (2003) ......................................................................27

U.S.S.G., ch, 1, intro., pt. 4(d) (1987) ....................................................................26

U.S.S.G. § 2A1.3 ....................................................................................................33

U.S.S.G. § 2A2.1 ....................................................................................................33

U.S.S.G. § 2A2.2 ..........................................................................................................33

U.S.S.G. § 2A3.1 ..........................................................................................................33

U.S.S.G. § 2A4.1 ..........................................................................................................33

U.S.S.G. § 2B1.1 .................................................................................................. *passim*

U.S.S.G. § 2J1.2(b)(l)(C) .............................................................................................33

U.S.S.G. § 2K1.4(a)(1) .................................................................................................33

U.S.S.G. § 2K1.5(b)(1) .................................................................................................33

U.S.S.G. § 2K2.1(b)(3)(A) ...........................................................................................33

U.S.S.G. § 2L1.2(b)(1)(A) ...........................................................................................33

U.S.S.G. § 2R1.1(b)(2)(H) ...........................................................................................33

U.S.S.G. § 3A1.3(a) ......................................................................................................33

U.S.S.G. § 5G1.1 ..........................................................................................................17

U.S. Sentencing Comm'n, Notice of Proposed Guideline Revisions and Request
    for Public Comment, 77 Fed. Reg. 2778, 2783 (Jan. 19, 2012) .........................36

U.S. Sentencing Comm'n, 2012 Sourcebook of Federal Sentencing Statistics,
    tbl. 13 ....................................................................................................................34

U.S. Sentencing Comm'n, 2012 Sourcebook of Federal Sentencing Statistics,
    tbl. 27 ....................................................................................................................35

U.S. Sentencing Comm'n, Statistical Information Packet: Fiscal Year 2010
    Second Circuit, tbl. 10 ..........................................................................................35

U.S. Sentencing Comm'n, Statistical Information Packet: Fiscal Year 2011
    Second Circuit, tbl. 10 ..........................................................................................35

U.S. Sentencing Comm'n, Statistical Information Packet: Fiscal Year 2012
    Second Circuit, tbl. 10 ..........................................................................................35

U.S. Sentencing Comm'n, Supplementary Report on the Initial Sentencing
    Guidelines and Policy Statements 33 (1987) .......................................................26

Weisburd, David et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) .................................................................26

This memorandum is respectfully submitted in connection with the sentencing of Christopher Finazzo.

## PRELIMINARY STATEMENT

Christopher Finazzo concealed his significant financial interest in one of his employer's vendors. He fully accepts that his concealment was wrong. Nevertheless, we respectfully submit that Christopher Finazzo's life cannot fairly be reduced to that crime. He is also, genuinely, a person of extraordinary virtue. As the many letters written on Chris's behalf attest, his life has been guided by the strongest of values. Chris has demonstrated devotion to others, hard work and charity. His core is kindness, unselfishness and love.

Chris's strong values and acts of decency are important because the Sentencing Reform Act does not limit the sentencing process to the facts of the offense, but rather, also separately focuses on the offender. Accordingly, this memorandum discusses Chris's offense conduct in the full context of the rest of his life. It does so through the prism of the factors enumerated in 18 U.S.C. § 3553(a). Finally, we respectfully request that the Court consider Chris and his conduct in connection with the imposition of the minimum sentence – that which is "not greater than necessary," 18 U.S.C. § 3553(a) – to accomplish the objectives of sentencing. As the Supreme Court has emphasized, that analysis, known as "parsimony," is the statute's most important, or "overarching" factor in the sentencing calculus. *Kimbrough v. United States*, 552 U.S. 85, 111 (2007).

## LETTERS IN SUPPORT OF CHRISTOPHER FINAZZO

More than 20 letters from family members, friends and colleagues have been submitted to the Court on Chris's behalf. The letters, more than anything else, demonstrate the "history and characteristics of the defendant." In the aggregate, the letters reveal that Chris is so

1

much more than a criminal defendant. As lovingly and thoroughly described by those who know him best, Chris, first and foremost, is a devoted family member. He is a caring husband, adored father, cherished uncle, cousin, friend – and a grandfather at the center of his granddaughter's universe. As the letters make clear, Chris's offense conduct does not reflect the kind of life he has led, which, respectfully, has been creditable and praiseworthy. It has been a life full of love and passion for immediate and extended family, a life of service to those who are less fortunate, and a life of hard work and dedication that has resulted in almost uniform praise and admiration by his colleagues.

While all of the letters demonstrate Chris's positive aspects, various letter are particularly noteworthy.

### Josephine Class

Josephine, an oncology nurse and Chris's sister, describes how Chris personally cared for his dying father. *See* Ex. A, Ltr. of Josephine Class. In 2002, after surgery, radiation and chemotherapy for advanced brain and lung cancer, Leonard Finazzo became unable to use the stairs in his home. Chris responded by renovating the entire lower level of his father's house so that he would be able to live his last days in his own home. Chris also personally cared for his dying father, repositioning and cleaning his frail body as needed. Ms. Class's letter describes Chris's compassion and caring, and many of Chris's other admirable qualities.

### Anthony Finazzo

Chris's youngest son, Anthony, suffers from Tourette Syndrome. Anthony eloquently describes his father's compassionate support in dealing with that difficult affliction. *See* Ex. B, Ltr. of Anthony Finazzo. Anthony, as do so many others, also reports Chris's devotion to charities supported by their Knights of Columbus chapter and Chris's single-handed

organization of the chapter's most successful fundraising picnic ever, and the thousands of dollars provided to St. Jude's Hospital.

Likewise, the letters tell of Chris's unflagging efforts on behalf of the Boy Scouts, Calvary Hospital (the foremost hospice facility in the metropolitan area), the Wounded Warrior Project, The Ralph Lauren Center for Cancer Care and Prevention, Sloane-Kettering and finally, the Leonard R. Finazzo Cancer Foundation, funded by Chris to assist families dealing with cancer and funding for cancer research.

### Donna Laecca

Among the testaments to the love and caring that Chris generously gives to all within his orbit is the letter from his former wife, Donna Laecca. *See* Ex. C, Ltr. of Donna Laecca. Ms. Laecca describes how, long after she and Chris divorced, he and his family traveled from Long Island to Connecticut on consecutive days to offer support on the death of her father.

### Bryan Iula

Bryan Iula, Chris's former son-in-law, describes how Chris supported their relationship during the time he was married to Shanna, Chris's adopted daughter. *See* Ex. D, Letter of Bryan Iula. Indeed, Bryan explains how he considered Chris to be his best friend. Bryan elaborates, as does everyone else, on Chris's big heart and sincerity and how it remains important to Chris, to this day, to live his life the way an "Eagle Scout" should – placing service to others before self.

### Eric Luthro

Eric Luthro, Chris's friend of 25 years and former professional colleague from California, corroborates what many others say. *See* Ex. E, Ltr. of Eric Luthro. He writes: "I have always admired Chris's ability to care so much about his work, but more about his family

and friends. Chris always sacrificed for everyone else, especially his family." It is a theme often repeated.

### Artie Hazan

Mr. Hazan has known Chris for 16 years. Eleven years ago, Mr. Hazan told Chris that his two-year-old son needed an immediate kidney transplant. "Without hesitation, Chris told me that he would go to his doctor that evening for a blood test to determine if he was the same blood type. If he was, he would gladly donate one of his kidneys to my son." *See* Ex. F, Ltr. of Artie Hazan. It is safe to say that there are not too many people who would make such an offer to an acquaintance of five years.

### Sal Finazzo

The five-page letter from Sal Finazzo, Chris's first cousin, is commended to the Court for special attention. *See* Ex. G, Ltr. of Salvatore Finazzo. Sal relates how his depression had led him to the abyss of considering suicide – and how Chris was the only person sufficiently sensitive and responsive to Sal's plight to invest his time and emotional energy in Sal's healing. Chris took Sal "under his wing and cared for [him] more than anyone has ever done." Ex. G at 4. As a result of Chris's caring, compassion, devotion and attention, Sal "for the first time in a very long time, believe[d] there was hope." Ex. G at 4. As Sal describes, even over the last many years of Chris's own tribulations, Chris has continued to be an important source of emotional support for Sal. Sal is "happy to say that less than two years ago, at age 54, I found myself well enough to get married for the first time. I was honored to have Chris as my best man. And I say as God is my witness that Chris is the best man that I have ever known." Ex. G at 5.[1]

---

[1] Additional letters submitted to the Court on Mr. Finazzo's behalf are attached as Exhibit H.

# I.

## THE NATURE AND CIRCUMSTANCES OF THE OFFENSE
## AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT
## (18 U.S.C. § 3553(A)(1))

Section 3553(a)(1) provides, in relevant part: "The court, in determining the particular sentence to be imposed, shall consider – (1) the nature and circumstances of the offense and the history and characteristics of the defendant."

## A.    The Nature and Circumstances of the Offense

The essence of his offense was that Mr. Finazzo did not disclose to his employer the financial interest that he had in one of his employer's largest vendors. Specifically, he fostered a relationship between Aéropostale and South Bay without disclosing his own interest in South Bay. Mr. Finazzo's failure to disclose this was, without question, wrong. Nevertheless, consideration of the nature of the offense would be incomplete without recognizing the substantial benefits that Aéropostale reaped, as a result of the relationship between it and South Bay.

Aéropostale, through its CEO, Julian Geiger, favored a small group of vendors, including South Bay, from the beginning. Those vendors supported the company in ways that other vendors could or would not. South Bay was loyal to Aéropostale and provided it with services that were essential to its survival. As Aéropostale's general counsel, Edward Slezak, explained:

> We had a core group of vendors that started with us when we split from Macy's. We didn't have a lot of money. We didn't have credit and these are all things that I learned through my period of time being there. Didn't have money. Didn't have credit. So we needed to have a few, we called them core vendors, maybe you're using the word original, [t]hat would agree to make product for us on extended payment terms. So what was actually happening was we would get the product, we would sell it, we would get the

5

revenue for that before we had to pay the vendors. So they took a chance on us and Mr. Geiger was always very, in your term now, loyal, to people who in the beginning, people meaning vendors, who took a chance on us and he felt that as we grew, they should also grow because they took the risk in the beginning.

Slezak Tr. at 470-471.[2] South Bay was one of those "core vendors." *Id.*

South Bay provided a unique fast-turnaround replenishment system that Geiger described as follows:

Nobody in the world has ever done what we asked Doug to do. To have 3-5 million blanks, replenishing by size, by color, by screen, have automated equipment. There's nothing that I would ever say that we overpaid for anything. Ever.

GX-20A at 18 (Transcript of Finazzo termination interview) (excerpts attached as Ex. I).

Geiger's candid remarks at that interview in 2006 were consistent with what he said to *Business Week* in June 2004:

We have the ability to replenish more of our merchandise more quickly because such a large percent of our business is printed graphic T-shirts with our logo on it. Our goal is to be able to fill in by size, by color, by screen, by store, in 72 hours, which nobody else can do. . . . There are 16 vendors we have used since I started here. One of these guys, who shall remain nameless, has a printing plant in Long Island. At his risk, he stocks 2.5 million blank T-shirts at a time and is totally integrated into our systems. He has invested millions of dollars in infrastructure to be able to receive orders, print them, and get them out the door and to stores in 72 hours, except for California. That takes five days because of trucking time. Last year, we sold about 14 million graphic T-shirts. We sold 800 in 1996.

Bloomberg Business Week, *Targeting the Universal American Kid*, June 6, 2004, attached as Ex. J at 3.

---

[2] References in the form "Tr. __" or "[witness name] Tr. __" are to the transcript of the trial in *United States v. Finazzo* (the "Finazzo trial").

The relationship between South Bay and Aéropostale was, objectively, a success for both companies: Aéropostale profited by more than $130 million from selling the goods it bought from South Bay. Cunningham Tr. at 174-175.[3]

Julian Geiger was hardly unusual in the praise he consistently lavished on South Bay. Years ago, when communicating with a mid-level colleague at Aéropostale, Tom Carberry (a government witness) described South Bay's unique ability to rapidly replenish merchandise as "priceless." Tr. at 1263. Doris Wilshere, former head of both the Men's Division and Women's Division at Aéropostale, testified that South Bay's T-shirts were superior in quality to those of the other major graphic T-shirt vendor, Mias, and that South Bay's replenishment system was consistently quicker. Wilshere Tr. at 1754-56. South Bay's willingness to hold and store inventory was of great benefit to Aéropostale, given the fickle fashion tastes of its largely teenage customer base. *Id.*, Tr. at 1753, 1757.

The government, advocating a maximum, five year sentence for co-defendant Douglas Dey, describes the South Bay relationship as "to the detriment of Aéropostale." Government Letter re: Douglas Dey dated October 31, 2013 ("Gov.'s Dey Ltr.") at 5. As explained below, the South Bay relationship was most certainly not to Aéropostale's "detriment." The government also claims that Mr. Finazzo caused South Bay to "lack[] legitimate competition from other vendors." *Id.* This too is incorrect. South Bay did face competition from other vendors and the Court heard extensive evidence about who those vendors were, how Aéropostale's buyers constantly identified them and assessed their ability to perform based on various metrics, including their ability to replenish Aéropostale's stores as rapidly as

---

[3]  Aéropostale's profit on its South Bay purchases was likely higher than Cunningham's estimate. He came up with $130 million by trying to calculate 40 to 48% (Aéropostale's profit margin) of the $350 million in goods it bought from South Bay. But 40 to 48% of $350 million is $140–$168 million.

possible. While it is undisputed that Mr. Finazzo advocated in favor of South Bay, it is simplistic, at best, to ascribe South Bay's success entirely to that advocacy. It was also substantially a function of South Bay's well documented ability to replenish Aéropostale's stores faster than any other competitor.

The government gives South Bay a bad review for its performance as a vendor of graphic T-shirts. But that subjective review is derived from a cherry-picked universe – the paraphrased, direct testimony of Jennifer Heiser, Jill Kronenberg, and John DiBarto (Gov.'s Dey Ltr. at 6-7). The government completely ignores the significant testimony given by these witnesses on *cross*-examination as well as by other witnesses. Whether the purported harm to Aéropostale is analyzed by comparing South Bay to overseas manufacturers or Mias – or by analyzing whether Mr. Finazzo actually prevented "legitimate competition" – the evidence is not remotely as described by the government.

> **(i)**     **There Was Substantial Evidence that South Bay's Quick Replenishment, Though More Expensive, Allowed Aéropostale to Sell More Shirts and Was, as a Result, More Profitable for Aéropostale than Buying Lower Priced Shirts from Overseas**

Starting with Jennifer Heiser, the government suggests that Mr. Finazzo harmed Aéropostale by "prevent[ing] her" from purchasing cheaper T-shirts made in Singapore. Gov.'s Dey Ltr. at 6. Heiser's *opinion* that Aéropostale should have used overseas vendors was just that, the opinion of one mid-level employee. Other Aéropostale employees, senior to Heiser, explained why Aéropostale benefited from relying on domestic manufacturers. For example, government witness Jill Kronenberg was asked if she considered buying "shirts in Asia that were cheaper than the price that [domestic manufacturer] Mias was charging." She responded, "No, . . . we knew that if you went overseas with a T-shirt, on a graphic T-shirt . . . you would likely be able to pay less money but it would take . . . four, five months longer for that T-shirt to get

into your stores . . . ." She further explained that getting the T-shirts from domestic manufacturers would increase "the ability to get more from the customer [that] could be dollars difference" to Aéropostale. Thus, when asked if "Aéropostale's profitability as a company might be *greater* if it purchased the T-shirts for higher prices from U.S. manufacturers," she answered without equivocation, "Yes." Kronenberg Tr. at 564-565. Likewise, Doris Wilshere explained why a lower cost per T-shirt from overseas might not translate into greater profitability for Aéropostale. Aéropostale's predominantly teen-age customers were extremely fickle in their changing style preferences. Thus, "margin on paper is not money in the bank." Tr. at 1753-54. Tom Carberry, another government witness, described South Bay's "ability to replenish" Aéropostale's stock of T-shirts as "priceless." Tr. at 1263.

In the same vein, in the context of arguing its position as to restitution, the government references Mr. Finazzo's purported "refusal to comply with Geiger's directive to order 25% of the T-shirts from overseas vendors." Gov.'s Dey Ltr. at 18. But the characterization of what Geiger said as a "directive" is dubious, the timing of his remarks is unknown (but unquestionably late in Mr. Finazzo's tenure at Aeropostale), and the percentage that Geiger spoke of is unclear. For example, Geiger himself used the word "suggested" when describing what he said to Mr. Finazzo about putting 25% or more of the T-shirt orders overseas. Tr. at 1039. There was no evidence that Geiger put his suggestion into writing, or even an email or memo. *See* Cunningham Tr. at 149. Tom Carberry testified that the percentage about which Geiger spoke was lower, "15, 20 percent . . . somewhere in that range" (Tr. at 1232) and John DiBarto testified that Mr. Finazzo *did* purchase t shirts from overseas vendors. Tr. at 680. Similarly, Mary Epner sent an email to her staff that said "Chris said that we can go offshore for the proven graphics." GX 332 (attached as Ex. K).

In short, the government did not prove any tangible, pecuniary harm to Aéropostale as a result of the company's decision to use South Bay, rather than overseas vendors, for level 1 T-shirts.

### (ii)     There Was Substantial Evidence of South Bay's Superiority to Mias

The government relies entirely on the testimony of Jill Kronenberg to suggest that Mr. Finazzo's shifting of some orders from Mias (the only other domestic manufacturer of T-shirts) to South Bay also allegedly harmed Aéropostale. Gov.'s Dey Ltr. at 6. But there was substantial evidence to the contrary. For example, Mary Epner was asked if "[a]t the time Aéropostale chose South Bay over Mias to fulfill its replenishment needs South Bay was . . . generally quicker than Mias." She answered, "Yes." Tr. at 1357. John DiBarto testified that the quality of the T-shirts sold by South Bay was "comparable" to Mias Tr. at 646. Doris Wilshere testified that as between South Bay and Mias, "the delivery times from Mias were longer" and that South Bay's quality was higher. Tr. at 1754-55. Michael Cunningham, when asked if any of "Aéropostale's [other] vendors use[d] a quick replenishment system of the kind that South Bay used," said "The answer is no." Tr. at 170-71. Amy Judka testified that South Bay was able to get products to stores faster than Mias. Tr. at 1409. Moreover, the price difference between South Bay and Mias was small. *See* Tr. at 1756 (Doris Wilshere describing a price difference of 15 cents).

### (iii)     Fleece

As the trial evidence showed, most or all vendors inevitably encountered delivery issues and Aéropostale's primary vendors' prices were sometimes higher than the "target" price. *See, e.g.*, Jung Tr. at 1632 (acknowledging that other vendors sometimes had delivery delays); Lauritano Tr. at 1848-1850 (discussing vendor prices that exceeded Aéropostale's "target"

prices). South Bay was no exception. However, South Bay's delivery and price issues were overwhelmingly concentrated in its experimental "quick replenishing" fleece line in which the company tried to replicate South Bay's successful T-shirt quick replenishment. This experiment represented a small fraction of South Bay's business over its ten-year relationship with Aéropostale. *See* Wilshere Tr. at 1758. In any event, Julian Geiger "had the ultimate say" and supported South Bay's fleece business in Peru: "he agreed that investing in South Bay's fleece business in Peru was fine and we could proceed [with orders] because if he didn't agree, we could not have been able to place the orders." Wilshere Tr. at 1766.

Although the fleece business was relatively small, the Government substantially focuses on it (and level 2 T-shirts) when claiming that the South Bay relationship was to Aéropostale's "detriment." *See* Gov.'s Dey Ltr. at 7-8. But, as with South Bay's graphic T-shirts, the government cherry picks the testimony in a transparent effort to exaggerate the delivery issues and blame South Bay for problems that Aéropostale shared in causing.

Beginning with problems that did not exist at the outset of South Bay's provision of fleece, the government ignores South Bay's solid beginning. As Geiger testified, "the first year that we utilized [South Bay] we bought men's fleece, crew neck with certain graphics on them and the prices were, in fact, quite good." Tr. at 1042. Doris Wilshere explained that Aéropostale did not evaluate its relationships with its vendors on an order by order basis. Rather, it "tried to run the business long-term. So, as we were growing, we wanted our suppliers, partners to grow with us. So, . . . we essentially were making an investment with South Bay into their business to support their growth in Peru with fleece and . . . to see if we could add another fleece supplier to our growing need for fleece." Tr. at 1764. Thus, although Aéropostale sometimes bought fleece from South Bay at prices that were not necessarily the lowest available,

Megan Lauritano explained that it was "not unusual" for Aéropostale to do that sort of thing with its vendors. Tr. at 1863.

Moreover, the delivery delays that Aéropostale experienced with respect to South Bay fleece in 2006 had multiple, complex causes, some of which lay at the feet of Aéropostale. As Slezak explained, "the problem was that . . . Aéropostale didn't own our name, our trademark, in Peru . . . the person who owned [it] . . . blocked South Bay from exporting the fleece products, our fleece products, to the United States. Tr. at 359. Moreover, a dockworker strike in Peru hampered South Bay and there was a breakdown afflicting the boats onto which the South Bay fleece was loaded, causing "delivery delays." Meno Tr. at 301.

Aéropostale did not immediately punish South Bay for its fleece product performance, but this was not unprecedented. For example, Aéropostale *tripled* its orders of cargo shorts from the vendor "FRC" in the year after it delivered the shorts "very late, causing Aéropostale to miss key spring sales." Wilshere Tr. at 1767-68. And Aéropostale did cut back on fleece orders from South Bay in response to its performance problems. South Bay's orders for Holiday 2006 fleece were only half of its 2005 orders. Lauritano Tr. at 1850-51. And for Spring 2006, South Bay submitted bids to Aéropostale for *six* different styles of fleece, but was awarded only one style. Lauritano Tr. at 1830-31.

In sum, there were very good reasons for Aéropostale to use and support South Bay. Chris's failure to disclose his interest in South Bay to Aéropostale was wrong. But this disclosure failure does not change the fact that Aéropostale's success, at least in part, was a function of Aéropostale's relationship with South Bay.

### (iv)    The Advice of Paul Conefry

The advice that Mr. Finazzo received from Paul Conefry helps to place his conduct into context. Conefry, a CPA, did much more than keep the books and file tax returns. He also advised Chris (and Doug) on the legality of their partnership, repeatedly telling them that the relationship was "no harm, no foul." Conefry Tr. at 884. By that, Conefry meant that Aéropostale was not hurt by the relationship. *Id.*, Tr. at 903-04. Having changed his testimony at trial (given as part of his cooperation agreement with the government), Conefry testified: "I told them no harm because I was a fool then, that's why. . . . And they were fools if they listened to me . . . ." Tr. at 899. But Chris did not know he should disregard Conefry's "no foul" advice at the time he gave it, nor did he know that years later, Conefry would suddenly describe himself as "a fool" for giving Chris that advice. Chris's actions must be viewed in the context of the advice he repeatedly received from Conefry at the time, and not what Conefry thought about that advice in hindsight. In short, Conefry – a CPA and Chris' sole business advisor – miserably failed to provide Chris with proper, professional advice about conflicts of interest, and failed him by expressly communicating that the relationship between Chris and Doug did not constitute a "foul."

### B.    History and Characteristics of Mr. Finazzo
### (*See also* Section Labeled Letters in Support of Chris Finazzo, *supra* at 1)

As described above, the letters written on Chris's behalf make apparent Chris's essential goodness and unselfishness. They describe his willingness to give his money, time and to make an emotional investment in bettering the lives of all of the people whose lives are intertwined with his.

## 18 U.S.C. § 3553(A)(2)

18 U.S.C. § 3553(a)(2) describes the following goals of sentencing: "(A) to reflect the seriousness of the offense; promote respect for the law, and provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner."

Respectfully, the statutory objectives of sentencing can be met without a prison sentence, and certainly, without a long sentence. As an accomplished business person with an extraordinary network of family and friends to provide social and emotional support, Mr. Finazzo does not require any educational, vocational or other training. Nor is there any need to imprison Mr. Finazzo to "protect the public." Mr. Finazzo's offense derived entirely from the nature of his fiduciary position at his employer, and the conditions that the court may impose as part of Mr. Finazzo's supervision are more than adequate to address this objective without incarceration.

Nor, respectfully, does the goal of deterring others from involvement in similar criminal conduct necessitate a prison sentence. Regardless of whether Mr. Finazzo is given a custodial or non-custodial sentence, a rational person in similar shoes would conclude that engaging in similar conduct is folly. Mr. Finazzo's life has been turned upside down by the consequences of his conduct. He was fired from the job that he loved. The publicity surrounding his firing – and particularly his subsequent trial – was personally devastating and is utterly destructive of the career that was so important to him. Mr. Finazzo's professional reputation is tarnished, forever. Moreover, the necessary expenses of defending against all of the

14

litigation his conduct has spawned – the arbitration brought by Aéropostale, the investigation

spawned by the SEC, and ultimately, the federal criminal charges brought by the United States

Attorney, have obviously been quite substantial.  Those costs, on the heels of his loss of

employment, his $5 million settlement with Aéropostale and the financial penalties that may be

part of his sentence, have turned his financial success into bankruptcy.  In short, no rational

person watching these events would wish this on him or herself – even if Mr Finazzo were to

receive a non-custodial sentence.  As Judge Rakoff also recently noted in his written version of

his remarks to the ABA, "[t]here is a considerable body of literature that suggests that even small

amounts of prison time can achieve substantial deterrence in the case of non-violent crimes

(whether they be "white collar" crimes or just modest instances of theft, fraud, or

embezzlement)."[4]  We elaborate on the subject of general deterrence, below, in explaining the

potential for a dollars-driven guideline calculation to produce a recommended sentence

significantly longer than necessary to meet the goals of sentencing.

Finally, we urge the Court to conclude that the punitive purposes of sentencing do

not require a prison sentence.  There is hardly an offense that does not qualify as "serious."

That said, the undeniable benefits to Aéropostale of the relationship that Mr. Finazzo fostered

between it and South Bay makes his conduct relatively less serious, than would be the case if Mr.

Finazzo had simply stolen money or intended to cause direct, actual harm to Aéropostale through

that relationship.  Moreover, Mr. Finazzo appeared to genuinely think highly of South Bay's

performance and the overwhelming evidence was that he was deeply devoted to Aéropostale and

never intended to cause it any harm.  Finally, it is mitigating of Mr. Finazzo's intent that the

---

[4] Speech of Hon. Jed S. Rakoff, U.S. District Judge for the Southern District of New York, "Why the Federal Sentencing Guidelines Should Be Scrapped," American Bar Association 27th Annual National Institute on White Collar Crime, Las Vegas, Nevada, Mar. 7, 2013 ("J. Rakoff Sentencing Remarks") (attached as Ex. L), at 3.

professional he and Doug consulted for advice about their relationship told them that the relationship caused "no foul."

## III.

### 18 U.S.C. § 3553(A)(3): KINDS OF SENTENCES AVAILABLE

There are many kinds of sentences available to the Court, including Probation and/or a short prison sentence followed by a term of supervised release. Additionally, the Court may impose periods of custody while on probation or supervised release "during nights, weekends or other intervals." *See* 18 U.S.C. §§ 3563(b)(10) & 3583(d) (allowing same conditions of supervised release as authorized for probation sentences).

## IV.

### THE SENTENCING GUIDELINES CALCULATION UNDER § 18 U.S.C. 3553(A)(4)

The draft Pre-Sentence Investigation Report ("PSR") divides the offenses of conviction into two categories: (i) Conspiracy to Violate the Travel Act by using the means of interstate commerce to violate New York State's misdemeanor bribe receiving statute (Count 1(c)); and (ii) the other charges consisting primarily of 15 substantive counts of mail and wire fraud. Because Mr. Finazzo agrees with the Probation Department that the Guidelines *recommend* a sentence of five years for Count 1, we address the Guideline calculation as to Count 1 only to respond to the government's contention that Count 1(c) is subject to a "Guidelines range of imprisonment of 97-121 months." Government Letter re: Christopher Finazzo, dated Sept. 27, 2013 ("Gov. Ltr dated 9/27"), at 6. Whenever the initial guideline calculation generates a sentence length longer than the statutory maximum for a specific offense,

16

"the statutorily authorized maximum sentence shall be the guideline sentence." U.S.S.G. §

5G1.1. Accordingly, the sentence recommended by the Guidelines manual is five years.

The parties and the Probation Department agree that § 2B1.1 is the pertinent

Guideline provision for counts 2 through 16. The parties' sole disagreement involving § 2B1.1

is the manner in which "loss," if any, is calculated.

**A.**     **The Government Fails to Point to Specific Evidence Proving a Loss of $27 Million**

Mr. Finazzo incorporates by reference his Objections to the PSR's Guideline

Calculation with respect to counts 2 through 16. The government's response to those Objections

includes the assertion, made without explanation, analysis or arithmetic, that the amount of

profits Mr. Finazzo received from South Bay is "a *conservative* estimate of loss." Gov. Ltr.

dated 9/27 at 21 (emphasis added). The only support for this notion that the government

identifies in its September 27 letter is a vague reference to the testimony given by witnesses

Geiger, Slezak, and Cunningham – without a single quotation or transcript citation. In any event,

the actual testimony of those witnesses on this subject was ambiguous, inconsistent and

equivocal. At its best, from the government's point of view, it included self-serving opinions

expressed by those witnesses along the lines of "every penny that Chris ever got from South Bay

should have been ours." Slezak Tr. at 365. Apparently relying on this sort of testimony, the

government baldly asserts that there is a "direct correlation between the kickbacks . . . and the

loss to Aéropostale." Gov. Ltr. dated 9/27 at 7. But saying it does not make it so. As will be

explained in detail below, there is no factual, financial, accounting or legal underpinning for the

conclusion that a bribe received by a company employee necessarily damages the company in

tangible pecuniary terms equal to, or even roughly equal to, the amount of that bribe. To the

contrary, the law is plain that the amount of a kickback cannot be used as a proxy for loss when

there is no tangible pecuniary harm that is measurable in money. Indeed, the jury here rejected the charge that Mr. Finazzo so much as intended to deprive Aéropostale of money by committing his acts of mail and wire fraud.

The only specific testimony the government cites is Jinah Jung's, which, at best, was founded on hearsay conversations with unidentified vendors. Ms. Jung speculated that she could have placed the same order for fleece that was placed with South Bay with some other, unspecified vendor in some unspecified country in Asia for approximately $300,000 less than what Aéropostale paid to South Bay. Nor did Ms. Jung indicate whether such a hypothetical vendor was on the Aéropostale approved vendor matrix.[5] Tr. 636-37.

However, even if the hypothetical $300,000 of lost savings described by Ms. Jung were to be treated as a loss, that would not establish Mr. Finazzo's receipt of more than $20 million in profits as a reasonable approximation of Aéropostale's purported losses. As it acknowledges, the government bears the burden to prove that the money Mr. Finazzo received from South Bay is a reasonable approximation of Aéropostale's losses, a burden that it has not fulfilled with Ms. Jung's testimony about a purported loss of only $300,000.

**B.      The Evidence Does Not Establish That Aéropostale Sustained Any Tangible, Pecuniary Loss Under the Guidelines**

The Probation Department's loss calculation and analysis in the initial draft of the PSR is fatally flawed. Importantly, it concedes that Aéropostale's loss is "amorphous and speculative" and that either "an actual or intended loss determination [is] impossible." Draft PSR ¶ 20. Simply put, the reason why a loss determination is "impossible" is that there was and is no evidence of any pecuniary, monetary loss. The Probation Department's contrary

---

[5] As repeatedly proved at trial, different vendors were selected for different reasons. And while Asian vendors were certainly less expensive than other vendors, the goods required much more lead time to order, ship and replenish. The vendor comparison repeatedly proffered by the government did not compare the same goods and services.

18

conclusion that Chris's profits are an approximation of Aéropostale's loss is founded on its interpretation of Application Note 3(B). Respectfully, the Probation Department misconstrues the Application Note and fails to place it in the context of the guideline provision and its other application notes.

Application Note 3(B) specifically provides: "The court shall use the gain that resulted from the offense as an alternative measure of loss *only if there is a loss* but it reasonably cannot be determined." (emphasis added). Thus, the plain language is that gain received by a defendant may be used as a proxy for loss *only* when there is, in fact, a loss. Note 3(B) does not alter the definition of "actual loss" stated in Application Note 3(A)(iii). That definition is "pecuniary harm," actually suffered by the victim, which is further defined as follows:

> Pecuniary Harm. – "Pecuniary harm" means harm that is *monetary or that otherwise is readily measurable in money*. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.

Thus, before considering whether gain may be used as a measure of loss, the threshold question is whether the government has proved a tangible, pecuniary loss, that is, one measurable in money. "[B]efore using gain as an alternate estimate of loss, the district court must first estimate the actual and intended loss due to a defendant's fraudulent conduct . . . ." *United States v. Galloway*, 509 F.3d 1246, 1252 (10th Cir. 2007). If the loss is zero, the defendant's gain may not be used as an alternative. *United States v. Chatterji*, 46 F.3d 1336, 1340 (4th Cir. 1995) (a defendant's gain "is not a proxy for loss when there is none"). *See also United States v. Andersen*, 45 F.3d 217, 221 (7th Cir. 1995) ("[G]ain may be used only as an alternative method of calculation when *there is in fact a loss*, and *only if* use of the gain results in a *reasonable* estimate of loss.") (emphasis added).

19

By contrast, when a court "simply seize[s] upon the defendants' gain and use[s] it as a measure of loss . . . this cannot satisfy the district court's responsibilities unless the court has first attempted to determine with *some degree of certainty* the general amount of loss, actual or intended, that is attributable to the defendants' criminal conduct and concluded that the defendants' gain 'correspond[s] to' that amount." *United States v. Gallant*, 537 F.3d 1202, 1238 (10th Cir. 2008) (emphasis added). Moreover, "[w]here there is evidence of the value of the products in the market within which the victim operated, the Guidelines and our precedent are united against using an alternative measure like defendant's profits." *United States v. Stoupis*, 530 F.3d 82, 86 (1st Cir. 2008).

Apart from baldly asserting that Mr. Finazzo's gain must be a measure of Aéropostale's loss, neither the government nor the Probation Department has explained why this is so. They have not cited evidence that proves Aéropostale's actual loss of money, much less in an amount remotely approximating $27 million. Nor do they explain how Mr. Finazzo's share of South Bay's profits is a "reasonable estimate of the actual or intended loss." *United States v. Galloway*, 509 F.3d at 1252. Here, as in *United States v. Stoupis, supra*, there is a great deal of evidence of the value of the products that the victim, Aéropostale, purchased from vendors like South Bay. Therefore, the Guidelines and the law are "united against using an alternative measure like defendant's profits." *Stoupis*, 530 F.3d at 86.

The government claims to know of "legal precedent to support the conclusion that the amount of a commercial bribe is a loss to the company that employs the recipient." Gov. Ltr. at 8. However, none of the three cases it cites in its September 27 letter support the use of a bribe amount as the fraud loss amount, without proof that the loss is (a) of a type that is measurable in money, that is, satisfying the "pecuniary harm" requirement defined under Note

20

3(A)(iii) as harm that is "*monetary* or that otherwise is readily measurable in *money*" (emphasis added), and (b) based on evidence that the defendant's gain is a *reasonable* estimate of that monetary loss.

The government initially cites two cases in support of the proposition that the bribe amount is the loss amount: *United States v. Ebrahim*, 2013 U.S. Dist. LEXIS 72072 (S.D.N.Y. May 21, 2013), and *United States v. Skowron*, 839 F. Supp. 2d, 740 (S.D.N.Y. 2012). But neither case involved the treatment of a bribe as a loss under the fraud guideline and neither supports the proposition that bribe amount equals or reasonably approximates pecuniary loss amount. Indeed, both cases involved the misappropriation of a company's confidential information, facts completely dissimilar to those before this Court.

The government also cites to a third case, *United States v. Zangari*, 677 F.3d 86 (2d Cir. 2012), for the same proposition. However, nothing in *Zangari* supports the government's argument that the bribe amount may be used to calculate loss amount when there is no loss.

In the final analysis, the government's claim of pecuniary loss relies on nothing more than the speculation that if South Bay had not shared its profits with Mr. Finazzo, perhaps, maybe, it might have given Aéropostale a better deal on its products. But, as the government's witnesses also acknowledged, it is also possible that, had Aéropostale known of Mr. Finazzo's interest in South Bay, it might nevertheless have decided to maintain the same business relationship with South Bay, given South Bay's status as one of its original, core vendors and its unequaled ability to get products to market faster than any of its competitors. Mr. Slezak testified that related party transactions, such as Aéropostale's relationship with South Bay, could be "beneficial to the company." Tr. 372. Mr. Geiger, at the termination interview, said to Mr.

Finazzo, "if you had listed them and explained them, people might have said maybe this makes sense." GX-20A at 23 (attached as Ex. I). Mr. Cunningham agreed that companies "often engage in related party transactions" and that a related party transaction does not make a transaction "flawed." Tr. at 142-43. Indeed, Aéropostale's CEO and CFO admitted that the opinions they expressed at trial about the subject of pecuniary loss were *not* based on evidence. Mr. Cunningham said that Aéropostale had "*no way of knowing* if [the prices paid to South Bay were] the best possible price[s] we could get for the T-shirts overall." Tr. at 137 (emphasis added). Geiger twice acknowledged that his belief harm had occurred was in his "mind." Tr. at 1078, 1079. In short, the trial record does not contain any evidence that Mr. Finazzo's gain is a reasonable approximation of pecuniary loss purportedly suffered by Aéropostale.

Thus, assuming that Mr. Finazzo's receipt of money from the South Bay had the potential to make the vendor selection process less competitive than it otherwise might have been, this fact alone is insufficient basis for concluding that Aéropostale suffered a loss. Judge Kimba Wood recently arrived at the same conclusion in a case with substantially similar facts. When sentencing three defendants for "a wide-ranging scheme" that "systematically deprive[d] the public of the benefit of competition," she found:

> The fact that there may have been losses, however, is insufficient to meet the government's burden to show that the victims did sustain a loss. It is possible that this bidding process, although anticompetitive, had the same result as it would have absent the defendants' fraud.

Sentencing Tr. at 6, 10, *United States v. Ghavami*, No. 10-cr-1217 (2d Cir. July 23, 2013) (hereinafter "*Ghavami* Tr.").

Similarly, one can guess how Aéropostale would have fared differently, monetarily, if it had known of Mr. Finazzo's interest in South Bay. But guesses – whether

spoken by particular government witnesses in their testimony or by government counsel – should not substitute for what is required: concrete evidence of Aéropostale's actual losses or evidence of the losses Mr. Finazzo purportedly intended to cause it to suffer. That evidence simply does not exist.

**C.  <u>Acceptance of Responsibility</u>**

Mr. Finazzo incorporates his Objections to paragraph 33 of the PSR. The government's only response to those Objections is a generic assertion that Mr. Finazzo's "numerous arguments and submissions, including his objections to the PSR" somehow foreclose the adjustment. Gov. Ltr. dated 9/27 at 11. The government has not identified the arguments or submissions it considers to foreclose the adjustment, nor countered the essential point that Mr. Finazzo proceeded to trial to challenge, as legally incorrect, the concept that Aéropostale's intangible right to control its decisions is a form of property under the mail and wire fraud statutes.

**V.**

**A GUIDELINE SENTENCE SHOULD NOT BE IMPOSED
IN THE COURT'S DISCRETION UNDER
<u>18 U.S.C. § 3553(A)(4) AND (B)</u>**

For the reasons that are explained above at IV.A and in our Objections to the PSR, the correct guideline calculation for Counts 2-16 should not be enhanced by any loss amount because, by depriving Aéropostale of a right to control decision-making, Mr. Finazzo did not cause a loss that was "pecuniary," "monetary," or "measurable in money."

Should the Court nevertheless arrive at a guideline calculation similar to that advocated by the government and the Probation Department, we respectfully ask the Court to consider whether the Guidelines overstate the seriousness of the offense. As explained below,

the Guidelines' overreliance on dollar amounts, the history of guideline bracket inflation and other important offense facts to which the Guidelines give no weight combine to cause a dollars-driven calculation to vastly overstate the seriousness of Mr. Finazzo's offense.

Under the approach advocated by the government and Probation, Mr. Finazzo's Guideline range would be driven by enhancement for loss of over $20 million under § 2B1.1. That would result in a 22-level increase to Mr. Finazzo's base offense level (for counts 1(a), 1(b), and 2 to 16) – a more than a three-fold increase from the base offense level of 7. However, as explained below, the continually escalating enhancement in § 2B1.1's loss table has resulted in the fraud guidelines being of extremely limited utility to the Court's assessment of the § 3553(a) factors.

Many jurists and other legal commentators have identified limitations and flaws of the Sentencing Guidelines, including its potential overreliance on formulas that impede genuine, individualized sentencing. U.S. District Judge Jed Rakoff, for one, recently said: "Perhaps the most fundamental flaw in the sentencing guidelines is that they are based on the assumption that you can, in the name of reducing disparities, isolate from the complexity that every sentence presents a few arbitrary factors to which you then assign equally arbitrary weights —and somehow call the result rational." J. Rakoff Sentencing Remarks at 3. In particular, where the ultimate guideline calculation is primarily a function of the amount of money involved, the danger of overreliance is heightened. *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring).

**A.      The Court Has Discretion to Reject the Fraud Guidelines Due to the Lack of
Empirical Data**

The Sentencing Guidelines "reflect a rough approximation of sentences that might

achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007). The

Guidelines' usefulness is premised on the Commission's "exercise of its characteristic

institutional role," consisting of its "empirical approach based on data about past sentencing

practices" and its revision of the Guidelines based on judicial feedback and consultation with

advocates, civil liberties groups, and experts. *Kimbrough v. United States*, 552 U.S. 85, 96, 109

(2007). By contrast, where the Commission has formulated a Guidelines range without "tak[ing]

account of 'empirical data and national experience,'" the sentencing court is free to conclude that

the Guidelines "yield[] a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even

in a mine-run case." *Id.* at 109, 110.   Indeed, even before the Guidelines were rendered advisory

by *Booker*, the Sentencing Commission expressly authorized courts to depart downwardly from

the Guidelines when monetary loss overstates the seriousness of the particular fraudulent

conduct. *See* Commentary to § 2B1.1, Application Note 19(c); *United States v. Cheng*, 96 F.3d

654, 657 (2d Cir. 1996).

Thus, this Court has broad discretion to disagree with the fraud Guidelines (even

on policy grounds) because the Commission failed to rely on empirical data or national

experience in promulgating or amending them. *See Spears v. United States*, 555 U.S. 261, 264

(2009) (explaining that when the Commission fails to fulfill its institutional role, a district court

can vary from the guidelines "based on *policy* disagreement with them, and not simply based on

an individualized determination that they yield an excessive sentence in a particular case");

*United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (no deference to Guidelines if they do

not reflect "an empirical approach based on data about past sentencing practices").

Before the Guidelines were promulgated, 18% of first offenders convicted of sophisticated fraud involving *the highest loss amount* received probation while the rest served an average of 18-24 months in prison. *See* U.S. SENTENCING COMM'N, SUPPLEMENTARY REPORT ON THE INITIAL SENTENCING GUIDELINES AND POLICY STATEMENTS 33 (1987). Not relying on these sentencing practices when formulating the fraud and theft Guidelines in 1987, the Commission "decided to abandon the touchstone of prior past practice" for white-collar offenses. Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 HOFSTRA L. REV. 1, 23 (1988). In doing so, the Commission reasoned that "the definite prospect of prison, *though the term is short*, will act as a significant deterrent . . . , particularly when compared with the status quo where probation, not prison, is the norm." U.S.S.G., ch, 1, intro., pt. 4(d) (1987) (emphasis added).

The Commission's deterrence theory, however, was not supported by empirical research, which shows limited, if any, deterrent impact of prison sentences in white-collar cases. *See* David Weisburd, *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 CRIMINOLOGY 587 (1995). In fact, studies have concluded that harsher penalties have little effect on deterrence. *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006) (noting that three panels of the National Academy of Science, as well as "every major survey of the evidence," have concluded that "increases in severity of punishments do not yield significant (if any) marginal deterrent effect"); *see also United States v. Bannister*, 786 F. Supp. 2d 617, 660 (E.D.N.Y. 2011) ("Compelling arguments have been made that the deterrent value of a sentence is highest when the chances of its being administered are high and the offender is able to rationally consider the consequences of his or

her actions. It appears to be primarily in the certainty of punishment, not its severity, that deterrent power lies.").

At any rate, the Commission soon abandoned its goal of "short but definite" imprisonment, only two years after the 1987 Guidelines were promulgated. Between 1989 and 2003, it adopted a series of amendments that steadily increased the prison sentences for economic crimes.[6] Largely driven by congressional directives, these amendments, too, lacked an empirical basis. *Corsey*, 723 F.3d at 380 (Underhill, J., concurring); Jeffrey S. Parker & Michael K. Block, *The Sentencing Commission, P.M. (Post-Mistretta): Sunshine or Sunset?*, 27 AM. CRIM. L. REV. 289, 319-20 (1989); *see also United States v. Jaber*, 362 F. Supp. 2d 365, 374 (D. Mass. 2005) (Gertner, J.) ("[T]he Commission simply took the average national sentences for a given offense, and then increased them, without explanation, much less scientific study."). The net result of these amendments are Guidelines that – far from reflecting "an empirical approach based on data about past sentencing practices," *Dorvee*, 616 F.3d at 184 – subject first-time, economic offenders to sentences historically reserved for far more serious crimes.

In short, the Commission did not fulfill its institutional role of utilizing empirical evidence when placing loss amount at the center of its fraud Guideline and then repeatedly increasing the number of points added for specific loss amounts. Therefore, we respectfully request that the focus be on all of the § 3553(a) factors (as well as the jury's verdict on the 15 counts of mail and wire fraud finding that Chris did not intend to deprive Aéropostale of any

---

[6] *See* U.S.S.G. App. C, Amend. 154 (1989) (raising the penalties for fraud crimes by creating a new loss table); U.S.S.G. App. C, Amend. 317 (1990) (adding aggravating specific offense characteristics); U.S.S.G. App. C, Amend. 551 (1997) (same); U.S.S.G. App. C, Amend. 576 (1997) (same); U.S.S.G. App. C, Amend. 596 (2000) (same). U.S.S.G. App. C, Amend. 617 (2001) (adopting a new loss table with additional sentence increases); U.S.S.G. App. C, Amends. 647, 653 (2003) (increasing base offense level, extending loss table, and adding new enhancements).

money) in fashioning a sentence "sufficient but not greater than necessary" to fulfill the various purposes of sentencing.

**B.    The Guideline Range Substantially Overstates the Seriousness of the Offenses**

The fraud Guideline has increasingly come under criticism for yielding unreasonable results.  As Judge Underhill recently observed while sitting on a panel of the Second Circuit and concurring in the Court's decision to reverse a sentence as procedurally unreasonable: "A single factor – loss, specifically intended loss – drove the Guidelines calculation. . . . The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges." *Corsey*, 723 F.3d at 380 (Underhill, concurring, J.).

Mr. Finazzo's guideline sentencing range, when using the government's proposed loss amount, is badly afflicted by the "bracket inflation" that Judge Underhill described.   As shown in Table 1 below, the fraud guideline range for Mr. Finazzo's conduct under the original (1987) guidelines would have been 30-37 months; under the 2012 guidelines, the range, according to the government, is 108-135 months.  Similarly, with respect to count 1(c), Mr. Finazzo's recommended guideline sentence is 60 months, but under the 1987 guidelines, it was less than half of that: 24 to 30 months. *See* Table 1. Thus, between 1987 and 2012, the sentence range applicable to Mr. Finazzo's mail and wire fraud convictions increased nearly four-fold, at both the bottom and top of the range, and his guidelines for the Travel Act conspiracy more than doubled.

During this time, there has been no identifiable change in the perception of the wrongfulness of fraud or bribe receiving.  Indeed, because of the impact of inflation, the same

dollar of loss in 1987, in real terms, is worth approximately than half what it was worth 20 years later in 2005-2006, the years in which Mr. Finazzo received the largest amount of the bribes. With the wrongfulness of the conduct not having changed since 1987 and the effect of inflation operating as a factor that would logically have taken the fraud (and bribery) guidelines in the direction opposite from the one they went, many observers have blisteringly criticized the fraud Guideline as unsound.

The history of bracket inflation also illustrates why a sentence that even approaches the current guideline range cannot genuinely be the minimum sentence necessary to effectuate the purposes of sentencing. In 1987, the Sentencing Commission considered the range of sentences sufficient to punish a $20+ million fraud to be in the *30 to 37 month* range. How then, could a sentence three times longer than 37 months have become necessary to punish a similar fraud committed 10 to 20 years later? To ask the question is to answer it. In short, the previous decisions of Congress and the Sentencing Commission to cap most $20 million fraud sentences (with guideline calculations otherwise similar to Mr. Finazzo's) at 37 months means that logically, the minimum sentence necessary to penalize such conduct cannot suddenly have jumped to 8 years (the Probation Department's recommendation) or 108 months (the bottom of the government's calculation).

**Table 1**

| Counts 1(a), 1(b), and 2 through 16 | | | | |
|---|---|---|---|---|
| | **1987 Guidelines** | | **2012 Guidelines** | |
| *Base Offense Level* | § 2F1.1(a); § 2X1.1(a) | 6 | § 2B1.1(a); § 2X1.1(a) | 7 |
| *"Loss" Amount* | § 2F1.1(b)(1)(L) (greater than $5 million) | +11 | § 2B1.1(b)(1)(L) (greater than $20 million) | +22 |
| *Adjustment for Abuse of Position of Trust* | § 3B1.3 | +2 | § 3B1.3 | +2 |
| | **Adjusted Offense Level: 19** | | **Adjusted Offense Level: 31** | |

| Count 1(c) | | | | |
|---|---|---|---|---|
| | **1987 Guidelines** | | **2012 Guidelines** | |
| *Base Offense Level* | § 2E1.2(a); § 2X1.1(a) | 6 | § 2B4.1(a); § 2X1.1(a) | 8 |
| *"Loss" Amount* | § 2F1.1(b)(1)(L) (greater than $5 million) | +11 | § 2B1.1(b)(1)(L) (greater than $20 million) | +22 |
| | **Adjusted Offense Level: 17** | | **Adjusted Offense Level: 30** | |

| Multiple-Count Adjustment | | | | |
|---|---|---|---|---|
| | **1987 Guidelines** | | **2012 Guidelines** | |
| *Applicable Offense Level After Grouping* | § 3D1.2(b); § 3D1.3(a) (greater of adjusted offense levels) | 19 | § 3D1.2(b); § 3D1.3(a) (greater of adjusted offense levels) | 31 |
| | **Total Offense Level: 19** **Criminal History Category: I** **Guideline Range: 30-37 months** | | **Total Offense Level: 31** **Criminal History Category: I** **Guideline Range: 108-135 months** | |

Not only is the Guideline calculation flawed because of its bracket inflation, but it is additionally flawed because it treats all dollars of fraud loss identically, blurring important differences in the nature and identity of the victims of the fraud that merit consideration in the sentencing decision. Judge Underhill explained in his concurrence, in *Corsey*, how the dollars-

driven guidelines fail to adequately capture that some losses lead to identifiable pain suffered by

real people, as compared to other losses that are absorbed by large institutions or entities:

> And not all actual loss is equally serious. A fraud that results in
> the loss of even a few thousand dollars by an elderly or sick person
> who, as a result of the loss, becomes unable to afford the
> necessities of life or medical care is much more serious than a
> fraud that results in ten or a hundred times that loss by a large
> corporation able to absorb the financial consequences . . . . Simply
> put, contrary to the assumption underlying the loss guideline, not
> all dollars of loss are fungible.

*Corsey*, 723 F.3d at 380 (Underhill, concurring, J.); *see also* Frank O. Bowman III, *Sentencing*

*High-Loss Corporate Insider Frauds After* Booker, 20 FED. SENT. R. 167, 171 (Feb. 2008)

(criticizing fraud loss Guideline for "fail[ing] to distinguish between defendants who intend to

steal or cause economic harm to others and defendants who, though guilty of criminal conduct,

cause losses they neither desired nor perhaps even foresaw").

   While Chris fully appreciates the seriousness of the offenses of which he was

convicted, we respectfully submit that this case is far removed from many recent high profile

corporate fraud cases. Mr. Finazzo did not loot Aéropostale's treasury. Indeed, the jury's

special verdict as to all 15 counts of mail and wire fraud specifically found that Mr. Finazzo did

*not* intend to deprive Aéropostale of money. This case is also different from many recent fraud

cases in terms of the harm caused. No company collapsed as a result of Mr. Finazzo's conduct;

no employees lost their pensions; no public shareholders sustained any loss. To the contrary,

Aéropostale's sales and profits actually increased – tenfold – during the period that South Bay

was one of its vendors. The advisory Guidelines take no such distinctions into account,

providing an inflexible framework that is of little value in assessing culpability.

   This sort of false equivalence has led sentencing courts to criticize the "inordinate

emphasis" that the Guidelines place "on the amount of actual or intended financial loss" in fraud

cases, without explaining "why it is appropriate to accord such huge weight to [this] factor."

*United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (Rakoff, J.), *sentence aff'd*,

301 Fed. Appx. 93 (2d Cir. 2008); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y.

2012) ("By making a Guidelines sentence turn, for all practical purposes, on this single factor

[monetary loss or gain], the Sentencing Commission effectively ignored the statutory

requirement that federal sentencing take many factors into account."); *United States v. Ovid*, No.

09-CR-216 (JG), 2010 WL 3940724, at *8 (E.D.N.Y. Oct. 1, 2010) (Gleeson, J.) (criticizing "the

illusion of precise calculation created by the ever-expanding fraud guideline").

   In short, loss amount is a highly imperfect measure of the seriousness of the

offense. *See United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (faulting the

Guidelines for their "mechanical correlation between loss and offense level," which it described

as "[o]ne of the primary limitations of the guidelines"). The specific amount of loss (or gain) is

often "a kind of accident" providing a "relatively weak indicator of the moral seriousness of the

offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28

(S.D.N.Y. 2004) (Lynch, J.). Most defendants do not set out to defraud a specific amount of

money; rather, the amount of loss is dependent on the security procedures in place and the point

in time when the ongoing fraud happens to be detected. *Id.* As Judge Lynch explained in

*Emmenegger*, "Had [the defendant] been caught sooner, he would have stolen less money; had

he not been caught until later, he would surely have stolen more." *Id.*

   Yet the "overly-rigid loss table," *Id.*, treats the amount of loss (or gain) as so

overwhelmingly important that it puts purely economic crimes – including those in which the

harm is intangible and therefore hard to define – in a class with some of the most serious violent

offenses. The results are Guidelines calculations "that have so run amok that they are patently

abs urd on their face." *Adelson*, 441 F. Supp. 2d at 515. Indeed, the impact of high loss amount

enhancements under § 2B1.1 dwarfs that of any other Guideline sentencing provision. In Mr.

Finazzo's case, for example, the proposed loss amount results in a 22-point enhancement –

significantly larger than any other enhancement anywhere in the Guidelines. Indeed, only a

handful of double-digit enhancements exist in the entire Guideline manual, and they range from

12 to 16 levels.[7]

      The increasingly severe Guideline sentences have put fraud crimes on par with

offenses that are self-evidently more serious (including some violent offenses) – resulting in

offense levels comparable to, and sometimes exceeding, those applicable to violent offenders.

By way of comparison, the Guidelines' base offense level for voluntary manslaughter is 29

(U.S.S.G. § 2A1.3); for attempted first-degree murder resulting in serious bodily injury, 35

(U.S.S.G. § 2A2.1); for bombing an airport or mass transit center, 24 (U.S.S.G. § 2K1.4(a)(1));

for aggravated assault where a firearm was discharged resulting in life-threatening bodily injury,

26 (U.S.S.G. § 2A2.2); for aggravated sexual abuse, 34 (U.S.S.G. § 2A3.1); for kidnapping, 32

(U.S.S.G. § 2A4.1); and for arson creating substantial risk of death or serious bodily injury, 24

(U.S.S.G. § 2K1.4(a)(1)).

      Moreover, the upward ratchet in fraud penalties under the Guidelines has led to

the anomalous result that first-time, nonviolent offenders like Chris are subject to sentences

comparable to or surpassing those actually imposed for violent and more serious offenses. Here,

the Guideline sentence recommended for Mr. Finazzo is comparable to – and in some cases,

---

[7] *See* § 2J1.2(b)(l)(C) (terrorism-related obstruction of justice); § 3A1.3(a) (felony involving or intending to promote terrorism); § 2K1.5(b)(1) (willfully boarding an aircraft with a dangerous weapon or material without regard for the safety of human life); § 2K2.1(b)(3)(A) (trafficking, receiving, or possessing a portable rocket, missile, or launcher); § 2L1.2(b)(1)(A) (unlawfully entering or remaining in the United States after being convicted of certain major felonies); § 2R1.1(b)(2)(H) (bid-rigging or price-fixing, if commerce volume exceeds $1.5 billion).

exceeds – the average sentences imposed for violent crimes. In 2012, the average sentence imposed for manslaughter was 60 months; for sexual abuse, 127 months; for arson, 77 months; and for child pornography, 129 months. *See* U.S. SENTENCING COMM'N, 2012 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS, tbl. 13 (2012). While the crimes for which Mr. Finazzo has been convicted are serious, they simply do not merit a punishment remotely as severe as manslaughter, arson, sexual abuse, or child pornography.

Courts within and outside the Second Circuit have not hesitated to impose sentences far below the advisory Guidelines range to avoid unjust results. Indeed, "since *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines for cases like these and the fundamental requirement of § 3553(a) that judges impose sentences 'sufficient, but not greater than necessary' to comply with its objectives." Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 FED. SENT. R. 167, 169 (Feb. 2008). *See, e.g.*, *United States v. Treacy*, No. 08-cr-366 (S.D.N.Y. Sept. 2, 2009) (Sentencing Tr. at 86) & ECF No. 130 (after calculating a guidelines range of 121 to 151 months based on profits a corporate executive had gained from backdated stock options, court issued a non-Guidelines sentence of 24 months based on the § 3553 factors); *United States v. Milton*, No. 3:06-cr-137, ECF No. 1216 (D. Conn. Jan. 30, 2009) (Judgment) & ECF No. 1164 (D. Conn. Oct. 31, 2008) (Ruling on Loss Calculation, Victim Enhancement, and Restitution) (imposing 48-month sentence on defendant convicted of various fraud counts involving over $400 million in losses, despite Guidelines recommendation of life imprisonment); *United States v. Turkcan*, No. 08-cr-428, ECF No. 52 (E.D. Mo. June 11, 2009) (Judgment)

34

(imposing a one-year-and-one-day sentence of imprisonment on a defendant who caused

approximately $25 million loss); *United States v. Parris*, 573 F. Supp. 2d 744, 745, 754

(E.D.N.Y. 2008) (Block, J.) (imposing a sentence of 60 months in the face of a Guideline range

of 360 to life, criticizing the fraud guideline as "a black stain on common sense"); *United States

v. Ferguson*, No. 3:06-cr-137, ECF No. 1199 (D. Conn. Dec. 31, 2008) (Judgment) & ECF No.

1164 (D. Conn. Oct. 31, 2008) (Ruling on Loss Calculation, Victim Enhancement, and

Restitution) (imposing sentences ranging from one year and one day to four years on five

defendants convicted of fraud leading to over $544 million in loss whose Guideline ranges

included the possibility of life imprisonment); *United States v. Adelson*, 441 F. Supp. 2d 506,

512, 514 (S.D.N.Y. 2006) (imposing 42 months on defendant convicted of leading to more than

$50 million in loss notwithstanding Guidelines calling for life imprisonment), *aff'd*, 2008 WL

5155341 (2d Cir. Dec. 9, 2008).

   The U.S. Sentencing Commission's most recent statistics show that, in fiscal year

2012, 47.5% of all fraud sentences imposed at the national level were below the Guidelines

range. *See* U.S. SENTENCING COMM'N, 2012 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS,

tbl. 27. In the Second Circuit, the proportion was even higher in fiscal 2012, with over 60% of

sentences for fraud crimes below Guidelines range. *See* U.S. SENTENCING COMM'N,

STATISTICAL INFORMATION PACKET: FISCAL YEAR 2012 – SECOND CIRCUIT, tbl. 10. The data

from the preceding two years demonstrates comparable proportions of below-Guidelines

sentences where fraud was the primary offense. *See* U.S. SENTENCING COMM'N, STATISTICAL

INFORMATION PACKET: FISCAL YEAR 2011 SECOND CIRCUIT, tbl. 10 (indicating that over 60

percent of Second Circuit fraud sentences were below guidelines); U.S. SENTENCING COMM'N,

STATISTICAL INFORMATION PACKET: FISCAL YEAR 2010 SECOND CIRCUIT, tbl. 10 (indicating

over 59 percent of Second Circuit fraud sentences were below guidelines).

Notably, even the Sentencing Commission itself has recognized a need to reform

the fraud Guidelines. In a *Federal Register* notice published on January 19, 2012, the

Commission explicitly acknowledges criticism of § 2B1.1 and seeks public comment on

proposed revisions to the Guideline. Specifically, the note states,

> The Commission has observed that cases sentenced under § 2B1.1
> involving relatively large loss amounts have relatively high rates of
> below-range sentences (both government sponsored and non-
> government sponsored), particularly in the context of securities
> fraud and similar offenses. The Commission also has received
> public comment and reviewed judicial opinions suggesting that the
> impact of the loss table or the victims table (or the combined
> impact of the loss table and the victims table) may overstate the
> culpability of certain offenders in such cases.

U.S. SENTENCING COMMISSION, NOTICE OF PROPOSED GUIDELINE REVISIONS AND REQUEST FOR

PUBLIC COMMENT, 77 Fed. Reg. 2778, 2783 (Jan. 19, 2012). The Commission adds that, in view

of the concern that § 2B1.1 "may overstate the culpability of certain offenders," it is "studying

whether it should limit the impact of the loss table or the victims table (or both) in cases

sentenced under § 2B1.1 involving relatively large loss amounts and, if so, how it should limit

the impact." *Id.*

## VI.

## APPLICATION OF THE GUIDELINES REFLECTS A N
## UNWARRANTED SENTENCE DISPARITY UNDER 18 U.S.C. § 3553 (A)(6)

All of the above described cases, in which courts varied downward, substantially,

from the fraud guidelines are also relevant to the Court's statutory obligation to consider "the

need to avoid unwarranted sentence disparities among defendants with similar records who have

been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). This requirement seeks to assure

nationwide uniformity in the sentencing of federal defendants who are similarly situated. *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008) ("[S]ection 3553(a)(6) requires a district court to consider nationwide sentence disparities.").

In addition to the cases cited above, the post-trial sentences imposed by U.S. District Judge Kimba Wood in *United States v. Ghavami* stand out as particularly relevant to the court's consideration of its obligation to avoid disparity. *Ghavami* is noteworthy because the essence of the conduct was that those defendants enriched themselves and thereby corrupted the competitive bidding process (for municipal bond underwriting) for which the defendants were responsible. *See Ghavami* Tr. at 6 (the "defendants participated in a wide-ranging scheme, for years, to systematically deprive the public of the benefit of competition . . . [i]t is this corrupt conduct for which defendants should be sentenced, which is less tied to loss amounts than is the case in many frauds). *See also Ghavami* Tr. at 10 ("According to the government, this anticompetitive conduct caused municipal issuers to lose money because they did not get the highest price possible for the escrows."). The parallel is apparent, as the essence of the conduct here, as the government describes it, was that Mr. Finazzo and Mr. Dey likewise participated in a scheme whose purpose was to deprive the victim (Aéropostale) of the full benefit of competition.

Judge Wood's summary of the seriousness of the defendants' conduct, and her description of that conduct, reinforce the impression that the conduct of the *Ghavami* defendants was, in many respects, even more serious than Mr. Finazzo's:

> The offenses for which these three defendants are being sentenced are very serious. The defendants, along with employees of other financial institutions, rigged bids for municipal bond reinvestment products. They were part of a corrupt corporate culture that spanned years. The crimes victimized many municipalities as well as other bond issuers across the United States and the IRS and the U.S. Treasury. Most of the victims' losses are very difficult to

quantify because there is no way to know the but-for bids; that is, what bids would have been submitted if the bids were not rigged.

*Ghavami* Tr. at 123. Thus, the cases are highly similar in that they both present high ranking corporate employees who corrupted the competitive bidding process for which they were responsible, over a period of years, in pursuit of personal gain. The cases are likewise similar in that the conduct involves losses that are difficult to quantity "because there is no way to know the but-for." However, the *Ghavami* case impacted many more victims, and the *Ghavami* defendants, unlike Mr. Finazzo, were not laboring under the advice of a professional that their conduct caused no "harm" and therefore presented no "foul." Respectfully, it is simply not the case that Mr. Finazzo "deserves" a longer sentence than the 16 to 24 month sentences that Judge Wood found to be appropriate for defendants Ghavami and Welty.[8]

## VII.

### THE NEED TO PROVIDE RESTITUTION
### 18 U.S.C. § 3553(A)(7)

Whether Aéropostale is a victim entitled to restitution is an issue disputed by the parties and which Mr. Finazzo has separately briefed. But, however the Court decides that issue, its resolution does not support the imposition of a long prison sentence. In short, if the Court agrees that Aéropostale is not entitled to restitution, the "need to provide restitution" will not be relevant to the other components of the Court's sentence. However, if the Court does impose a restitution order, Mr. Finazzo's ability to make meaningful restitution payments will plainly be enhanced by a non-custodial sentence.

---

[8] Although Ghavami's sentence was ultimately 18, not 24 months, Judge Wood explained that she reduced his sentence from 24 months because, as an alien, he would be ineligible to serve his sentence in a minimum security facility. Defendant Heinz's 27-month sentence is less relevant because his enhanced sentence was partially a consequence of Judge Wood's finding that he engaged in witness tampering. *Ghavami* Tr. 182.

# VIII.

## ADDITIONAL SENTENCING CONSIDERATIONS

While the 3553(a) factors must be considered, the Court is also permitted to consider other factors not expressly described in the statute. For example, it may consider the negative impact that imprisonment would have on Mr. Finazzo's family, including but not limited to his seven-year-old granddaughter who would be crushed by her grandfather's absence.

# IX.

## CONCLUSION – THE PARSIMONY PROVISION

For all of the foregoing reasons, we respectfully ask the Court to consider the minimum sentence necessary to accomplish the goals of sentencing and whether such may be accomplished by a minimally custodial, or perhaps a non-custodial, sentence. So-called "parsimony" under § 3553(a) is the sentencing statute's most important, or "overarching instruction." *Kimbrough v. United States*, 552 U.S. 85, 575 (2007).

Chris is bankrupt. The government has seized all of his available assets, including his IRAs, 401(k), and other retirement funds. The forfeiture of all of his assets, in and of itself, is draconian. Despite Chris's great success at taking a company that was losing money when he first joined it to huge profitability and his role in increasing its revenues from $132 million to over $1.4 billion, his conviction effectively bars him from ever again being employed in the public retail sector. Chris has suffered profoundly. That suffering has been financial, public and reputational. It has been ongoing and he will continue to suffer from the consequences of his conduct, whether or not the Court imposes a jail sentence. Respectfully, after considering Mr. Finazzo's genuine moral goodness, the undeniably positive things that he accomplished for Aéropostale and the very real pain he has already suffered because of his

conduct, we submit that a non-custodial sentence is consistent with the ends of justice and the exercise of mercy.

Dated: New York, New York
      November 7, 2013

                      Respectfully submitted,

                      CARTER LEDYARD & MILBURN, LLP

By: _____
                      Robert J.A. Zito
                      Alan S. Lewis
                      Two Wall Street
                      New York, New York 10005
                      (212) 732-3200

                      *Attorneys for Christopher Finazzo*