

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JPN:WMP
F. #2009R00374

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 14, 2013

**By Hand and ECF**

The Honorable Roslynn R. Mauskopf
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

     Re:  United States v. Christopher Finazzo
          Criminal Docket No. 10-457 (RRM)

Dear Judge Mauskopf:

        The government respectfully submits this letter in response to the defendant Christopher Finazzo's sentencing memorandum, dated November 7, 2013 ("Def. Memo."), which requests a non-custodial sentence following his conviction, after trial, in a $25 million fraud scheme. For the reasons set forth below, the government submits that a sentence at the low end of the advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 135-168 months is appropriate. The government also writes in response to Finazzo's memorandum with respect to restitution, dated November 7, 2013 ("Rest. Memo."). Finazzo is scheduled to be sentenced before the Court on November 19, 2013.

I.    Background

     A.   The Second Superseding Indictment

        On September 6, 2011, a grand jury sitting in the Eastern District of New York returned a second superseding indictment ("SSI") charging Christopher Finazzo and Douglas Dey with: (i) conspiracy to commit mail fraud and wire fraud and conspiracy to violate the Travel Act (Count One); (ii) mail fraud (Counts Two through Fifteen); and (iii) wire fraud (Count Sixteen). Finazzo, the former Chief Merchandising Officer of Aéropostale, was also charged with causing a false statement in

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 2

a report required to be filed with the United States Securities and Exchange Commission ("SEC") (Count Seventeen).[1]

The second superseding indictment described the alleged fraudulent scheme between Finazzo and Dey, the owner of South Bay Apparel, Inc. ("South Bay"), a vendor to Aéropostale. Specifically, the second superseding indictment explained that after Finazzo was employed by Aéropostale, Finazzo and Dey entered into a secret agreement that Finazzo would use his position at Aéropostale to purchase merchandise from South Bay, without regard to the price, quality or timely delivery of the merchandise, in exchange for secret payments to Finazzo through C&D Retail Consultants, Inc. ("C&D"), a company incorporated by Finazzo in June 1998. (SSI ¶¶ 5, 8). In detailing the fraudulent scheme, the second superseding indictment alleged that Finazzo and Dey defrauded Aéropostale by: (1) depriving Aéropostale of the opportunity to make informed decisions, thereby preventing Aéropostale from seeking lower prices for merchandise it purchased from South Bay, and the opportunity to select other vendors based upon price, quality and timely delivery; and (2) causing Aéropostale to pay higher prices on merchandise it purchased from South Bay than were available from other vendors, thereby increasing South Bay's profits and the amounts Dey paid Finazzo. (SSI ¶ 9).

B.   The Trial and Verdict

Following a three-week trial, the jury found Finazzo guilty on all sixteen counts, namely, one conspiracy count, fourteen mail fraud counts and one wire fraud count. Attached as Exhibit A is a copy of the verdict sheet.

II.   The Sentencing Guidelines

There is no dispute between the parties that the Guidelines range for Count 1(c), as calculated by the Probation Department, is 60 months' imprisonment.

---

[1]   The government moved to dismiss, without prejudice, Count Seventeen prior to the commencement of trial, and the Court granted the motion. (See docket entry no. 210 and order dated April 30, 2013).

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 3

In the PSR, the Probation Department correctly
calculated the total offense level under the Guidelines for
Counts 1(a), 1(b) and Counts 2-16 to be 33, which it calculated
based on a base offense level of 7, a 22-point enhancement for a
bribe exceeding $20 million, and a 4-point enhancement for being
an officer of a publicly-traded company. (PSR ¶¶ 35-41). The
Probation Department then correctly determined that Finazzo fell
within Criminal History Category I. A total offense level of
33, when applied with Criminal History Category I, results in a
Guidelines range of imprisonment of 135-168 months. (PSR ¶ 101).

Finazzo objects to the Probation Department's 22-point
enhancement for a bribe/gain exceeding $20 million on the basis
that there was no tangible, pecuniary loss suffered by
Aéropostale. (Def. Memo. 17-23). As set forth below, Finazzo's
objection should be rejected because he ignores the significant
evidence of such loss presented at trial.

A.   <u>Applicable Law</u>

Under the Guidelines, "loss" is defined as "the
greater of actual loss or intended loss." (U.S.S.G. § 2B1.1,
cmt. 3(A)). "Actual loss" means the "reasonably foreseeable
pecuniary harm that resulted from the offense" whereas "intended
loss" means the "pecuniary harm that was intended to result from
the offense." (<u>Id.</u>, cmt. 3(A)(i) and (ii)).

"Reasonably foreseeable pecuniary harm" is defined as
"pecuniary harm that the defendant knew, or under the
circumstances, reasonably should have known, was a potential
result of the offense," (<u>Id.</u>, cmt. 3(A)(iv)), and "pecuniary
harm" means "harm that is monetary or that otherwise is readily
measurable in money" (<u>Id.</u>, cmt. 3(A)(iii)). In calculating the
loss Guidelines, the Court "shall use the gain that resulted
from the offense as an alternative measure of loss only if there
is a loss but it reasonably cannot be determined." (<u>Id.</u>, cmt.
3(B)).

Notably, the sentencing court "need not establish the
loss with precision but rather 'need only make a reasonable
estimate of the loss, given the available information.'" <u>United
States v. Uddin</u>, 551 F.3d 176, 180 (2d Cir. 2009) (quoting
<u>Carboni</u>, 204 F.3d 39, 46 (2d Cir. 2000) and <u>United States v.
Jacobs</u>, 117 F.3d 82, 95 (2d Cir. 1997)); <u>see also United States</u>

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 4


v. Canova, 412 F.3d 331, 352 (2d Cir. 2005); U.S.S.G. § 2B1.1,
cmt. 3(C). For example, a district court may make a reasonable
estimate "by extrapolating the average amount of loss from known
data and applying that average to transactions where the exact
amount of loss is unknown." United States v. Bryant, 128 F.3d
74, 76 (2d Cir. 1997) (per curiam). Such determinations are
made by a preponderance of the evidence. See United States v.
Garcia, 413 F.3d 201, 220 n.15 (2d Cir. 2005) (judicial
authority to find facts relevant to sentencing by a
preponderance of the evidence survives Booker). On appeal, the
Second Circuit will review the "district court's factual
findings on loss for clear error and its conclusions of law de
novo." United States v. Carboni, 204 F.3d at 46.

B.    Discussion[2]

        The record is inundated with examples of how Finazzo
not only intended loss, but caused actual loss, to Aéropostale
by favoring Dey and South Bay, and in turn, increased his
kickback payments. Finazzo's argument that there is no
pecuniary or monetary harm caused by him in a business where he
was overpaying for t-shirts, as set forth below, has no merit.
For example:

        1.    Finazzo's Refusal to Follow Geiger's
              Directive to Place 25% of Graphic
              T-Shirts with Overseas Vendors

        Finazzo's refusal to comply with Aéropostale's Chief
Executive Officer Julian Geiger's directive to place 25% of the
t-shirts orders with overseas vendors cost Aéropostale millions
of dollars. This is a simple example of pecuniary harm suffered
by Aéropostale. There is no dispute that t-shirts made overseas
cost less than t-shirts made by South Bay. Finazzo's attempts
to justify his refusal to move the t-shirts overseas by praising
South Bay's quality and speed of delivery do not change the fact
that Aéropostale paid more than it should have paid for these t-
shirts. When viewed in the context of Finazzo's kickback

_____

        [2]   This section also sets forth the factual basis for
Aéropostale as a victim of this fraud and the fact that
restitution is owed to Aéropostale in the amount of
$25,790,822.94.

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 5


scheme, it is evident why Finazzo refused to comply with this order.  Moving 25% of a high-priced business away from South Bay meant lower profits for South Bay, which directly lowered Finazzo's kickback payments.  Several witnesses testified about Finazzo's refusal to move 25% of the t-shirt business away from South Bay and its impact on Aéropostale's finances.

Michael Cunningham, Aéropostale's Chief Financial Officer, testified that in early 2005, Geiger told Finazzo to "take 25 percent of the total t-shirts that we were buying from South Bay and have them produced overseas at a much lower cost resulting in significant cost savings to Aéropostale." (United States v. Finazzo, 10-CR-457 (RRM), Trial Transcript ("T") 123-24).  Cunningham further testified that Finazzo "became very agitated" whenever the topic of moving graphic t-shirt overseas was brought up and ended the meeting by walking out and slamming the door shut.  (Id.).  Cunningham explained that Finazzo's refusal to move 25% of the t-shirt business overseas harmed Aéropostale because "it was a very significant cost savings for Aéropostale." (T 125).

Edward Slezak, Aéropostale's General Counsel, similarly testified that Geiger instructed Finazzo to "place 25 percent of our total t-shirt business ... to an overseas vendor at lower prices" but Finazzo initially paid lip service, then got belligerent, and finally "called a moratorium ... on the discussion of t-shirts." (T 396-97).

Julian Geiger testified that he asked Finazzo to place at least 25% of Aéropostale's graphic t-shirts orders from overseas because Aéropostale could buy them at a substantially lower price, but Finazzo refused to comply.  (T 1039-41).  Geiger estimated that Finazzo's refusal to do so cost Aéropostale at least "$6 million" in profit.  (T 1041).

Contrary to Finazzo's claims, this loss is neither speculative nor amorphous.  At the time of Geiger's directive, Aéropostale had overseas vendors who were providing graphic t-shirts at $3.50 per t-shirt (at least $1.50 cheaper than South Bay's price).  (T 1040).  Additionally, Geiger explained that he arrived at the $6 million loss figure by multiplying 25% of the t-shirt business, essentially 4 million t-shirts, with $1.50 in savings per t-shirt.  Merchants dealing with t-shirts, including Jennifer Heiser, John DiBarto, Mary Epner and Thomas Carberry,

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 6

similarly testified about the money that Aéropostale could have
saved by purchasing graphic t-shirts from overseas vendors. (T
193-94, 203, 746, 1232-33, 1311-12, 1328). This pecuniary loss
to Aéropostale is further evident by South Bay agreeing to sell
the same graphic t-shirts to Aéropostale at $3.50/unit as part
of its settlement agreement with Aéropostale.

      With respect to the Guidelines, Finazzo's refusal to
move 25% of the graphic t-shirt business overseas constituted
actual loss. Even if there is some dispute as to this, it is
difficult to comprehend how this does not, at the very least,
constitute intended loss. Finazzo's kickbacks were directly
tied to South Bay's profits. By causing Aéropostale to pay
$1.50 more on millions of t-shirts, he intended to increase his
kickbacks, which were inversely tied to Aéropostale's profits.

      2.   South Bay's Disastrous Fleece Program

      The evidence is overwhelming that Finazzo caused
pecuniary loss to Aéropostale by placing fleece merchandise with
South Bay. Finazzo tries to undermine this loss by describing
South Bay's fleece business as "relatively small" and that South
Bay's delivery issues were similar to other vendors. (Def.
Memo. 10-11). First, this "relatively small" business was worth
millions of dollars to South Bay and cost Aéropostale millions
of dollars in loss. Second, a careful examination of the
record, including the portions cited by Finazzo, make it
abundantly clear that South Bay was in a class by itself when it
came to excessively late deliveries and the complete lack of
accountability for its poor performance.

      South Bay was simply not capable of being a proficient
vendor of fleece merchandise. It had no expertise in producing
fleece merchandise, and moreover, Aéropostale had capable fleece
vendors. Nonetheless, Finazzo expanded South Bay's role as a
vendor at Aéropostale by giving them the fleece business. More
orders and profits for South Bay meant larger kickback payments
to him and he could not pass up the opportunity to increase
South Bay's profits. Not surprisingly, South Bay's fleece
program was a disaster from beginning to end. Indeed, South
Bay's fleece program was such a failure from the start that
Finazzo was forced to intervene and make excuses for South Bay.
In an email dated December 3, 2004, Finazzo stated:

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 7

> We need to address the South Bay fleece
> program as a company first. They are wrong
> in the way they have approached this
> program. I believe that this is why I
> always believe it takes a year to develop a
> new vendor. We are all stressed out this
> season. Let's figure out what will be here
> for Christmas and what will be here in
> January. I would like you all to have a
> meeting before I land in Chicago and figure
> it out.  We cannot make the goods they do
> not have and end it. Doris, John, Stacey, I
> will call you around twelve noon for what we
> will do. Plane is leaving. Chris.

(T 1894-95; Government Exhibit ("GX") 241).  Unfortunately for
Aéropostale, South Bay's performance and quality did not improve
and Finazzo's insistence on placing fleece orders with South Bay
cost Aéropostale money.

Defense witness Megan Lauritano testified that Finazzo
ordered the production group to place fleece orders with South
Bay and that Finazzo set the price and quantity of fleece orders
placed with South Bay.  (T 1895-96).  Lauritano further stated
that Finazzo directed the production team to continue using
South Bay for fleece in 2005 and 2006 even after their
disastrous performance in 2004, and that South Bay's poor
performance continued in 2005 and 2006.  (T 1896-97, 1906-13).
Indeed, Finazzo directed Lauritano to place fleece merchandise
with South Bay even after Lauritano informed Finazzo that a cost
comparison between South Bay and other vendors showed that South
Bay was not competitive.  (T 1901-06; GX 295).

An additional example of pecuniary harm to Aéropostale
was South Bay's excessively late deliveries.  The following
testimony by Lauritano demonstrates the impact of South Bay's
late deliveries on Aéropostale's finances:

Q:  Now, how late was the fleece merchandise produced by
    South Bay Apparel for the holiday season in 2006?

A:  I recall that some of it was as much as 66 days late.

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 8

Q:   And what impact, if any, did the late deliveries of
     fleece product have on Aéropostale's fleece business
     in 2006?

A:   We lost the selling opportunity on that product. It
     hurt our gross margin. You know, we lost -- we weren't
     able to sell it and when we did finally bring it in,
     we probably would have marked it down and took a loss.

Q:   And did Aéropostale lose money by doing that?

A:   Yes.

Q:   South Bay still received the cost that Aéropostale
     paid for the fleece product, correct?

A:   Yes, they did.

Q:   Did you take any steps to address the loss of money
     caused by South Bay Apparel's late delivery of fleece
     merchandise in 2006?

A:   Yes. I worked with Nicole Vavaroutsos on a proposed
     discount on all of the styles that were late.

*    *    *

Q:   Did South Bay Apparel pay the proposed discount?

A:   No.

*    *    *

Q:   Whose decision was it not to pursue the discounts for
     these late deliveries in 2006 from South Bay Apparel?

A:   Chris Finazzo.

Q:   And, Ms. Hlavac, how did this decision compare to
     Aéropostale's typical dealings for excessively late
     deliveries from other vendors?

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 9

A:   It didn't compare. If this had happened with other
     vendors, we would have taken measures such as taking
     the discount or we would have cancelled the orders.

Q:   So just like in 2005, South Bay Apparel did not pay a
     discount in 2006, correct?

A:   Correct.

Q:   And both times it was the defendant Christopher
     Finazzo's decision?

A:   Yes.

Q:   How did South Bay Apparel's fleece product sell
     compared to fleece product from other vendors?

A:   It didn't sell as well. The customers liked the
     applique-washed fleece better.

(T 1912-22).

        Other witnesses provided similar accounts of the
pecuniary harm suffered by Aéropostale as a direct result of
Finazzo's decision to place fleece orders with South Bay.
Justin Meno, Aéropostale's Product Manager in 2005 and 2006,
testified that Finazzo did not permit Aéropostale's employees to
seek discounts from South Bay for excessively late deliveries of
fleece merchandise, which impacted Aéropostale's finances. (T
258, 263-64, 268-69). Meno described how South Bay's
"deliveries slid egregiously" and how this caused Aéropostale to
miss "significant sales opportunities." (T 254). Indeed, Meno
stated that delivery delay loss for men's fleece for one season
alone resulted in an "approximately 1.8 million" loss to
Aéropostale. (T 254-56). Finazzo's self-serving decision was
further highlighted when Meno noted that other vendors did not
have these types of delivery delays. (T 258).

        Jinah Jung, Aéropostale's Associate Product Manager in
2005 and 2006, testified that she did not want to purchase
fleece product from South Bay because South Bay's costs were
"always high" and their quality "subpar" compared to
Aéropostale's primary fleece vendors. (T 603-04). Notably,
Jung testified that Finazzo nonetheless instructed her to place

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 10


fleece orders with South Bay.  (Id.).  Jung also explained how
order placement with South Bay differed from other fleece
vendors in that Finazzo placed orders directly with South Bay
and that the price and quantity of orders were already
determined when the production department learned of the orders.
(T 608-09).

John DiBarto, the head merchant in the Men's Division,
testified that South Bay's fleece deliveries, negotiated by
Finazzo, were extremely late and this "had a negative effect
because during the peak time ... Black Friday into Christmas we
missed key selling weeks of a lot of units."  (T 747-48).
DiBarto also testified that Finazzo overruled merchants and
product managers and prevented Aéropostale from seeking any
discounts from South Bay in spite of their excessively late
deliveries and harm to Aéropostale.  (T 752-61).

Karen Klimkiewicz, Aéropostale's fleece merchant in
2005 and 2006, in describing Finazzo's treatment of South Bay
stated that Finazzo "went out of his way to make sure [South
Bay's] business worked a little smoothly, more or less the
golden child."  (T 1465).  Klimkiewicz testified that South Bay
had a more lenient approval process compared to other vendors.
(Id.).  Klimkiewicz also testified that Finazzo's decision
overruling her attempts to seek discounts from South Bay for
their excessively late fleece deliveries cost Aéropostale money.
(T 1467-69).

Finally, CEO Julian Geiger also explained the impact
of late fleece deliveries: "Any late deliveries would have
dramatic effects on our ability to sell through them on a timely
basis. And if they were late, generally so we didn't get
overstocked, one would have to take sooner and deeper markdowns
with them. So we would have a lower gross margin percent and
lower sales and lower profit for anything that was late."  (T
1043-44).

> 3.  Finazzo Chose South Bay's and
>     His Own Interests over Aéropostale
>     And Cost Aéropostale Millions of Dollars

As Aéropostale's Chief Merchandising Officer, Finazzo
had the final say on orders placed with South Bay and set the
prices that Aéropostale paid South Bay for merchandise purchased

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 11


from South Bay.  (T 99, 210-11, 364, 652, 682-83, 738).  Finazzo was hired by Aéropostale and owed a duty of loyalty to Aéropostale.  He was supposed to be seeking the best deal for Aéropostale.  Instead, his interests were in direct conflict with Aéropostale's interests.  Lower costs for merchandise from South Bay meant greater profits for Aéropostale.  But this meant a lower profit margin for South Bay.  And a smaller profit margin for South Bay meant smaller kickback payments for Finazzo.  Put simply, Finazzo was financially motivated to increase South Bay's profits and this increase came directly at Aéropostale's expense.

Yet another clear example of pecuniary loss to Aéropostale as a result of Finazzo and Dey's scheme was Finazzo's directive to Jinah Jung to place fleece orders with South Bay in February 2005, which ultimately cost Aéropostale $300,000.  Jinah Jung testified about GX 261, and how she sent an email to Finazzo informing him that an order for 450,000 units that he placed with South Bay for $6.85 per unit was "really high" and that Aéropostale "could have saved approximately $300,000" by placing the same order with another vendor.  (T 605-06, 636).  Jung further testified that South Bay's fleece was "more expensive" and that their fabric quality was "subpar."  (T 607).  Despite all of this, Finazzo told Jung: "Yes, that is the price I agreed with Doug on.  He did not make any money last holiday, and he is a valued partner, so good callout.  As we get closer to holiday, we can discuss.  This is his program. Chris."  (T 607-08).

Similarly, a number of former and current Aéropostale employees discussed how doing business with South Bay caused Aéropostale pecuniary harm.  In particular, they described how Finazzo (i) completely controlled the business with South Bay, (ii) prevented them from seeking lower prices from South Bay or moving business to other vendors, and (iii) reacted angrily when they challenged him on South Bay's quality, price or performance.

Jennifer Heiser, Aéropostale's men's graphic t-shirt merchant from 2000 to 2003, testified that she "was not allowed to bring in other manufacturers" and that when she tried to place some orders in Singapore, Finazzo "discouraged [her] from doing so."  (T 193-94).  Heiser also testified that Finazzo told her to bring in excess inventory from South Bay, which harmed

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 12


Aéropostale, and that South Bay did not go through the same approval process as other vendors. (T 200-03). Importantly, Heiser pointed out that South Bay's t-shirt price was high, but Finazzo prevented her from getting less expensive t-shirts at better quality from Singapore. (T 203-04). When Heiser challenged Finazzo on South Bay's high prices and lower profit margins, Finazzo got angry, "broke a pencil and said, we are using South Bay, end of story." (T 204). Heiser also testified how Finazzo terminated Jody Green, her associate merchant, because Green challenged Finazzo on South Bay. (T 205).

Jill Kronenberg, Aéropostale's Women's Divisional Merchandising Manager from 1997 to 2004, described how Finazzo got South Bay involved in the women's graphic t-shirt business when the women's department started to outgrow the men's department. (T 508-13). Importantly, Kronenberg testified that Finazzo directed her to place 50% of the women's graphic t-shirt orders with South Bay over her objections. (T 521; GX 182). Kronenberg explained her opposition to South Bay by stating that "the graphic t-shirts made by Mias [South Bay's main competitor] were better quality" and priced lower than South Bay. (T 520-21, 540-42).

John DiBarto, Aéropostale's Men's Divisional Merchandising Manager from 2004 to 2006, testified how he did not even bother to negotiate prices with South Bay because "that was ... Chris' thing. He controlled production. And that was ... his baby from the beginning, so we're really, you know, we did whatever he wanted." (T 652, 682-83). DiBarto stated that it was not "worth" challenging Finazzo on prices because he "would get angry" and that it was "stressful" when Finazzo was angry. (T 683-84). Specifically, DiBarto explained an email sent by Finazzo, triggered by Thomas Carberry, a merchant, questioning South Bay's costing structure. In this email, Finazzo stated, "John, I would like to let you know that if I hear that Tom Carberry is talking trash about South Bay to other people in the company, I will not tolerate that, and I will be swift in my actions." (T 735-36; GX 368). Similarly, DiBarto testified about another email where Finazzo stated, "Last night when I could not sleep I decided that as long as I'm here we will run the business as we started it with our key vendors. ... I will not change our vendor structure or the way we set up this business and I guess I can make that decision. I want South Bay to be the main t-shirt supplier." (T 766-67; GX 386). DiBarto

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 13

further testified that when Finazzo thought he and another
merchant were meeting with a potential competitor for South Bay,
Finazzo became agitated and stated, "we're not going to have any
other – you're only going to do business with South Bay, why are
you wasting their time." (T 654-55).

\*      \*      \*

As demonstrated above, Finazzo cost Aéropostale
millions of dollars over the ten-year relationship between South
Bay and Aéropostale. At the very least, Finazzo caused
pecuniary harm to Aéropostale in the amount that he was directly
making on every transaction between South Bay and Aéropostale,
which was 50% of South Bay's profit (i.e., $25,790,822.94).
Slezak explained that because Finazzo "was on both sides of
those transactions," there was no way Aéropostale got the
benefit of the bargain or the best market prices. (T 364-65).
Julian Geiger explained that Finazzo profiting on Aéropostale's
business, given his position, directly diminished "Aéropostale's
ability to maximize its profits because monies were going
elsewhere that could have gone to the company." (T 1073).

There is no doubt that Aéropostale would have demanded
that South Bay's cost be reduced, at the very least, by the
amount of the kickbacks it was paying its Chief Merchandising
Officer, had Aéropostale known about the kickback arrangement.
This is evident by Aéropostale's response when it found out
about Finazzo's related-party transactions. Aéropostale
responded by terminating Finazzo and its relationship with South
Bay. As part of a settlement agreement, South Bay paid
Aéropostale $8 million and Finazzo was forced to give up $5
million of his compensation. Notably, Aéropostale was unaware
at the time of the settlement that Finazzo had received 50% of
South Bay's profit on every single transaction between South Bay
and Aéropostale.

In sum, the loss caused by Finazzo to Aéropostale is
neither speculative nor amorphous. Aéropostale suffered
pecuniary harm, at the very least, in the amount of
$25,790,822.94, as a direct and proximate result of Finazzo's
kickback scheme.

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 14

III. A Guidelines Sentence Is Appropriate in
<u>Light of 18 U.S.C. § 3553(a) Considerations</u>

A.   <u>Legal Standard</u>

In <u>United States v. Booker</u>, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] ... to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. 125 S. Ct. 738, 743 (2005); <u>see</u> 18 U.S.C. § 3553(a). Subsequent to <u>Booker</u>, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines ... to 'consider' them, along with the other factors listed in section 3553(a)." <u>United States v. Crosby</u>, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." <u>Id.</u> at 113.

Later, in <u>Gall v. United States</u>, the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." <u>Id.</u> at 49-50 (citation and footnote omitted).

B.   <u>Application of Law</u>

As is explained in greater detail below, the government respectfully submits that the Court should impose a sentence at the low end of the Guidelines range of 135-168 months because such a sentence is appropriate to: (1) "reflect the seriousness of the offense, to promote respect for the law,

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 15

and to provide just punishment for the offense" (18 U.S.C. § 3553(a)(2)(A)); and (2) further the aims of general deterrence (see id. § 3553(a)(2)(B)).

The non-custodial sentence proposed by the defendant is so lenient, and so wildly divergent from the bottom of the Guidelines range, which calls for a sentence of 135 months, that the defendant's proposal should give this Court pause. See Rita v. United States, 551 U.S. 338, 350 (2007) (observing that, in light of the Commission's "ongoing" revisions to the Guidelines, based on review of criminal sentences and "advice from prosecutors, defenders, law enforcement groups, civil liberties associations, experts in penology, and others [,] .... it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives").

1.   The Nature and Circumstances of the Offense

The evidence of Finazzo's lies to Aéropostale and his efforts to conceal his deceit is staggering.  From the start of his employment with Aéropostale in July 1996 to his termination in November 2006, Finazzo schemed to line his own pockets and lied repeatedly to Aéropostale about the true nature of his relationship with Douglas Dey and South Bay.

Finazzo and Dey started scheming shortly after Finazzo was hired by Julian Geiger in July 1996. (T 820, 1004). Government cooperating witness Paul Conefry, who was Finazzo's and Dey's accountant during the relevant period, described a conversation he had with Finazzo and Dey in Mineola, New York, shortly after Finazzo was hired by Aéropostale. (T 821-22).  In that meeting, Finazzo discussed opening up a new business with Dey so that he could use his position at Aéropostale to send business to this newly-formed company. (Id.).  When Conefry cautioned Finazzo and advised him to check with Aéropostale if such an arrangement was acceptable, Finazzo responded that Aéropostale would not go for it. (Id.).

Following this meeting, in August 1996, Dey incorporated South Bay as the sole owner. (T 822).  According to their plan, Finazzo then got South Bay to become a vendor for Aéropostale.  To conceal Finazzo's interest with South Bay, Finazzo's name was intentionally left off South Bay's corporate

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 16

documents. (GX 128). In June 1998, as the business between South Bay and Aéropostale increased, Finazzo formed a shell company called C&D Retail Consultants, which was set up to receive his increasing kickbacks from South Bay. (T 824-25; GX 129). Over the course of his employment with Aéropostale, Finazzo abused his position as Aéropostale's chief merchant and grew South Bay's business without regard to South Bay's price, quality or performance.

Finazzo's reliance on Edward Slezak's testimony about Aéropostale's core vendors and Geiger's loyalty to these core vendors who took a risk by doing business with Aéropostale is misplaced. (Def. Memo. 5-6). Unlike Aéropostale's other vendors who had to perform to receive business, South Bay had very little risk. As demonstrated in Section II above, pages 4-13, South Bay had an insider working at Aéropostale and South Bay was guaranteed orders at high prices regardless of quality or performance. Finazzo's statement that South Bay was "loyal" to Aéropostale is absurd in light of the kickback arrangement between Finazzo and Dey. South Bay's existence and relationship with Aéropostale began with lies and ended with lies, not with loyalty. Although Aéropostale was loyal to its core vendors, including South Bay, Finazzo and Dey betrayed that loyalty from Aéropostale and this further demonstrates the troubling nature of this crime and the significant intangible harm, in addition to the tangible harm, suffered by Aéropostale.

Finazzo next relies on Geiger's statements about South Bay's replenishment system and the risks taken by South Bay for Aéropostale, which were made during Finazzo's termination interview in November 2006 and in an interview to Business Week in June 2004. (Def. Memo. 6). But Finazzo conveniently fails to point out that Geiger's statements were based on information provided to him by Finazzo. (T 1011-12, 1016, 1024, 1031, 1033, 1042). Finazzo described South Bay to Geiger as "one of our best partners" and a vendor that "would always go the extra yard to do something good for Aéropostale." (T 1033). Specifically, with respect to the comments made during the termination interview by Geiger about not having overpaid for anything from South Bay, Geiger testified that "it was based on my understanding at the time ... I didn't have all the information that I subsequently got but at the time and based on my trust in and belief in Mr. Finazzo, I believed that he would not overpay knowingly for anything." (T 1078). In light of this and other

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 17

responses by Geiger, it is not surprising that defense counsel chose not to question Geiger at trial about his comments to BusinessWeek in June 2004 that he now relies on.

Finazzo's masterful manipulation of Geiger and Kronenberg during the Claris Project when Finazzo moved a significant amount of the women's graphic t-shirt business from Mias to South Bay is evident from a plain reading of emails sent or directed by Finazzo in February and March 2004. (See GXs 174, 178, 179, 180, 181, 182, 186, 187, 188, 192, 200 and 201 – attached collectively as Exhibit B).

Finazzo's deceit and his false praises of South Bay are perhaps best illustrated by two emails sent by Finazzo in December 2004. (GXs 247 and 248 – attached as Exhibit C). In the first email, Finazzo forwards a fleece recap from Pamela Doiron, a merchant, to Julian Geiger, stating "[t]he fleece from southbay was great[.] better [gross margins] and stronger sales." (GX 247). Geiger responds, "Doug is God." (GX 247; T 1045-48). However, in a separate email, which did not include Geiger, Doiron responds to Finazzo that "Southbay was good @6.25 but at only 149,000 units it was not the biggest factor." (GX 248). Doiron further explained that the fact that production was able to reduce the average price for fleece produced by a different vendor by $1.00 was the real difference. (Id.). Finazzo's response to learning this information is not to correct his email to Geiger, but to say to Doiron, "Pls see me." (Id.).

Finazzo relies heavily on Doris Wilshire's testimony in support of his claim that South Bay was superior to its competitors. (Def. Memo. 7). The Court was able to observe Wilshire, a close friend of Finazzo, testify at trial and can make its own determination as to Wilshire's credibility in comparison to the testimony of other witnesses. While Finazzo points to Thomas Carberry agreeing that he had stated in an email to Justin Meno that he considered South Bay's facility and ability to replenish "priceless" (T 1263), Finazzo fails to point out that Carberry also testified that it was Finazzo who had described South Bay's service to him as "priceless," when he questioned Finazzo about South Bay's higher prices. (T 1225). Carberry also testified that South Bay's Level 1 graphic t-shirt printing was "good," quality of the blank was "marginal," service was "fair" and replenishment performance was "hit or

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 18

miss." (T 1219-20). Carberry also testified that the Level 2
t-shirts that Aéropostale purchased from South Bay had delivery
delays that cost Aéropostale money and were of a lower quality
and much higher price than available from other vendors. (T
1233-42).

Finazzo's claims that South Bay had legitimate
competition from other vendors are easily rebuffed by the
overwhelming evidence to the contrary, as set forth above.
Similarly, Finazzo's claim that the government cherry-picked
evidence in the sentencing letter submitted in connection with
co-defendant Dey's sentencing is meritless in light of the
evidence set forth above. Having presided over the trial, the
Court saw and heard directly from sixteen witnesses called by
the government and three witnesses called by Finazzo, and thus,
can assess the credibility of witnesses and make its own
determination as to the strength of the government's evidence.

From June 2002 through November 2006 alone, Finazzo
received more than $25 million in kickbacks from South Bay. (GX
126). And in that time period alone, Aéropostale purchased more
than $267 million in merchandise from South Bay. (GX 121).
Over the course of his employment with Aéropostale, Finazzo
received close to $20 million in salary, bonuses and stock from
Aéropostale, but he was greedy and wanted even more. And
through his fraud, he made more in kickbacks. Finazzo failed to
stop his scheme even after Aéropostale became a public company
in May 2002.

Paul Conefry testified that he unsuccessfully advised
Finazzo to disclose his relationship with South Bay to
Aéropostale just prior to Aéropostale becoming a public company
because he was concerned that the Securities and Exchange
Commission's ("SEC") involvement would come with "some serious
repercussions." (T 831-32). Conefry described yet another
conversation he had with Finazzo in 2005 where he relayed
information he had learned from an attorney in California about
SEC violations being referred to the Department of Justice for
criminal prosecution. (T 835, 838). But instead of stopping
his kickback scheme, Finazzo stated that "he was going to be
leaving Aéropostale fairly soon and that it was too late really
to do anything about it now." (T 839). In 2005, Finazzo
received $13 million in kickbacks. (GX 62).

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 19

Finally, Finazzo's attempt to place the blame for his abuse of power, betrayal of trust and lies to Aéropostale on the advice he received from his accountant Paul Conefry further highlights the egregious nature of this offense and Finazzo's complete lack of acceptance of responsibility. Finazzo worked at Macy's and owned his own business for years prior to being employed by Aéropostale. He became the chief merchant at Aéropostale and quickly rose to become second in command at Aéropostale. He was aware of conflicts of interest and knew that receiving kickbacks from a vendor was wrong. Moreover, the record is clear that Conefry warned Dey and Finazzo about the consequences of this scheme, and particularly when Aéropostale became a public company. (T 831-32, 838-39). Conefry further testified, on cross examination, that it was Finazzo and Dey who told him to classify the kickback payments as "consulting fees." (T 889). Indeed, it was Finazzo who opened C&D Retail Consultants, a shell company to receive kickbacks. Paul Conefry's testimony may have been devastating to Finazzo's defense, but to shift blame for this crime on the accountant who made less than $1 million while Finazzo and Dey each made $25 million from South Bay further demonstrates the need for a Guidelines or close to Guidelines sentence.

### 2.   History and Characteristics of the Defendant

The government takes no position as to Finazzo's assertions about his "essential goodness" and his willingness to give his money and time to "bettering he lives of all people." However, describing Finazzo as "unselfish" in light of the greed and selfishness exhibited in his $25 million kickback scheme lacks merit. Finazzo's greed not only cost Aéropostale, but also cost the merchants and product managers who worked for him and made a lot less than him, because their bonuses were tied to Aéropostale's profit margin.

Finazzo's greed and penchant for kickback schemes and abuse of his power is further demonstrated by the fact that he engaged in two additional schemes while at Aéropostale. In 2000, Finazzo contacted "RG," the owner of Niteks, a vendor that Finazzo had introduced to Aéropostale, and requested that RG pay him kickbacks because he was not being adequately compensated by Aéropostale. RG felt obligated and complied with Finazzo's demands because Finazzo had introduced Niteks to Aéropostale. In the beginning, RG made some cash payments to Finazzo.

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 20


Finazzo then directed RG to make payments by check payable to
C&D Retail Consultants.  RG again complied and gave Finazzo 10-
15 checks over a three-year period of time.  Two of the checks
indicate payments of $12,000 and $12,500.

In 1999, "NC," the account manager for Ms. Bubbles, a
vendor for Aéropostale, suggested to Finazzo that they hire
Finazzo's daughter Shanna to work for Ms. Bubbles as an intern.
Shanna was subsequently hired by Ms. Bubbles for sales and
administrative work.  In addition to receiving a salary, she
received commissions on business between Aéropostale and Ms.
Bubbles.  A couple of years later, Finazzo's two sons were also
receiving commissions from Ms. Bubbles on its business with
Aéropostale.  Finazzo, through his children, demanded that they
receive commissions on all of Aéropostale's business with Ms.
Bubbles and Triple Jewelry, another entity formed by NC, even if
they did no work on those orders.  Ms. Bubbles and Triple
Jewelry complied with Finazzo's demand.  If NC dared to question
Shanna, Finazzo intervened.  In an email to NC, dated December
28, 2004, Finazzo states, "What is the tone that you have with
my daughter.  It needs to stop or I will pull all your
business."  In another email to NC, dated June 13, 2005, Finazzo
states, "I'm not sure I will finalize anything with you
anymore????? Should I have shanna open up her own business??"
In yet another email to NC, dated August 17, 2005, Finazzo
states: "since your womens knit business is getting better at
aero I would like [Shanna] to get a full percent commission as
of this order.  And it does not come out of any othe[r] family
commission.  I hope you understand."

Finally, it bears noting that there is nothing
compelling about Finazzo's personal or family circumstances that
necessitates a below-Guidelines sentence.

### 3.   Seriousness of the Offense and General Deterrence

This is an extremely serious offense that requires a
significant sentence.  Finazzo's repeated lies on numerous
disclosure forms caused Aéropostale, a public company, to make
multiple false filings with the SEC.  Edward Slezak testified
about Finazzo's numerous lies and non-disclosures as an officer
of Aéropostale.  Specifically, Slezak testified about Finazzo's
lies on the Director and Officer Questionnaires, where he stated
that (i) he was not an officer, director or partner of any other

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 21


company; (ii) he had not received any bribes or kickbacks or
favorable treatment from vendors with regard to Aéropostale's
business; and (iii) he had not engaged in any related-party
transactions. (T 406-19; GXs 25, 27, 28). Michael Cunningham
testified about Finazzo's numerous lies and non-disclosures
concerning his relationship with South Bay in the Related-Party
Questionnaires completed by Finazzo, where he stated that (i) he
did not serve as director, executive officer, general partner or
perform similar functions of any company, partnership or other
entity; (ii) he had not received any bribes or kickbacks or
favorable treatment from vendors with regard to Aéropostale's
business; and (iii) he had not engaged in any related-party
transactions. (T 85-92; GXs 30-31). Cunningham also testified
about eleven representation letters completed by Finazzo where
he lied, inter alia, that he was unaware of any violations of
the policies in the Employee Handbook and the Code of Business
Conduct. (T 92-96; GXs 33-44).

        Despite the obvious seriousness of this offense which
involved more than $25 million in kickbacks and numerous
violations of a publicly-held company, Finazzo undermines the
seriousness of the crime by again stating that "it is mitigating
of Mr. Finazzo's intent that the professional he and Doug
consulted for advice about their relationship told them that
their relationship caused 'no foul.'" (Def. Memo. 15-16). In a
further attempt to minimize his crime, Finazzo states that
"[t]here is hardly an offense that does not qualify as
'serious'" and "the undeniable benefits to Aéropostale of the
relationship that Mr. Finazzo fostered between it and South Bay
makes his conduct relatively less serious. . . ." (Def. Memo.
15). These statements clearly demonstrate that Finazzo is
unrepentant and lacks remorse for his actions. The fact that a
high-ranking officer of a public company can steal $25 million
of his employer's profits through kickbacks and then proceed to
make arguments that his kickback arrangement was in fact
beneficial to his employer because the company was overall
profitable emphasizes the need for a strong sentence that
promotes respect for the law and provides just punishment for
this serious offense.

        A sentence at the low end of the Guidelines will also
further the aims of general deterrence. See 18 U.S.C. §
3553(a)(2)(B). The government's three-plus year investigation
revealed that bribes and kickbacks are much too common in the

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 22

retail industry. Indeed, as described above, Finazzo was involved in at least two other, albeit smaller, kickback schemes. And Finazzo and Dey engaged in a similar scheme with another retail company, Anchor Blue, following Finazzo's termination by Aéropostale. A Guidelines or close to Guidelines sentence, which represents a strong but fair sentence by the Court, would send a strong deterrent message to officers of public companies that engaging in kickback schemes and lying on disclosures to the SEC are serious offenses that come with appropriate consequences.

IV. <u>Restitution</u>

Finazzo contends that the Court may not issue an order of restitution because (1) Aéropostale suffered no economic loss and (2) the special verdict demonstrates that the government did not prove that Aéropostale suffered a loss. (Rest. Memo. 1-7). For the reasons set forth below, Finazzo's arguments are without merit and should be rejected.

A. <u>Applicable Law</u>

The Mandatory Victim Restitution Act ("MVRA"), adopted on April 24, 1996 as part of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), and codified at Title 18, United States Code, Section 3663A, made restitution mandatory for particular crimes, including offenses involving fraud. 18 U.S.C. § 3663A(c)(1)(A)(ii). "[T]he 'primary and overarching' purpose of the MVRA 'is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being.'" <u>United States v. Boccagna</u>, 450 F.3d 107, 115 (2d Cir. 2006) (quoting <u>United States v. Simmonds</u>, 235 F.2d 826, 831 (3d Cir. 2000)).

Additionally, the MVRA was enacted to "ensure that the offender realizes the damage caused by the offense and pays the debt owed to the victim as well as to society." S. Rep. No. 104-179, at 12 (1996), <u>reprinted in</u> 1996 U.S.C.C.A.N. 924, 925; <u>see also</u> <u>United States v. Johnson</u>, 378 F.3d 230, 245 (2d Cir. 2004) ("[o]ur long-held understanding of the purposes of restitution ... include[s] not only the compensation of victims, but also the punishment of offenders") (citing <u>United States v. Brown</u>, 744 F.2d 905, 909 (2d Cir. 1984)); <u>United States v. Reano</u>, 298

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 23


F.3d 1208, 1211-12 (10th Cir. 2002).   Subject to limited
exceptions, failure to impose restitution for crimes covered by
the MVRA, where there is an identifiable victim, amounts to
clear error.   Johnson, 378 F.3d at 243-44.   The MVRA defines
"victim" as a "a person directly and proximately harmed as a
result of the commission of an offense for which restitution may
be ordered including, in the case of an offense that involves as
an element a scheme, conspiracy, or pattern of criminal
activity, any person directly harmed by the defendant's criminal
conduct in the course of the scheme, conspiracy, or pattern."
18 U.S.C. § 3663A(a)(2).

The Victim and Witness Protection Act ("VWPA") states
that "[t]he court, when sentencing a defendant convicted of an
offense under this title ... may order ... that the defendant
make restitution to any victim of such offense."   18 U.S.C. §
3663(a)(1)(A).

B.   Application of Law

As set forth in great detail in Section II above,
pages 4-13, the government has proved by a preponderance of the
evidence that Aéropostale suffered a pecuniary loss in the
amount of $25,790,822.94 as a direct and proximate result of
Finazzo's kickback scheme.

First, Finazzo's reliance on the jury's special
verdict at trial is unavailing.   The jury was deciding between
innocence and guilt based on a "proof beyond a reasonable doubt"
standard.   They were not determining restitution or whether
Aéropostale suffered pecuniary loss based on a preponderance of
the evidence standard.   Restitution is an issue for the Court to
decide based on a preponderance of the evidence standard and the
government has easily met its burden.

Second, the government agrees with Finazzo that a
defendant's gain may not be substituted for a victim's loss to
determine restitution.   United States v. Zangari, 677 F.3d 86,
93 (2d Cir. 2012) (holding that "a sentencing court ordering
restitution under the MVRA may not substitute a defendant's ill-
gotten gains for the victim's actual loss").   However, the
Zangari Court did affirm the restitution order in a kickback
case and explained:

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 24

> We agree that the restitution order was
> entered in error, but not because Zangari's
> victims suffered no loss. Rather, we hold
> that it was error to base the restitution
> order on Zangari's gain rather than the
> victims' actual losses.

Id. at 91 (emphasis added). It follows from the Second
Circuit's holding in Zangari that a kickback case does not
preclude loss to a victim. This interpretation is consistent
with Judge Amon's holding in United States v. Donaghy, 570 F.
Supp. 2d 411 (E.D.N.Y. 2008).

Finazzo claims that the trial witnesses merely
speculated that money Finazzo received might hypothetically have
gone to Aéropostale, and that such speculation is insufficient
to support an award for restitution. (Rest. Memo. 4). As
explained in Section II, pages 4-13 above, there is nothing
speculative or amorphous about the loss suffered by Aéropostale
as a direct and proximate result of Finazzo's actions.

Finazzo cites United States v. Gushlak, 728 F.3d 184,
196 (2d Cir. 2013) to argue that "restitution may only be
awarded for a 'reasonable approximation of losses supported by a
sound methodology.'" (Id.). The government agrees that only a
"reasonable approximation of losses" is required and it has
proven just that by a sound methodology. Indeed, in the very
next sentence, the Gushlak Court explains that:

> [T]he preponderance standard must be applied
> in a practical, common-sense way. So long
> as the basis for reasonable approximation is
> at hand, difficulties in achieving exact
> measurements will not preclude a trial court
> from ordering restitution.

728 F.3d at 196 (internal quotations and citation omitted).
Indeed, the law in this Circuit is clear that the preponderance
standard for restitution does not require "mathematical
prec[ision]." Id. at 195. In calculating "actual loss", a
"'reasonable approximation' will suffice especially in cases in
which an exact dollar amount is inherently incalculable." Id.
at 196; see United States v. Kerekes, 2013 WL 5382066, at *2 (2d
Cir. 2013) (unpublished opinion) (citing Gushlak for the

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 25


proposition that the MVRA requires "only reasonable approximation of losses"); <u>United States v. Murdock</u>, 2013 WL 5788646, at *1 (2d. Cir. 2013) (unpublished opinion) (same); <u>see also</u> <u>United States v. Newsome</u>, 399 F. App'x 625, 628 (2d Cir. 2010) (unpublished opinion) (noting that value under the MVRA is "a flexible concept to be calculated by a district court by the measure that best serves Congress's statutory purpose of making crime victims whole") (internal citation omitted).

Based on the facts provided above, the clearly-established law in this Circuit and the legislative purpose of the MVRA to make crime victims whole, the Court should order Finazzo to pay restitution to Aéropostale, jointly and severally with Dey, in the amount of $25,790,822.94. This amount represents a "reasonable approximation" of the loss suffered by Aéropostale as a result of this ten-year kickback scheme. The government further submits that the Court should deduct the $7.1 million already paid by Dey to Aéropostale under the terms of their settlement agreement. However, the government contends that the $5 million paid by Finazzo as part of his settlement should not be deducted from the restitution order because it was unrelated to the merchandise provided by South Bay to Aéropostale, and additionally because Aéropostale was unaware of the kickback scheme at the time of the settlement agreement.[3]

---

[3]   The government takes no position regarding Aéropostale's right to recover attorney's fees as it does not possess the necessary information. However, Aéropostale submitted a letter dated June 28, 2013 to the Probation Department that sets forth its basis for restitution of attorney's fees and related expenses.

Hon. Roslynn R. Mauskopf
November 14, 2013
Page 26


V.    Conclusion

        Based on the foregoing, the government respectfully
submits that the Court should sentence Finazzo to a term of
imprisonment at the low end of the Guidelines range of 135-168
months and order him to pay restitution, jointly and severally
with co-defendant Douglas Dey, in the amount of $18,690,822.94.

                            Respectfully submitted,

                            LORETTA E. LYNCH
                            United States Attorney
                            Eastern District of New York


                    By:    _____/s/_____
                            Winston M. Paes
                            John P. Nowak
                            Assistant U.S. Attorneys
                            (718) 254-6023 (Paes)


Enclosures

Cc:  Clerk of the Court (RRM) (By ECF)
     Robert J.A. Zito, Esq. (By ECF)
     Alan S. Lewis, Esq. (By ECF)
     Frank M. Marcigliano, U.S. Probation Officer (By Email)