Robert J.A. Zito (RZ-6990)
Alan S. Lewis (AL-2828)
CARTER LEDYARD & MILBURN LLP
Two Wall Street
New York, NY 10005
Tel.: (212) 732-3200

*Attorneys for Defendant Christopher Finazzo*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
UNITED STATES OF AMERICA,          : Cr. No. 10-457 (RRM)
                                                            :
            -against-                                       :
                                                            :
CHRISTOPHER FINAZZO,                                        :
                                                            :
                              Defendant.                    :
------------------------------------------------------------X

## REPLY SENTENCING MEMORANDUM OF CHRISTOPHER FINAZZO

CARTER LEDYARD & MILBURN LLP
COUNSELORS AT LAW
2 WALL STREET
NEW YORK, N.Y. 10005

(212) 732-3200

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

POINT I
CALCULATION OF THE FRAUD GUIDELINE .................................................................. 2

    A. Mr. Finazzo's Purported "Refusal to Follow Geiger's Directive to Place 25% of T-Shirts" Overseas. ............................................................................................. 3

    B. The South Bay Experimental Fleece Program ................................................... 8

    C. Choosing "His Own Interests Over Aéropostale" .............................................. 9

POINT II
OTHER SENTENCING ISSUES ........................................................................................... 11

POINT III
THE GOVERNMENT DOES NOT EXPLAIN ITS REASON FOR CHANGING ITS POSITION, ON THE APPLICABILITY OF A 4-POINT SECURITIES LAW ENHANCEMENT ..................................................................................................................... 12

POINT IV
THE GOVERNMENT'S ARGUMENT THAT "GENERAL DETERRENCE" REQUIRES AN 11-YEAR SENTENCE IS CONCLUSORY, IGNORES THE OTHER GOALS OF SENTENCING, AND IS BASED ON THE SPECIOUS CLAIM THAT MR. FINAZZO IS "UNREPENTANT" .................................................................................. 13

POINT V
REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY ............................................. 14

POINT VI
RESTITUTION IS NOT WARRANTED ............................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

CASES

*McNally v. United States*,
   483 U.S. 350 (1987) ............................................................................................ 9

*People v. Wolf*,
   98 N.Y.2d 105 (2002) .......................................................................................... 9

*United States v. Gallant*,
   537 F.3d 1202 (10th Cir. 2008) ..................................................................... 9, 10

RULES AND STATUTES

Fed. R. Evid. 408 ............................................................................................................ 7

U.S.S.G. § 2B1.1 app. n. 3(A)(i)-(iii) ............................................................................. 2

U.S.S.G. § 3B1.3 .......................................................................................................... 12

U.S.S.G. § 3E1.1 app. n. 2 ........................................................................................... 15

OTHER AUTHORITIES

Sentencing Transcript, *United States v. Ghavami*,
   No. 10-cr-1217 (S.D.N.Y. July 23, 2013) ......................................................... 10

This memorandum is respectfully submitted in reply to the government's letter, dated November 14, 2013, regarding Mr. Finazzo's sentencing.

## PRELIMINARY STATEMENT

The principal focus of the government's sentencing submission is the calculation of "loss" under the sentencing guidelines. The government calculates the guidelines range as between 11.25 to 14 years and asks the Court to impose a sentence within that draconian range.[1] The government's "loss" argument is that Mr. Finazzo stole $25 million from Aéropostale, Inc. ("Aéropostale"), despite the specific finding by the jury that Mr. Finazzo did not intend to deprive Aéropostale of any money. The government asks this Court to arrive at a factual conclusion opposite to what the jury found and makes few other sentencing arguments.

The government appears to concede, as it must, that it bears the burden of establishing that Aéropostale sustained a pecuniary loss of either money or some property that is "readily measurable" in money. As explained below, the starting point for the calculation of loss under the guidelines must be a precise identification of the "offense." The only offense here – reflected by the jury's special verdict – is that Mr. Finazzo intended to deprive Aéropostale of its intangible right to "control" its assets, a right that is not "readily measurable" in money. Accordingly, there is no dollar amount of loss attributable under the fraud guideline.

The government also fails to answer why Mr. Finazzo should be imprisoned for the lengthy period it advocates when, less than 20 years ago, his conduct would have been analyzed under the guidelines as warranting a sentence of about 3 years. The nature or wrongfulness of these crimes has not changed during this period. Perhaps more importantly, the

---

[1] The Department of Probation recommends a maximum sentence of 8 years.

1

government cannot cite to any recent case involving similar facts that resulted in anything near the draconian sentence it now urges.

## POINT I

## CALCULATION OF THE FRAUD GUIDELINE

For sentencing guidelines purposes, a "loss" is that which results from (or was intended to result from) "the offense." *See* U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 2B1.1 app. n. 3(A)(i)-(ii). A loss occurs only if it is "readily measurable in money." U.S.S.G. § 2B1.1 app. n. 3(A)(iii). Because the jury rendered a special verdict, the offense can only be based upon what the jury found to have been a fraud, and cannot be based on what the jury rejected. The "offense" is Mr. Finazzo's intention to deprive Aéropostale of its "right to control." The offense is not the deprivation of any money, as the jury specifically acquitted Mr. Finazzo of such charge.

The government does not attempt to value or monetize such "right to control" for reasons that are obvious: there is no value to such property. It cannot be bought or sold. It is not transferable.

Instead, the government seeks to retry the identical overpricing case that the jury rejected, asserting that the evidence proves nevertheless that Mr. Finazzo *stole* $25 million from Aéropostale. The government's argument is fundamentally flawed for the simple reason that it does not start in the right place – with the proper identification of "the offense": deprivation of the right to control – nor does it attempt to show how the loss from that offense is "readily measurable" in money.

Moreover, even following the government's faulty line of argument, there is no calculus that even remotely supports the proposition that Aéropostale was overcharged by any amount even remotely approaching $25 million.

2

The government divides its $25 million calculation into three parts:

1) Mr. Finazzo's alleged failure to "place 25% of graphic T-shirt" orders overseas (Govt. Ltr. at 4);

2) an allegedly "disastrous fleece program" (Govt. Ltr. at 6); and

3) the vague and general assertion that Mr. Finazzo chose "his own interests over Aéropostale" coupled with the ipse dixit conclusion that this "cost Aéropostale millions" (Govt. Ltr. at 10).

But the government offers no evidence of causation of any alleged loss, nor any arithmetic. Instead, the government asks this Court to speculate that these three alleged theories must have resulted in $25 million in damages to Aéropostale, again, something that the jury understandably rejected and which most importantly, cannot be derived from the mail/wire fraud offense of conviction.

A. **Mr. Finazzo's Purported "Refusal to Follow Geiger's Directive to Place 25% of T-Shirts" Overseas.**

The government asserts that it proved at trial that Aéropostale was damaged (in an unspecified amount) because Mr. Finazzo allegedly "refused" to follow Julian Geiger's alleged "directive" to purchase 25% of graphic t-shirts that are printed overseas. According to the government, Aéropostale overspent by "$1.50 per shirt," although the basis of this assertion is utterly unproven and, indeed, the government fails to even specify which shirt styles were allegedly affected, during what time period and in what quantities.[2] As will be seen, the government further fails to offer any calculation demonstrating what the total loss allegedly was and certainly fails to offer a calculation that even remotely totals $25 million.

The government's theory is fatally flawed, and, again, was properly rejected by the jury for the following reasons:

---

[2] Even the government's own witnesses did not consistently estimate $1.50 in savings. Cunningham, for example, testified to an estimated range of savings "anywhere from $1 up to $1.50." Tr. 125.

3

### No Directive

There was no evidence of any "directive" to Mr. Finazzo. Indeed, Geiger himself never testified to any "directive" and instead testified that he made a "suggestion" at some of the staff meetings of printing some graphic t-shirts off-shore.[3]

### No Documentary Evidence

There was no writing, such as a memorandum or even an email evidencing any decision or "directive" from the board of directors or even Geiger himself, or even of any "suggestion." Tr. 149.

### Disputed Target Percentages

While other witnesses testified about a "suggestion" that more graphic t-shirts might be printed overseas, the goals were vague and unclear about which particular shirts by graphic design and color might be printed offshore. Carberry's recollection differed from Geiger's, and he testified that he believed the targeted percentage might be between 15% and 20%. Tr. 1232: 5-15. Again, like each of the witnesses in this regard, Carberry could not specify which style and color t-shirts might be printed offshore. Again, no memorandum or email was ever issued that in any way clarified Geiger's "suggestion," set target amounts or specified which graphics and which colors might be tested.

### Disputed Time Period

Even assuming that Geiger made such a suggestion, it could not have occurred prior to February 2006, ten years after South Bay joined the Aéropostale Vendor Matrix. Indeed, Doris Wilshere, an Aéropostale General Merchandise Manager, first for the Men's and later for

---

[3] "I *suggested* in a very conservative manner that at least 25 percent of all our graphic t-shirts be manufactured abroad with a longer lead time on graphics that were the most easy to predict." Tr. 1039:15-18, emphasis added.

4

the Women's Division and who attended weekly executive meetings, testified that during her employment Geiger never made such a suggestion. Tr. 1752: 4-7. Cunningham testified that such a possibility was raised sometime in 2005, but he did not testify which persons were aware of such a possibility. Tr. 123.

### Mr. Finazzo Did Not Prevent Overseas Vendors From Being Used

There is no evidence that some portion of the graphic t-shirts were not printed overseas. Indeed, DiBarto testified that Mr. Finazzo had t-shirts printed overseas (*e.g.*, Tr. 679:18-21). In a May 2006 email from Mary Epner to her staff (GX332), she advised that Mr. Finazzo specifically approved the use of overseas vendors for "proven graphics" if buyers so desired.

Perhaps the most glaring flaw in the government's theory of "loss" is the lack of any loss causation, or, in other words, a specified amount of damages related directly to Mr. Finazzo's wrongful conduct. Mr. Finazzo's wrongful conduct was nondisclosure, not "stealing money." Mr. Finazzo did not steal from Aéropostale; he split profits with Doug Dey without disclosing that partnership to Aéropostale.

Even assuming that the CEO or the Board issued a mandatory "directive," despite the conflicting testimony and the lack of any written evidence, the government's proof fails to answer the following critical questions regarding the alleged loss:

- Which category of t-shirts by design graphic and color were allegedly affected?
- What time period was affected?
- How many t-shirts for each design graphic and color were affected?
- Which vendors were to be used by Aéropostale?
- Where were such hypothetical vendors located?

5

- Would such hypothetical vendors have had capacity in their facilities to fill the orders and the ability to ship the ordered goods in a timely fashion.[4]

- What were the costs of such t-shirts?

- What would have been the additional shipping costs for shipping "overseas" to a port in the United States?

- What would have been the additional shipping costs and handling fees for shipping the t-shirts from a port on the west coast to Aéropostale's distribution center in New Jersey?

The government has failed to provide a response to any of these critical questions. Nor has the government proved any of the facts necessary to offer such a response.

The government has further failed to prove that Aéropostale would have made more money without its relationship with South Bay and by eliminating the quick replenishment system that was in place with both Mias Fashions and South Bay. Not a single witness testified that ordering t-shirts from overseas vendors without quick replenishment would have made more money for Aéropostale, or that Aéropostale lost any money as a result of its relationship with South Bay. To the contrary, each witness without exception conceded that abandonment of the quick replenishment program put Aéropostale at risk by making it unable to replace the sold items that were "hot," which translates into lost sales. The Court heard more than one government witness explain that by using South Bay, Aéropostale took less inventory risk. South Bay was able to deliver goods to market faster than any other vendor, sometimes even on 24 hours' notice, which, in turn, resulted in more than $140 million[5] in profit for Aéropostale. *See, e.g.*, Tr. 1129:6-8, 1129:25-1130:2, 1357:21-24, 1435:15-1436:1, 174:25-175:14. All witnesses conceded that a t-shirt printed overseas, while possibly less expensive, could take many months to reach Aéropostale's stores, during which time demand for that particular shirt

---

[4] Not a single vendor testified that it was able to manufacture the same goods and provide the same services at the same price as South Bay. Cunningham characterized South Bay's services as unique. Tr. 170-171.
[5] Michael Cunningham testified that Aéropostale's profit margin on the $350 million in goods it bought from South Bay was 40 to 48%, which is $140–$168 million, not $130 million as Cunningham miscalculated. Tr. 174-175.

design might decrease, causing Aéropostale to mark down the shirt's selling price once it was delivered to the stores for retail sale. Government witness Jill Kronenberg, Aéropostale's former women's General Merchandising Manager, explained this thoroughly. *See* Tr. at 564-65.

In addition, without quick replenishment, Aéropostale would have been forced to order large quantities of t-shirts from overseas vendors to fill the shelves for the upcoming season months in advance, without being able to test the market with small orders to discern whether particular styles would be successful, and then replenishing on the successful styles. Such large quantity orders, without market sales data, created inventory risk and mark-downs. Indeed, such inventory risk and mark-downs were directly attributed to Aéropostale's losses and lack of success during its early years.

Notably, Wade Mosteller of Claris Consulting, a wholly impartial and disinterested third-party witness, testified that Claris' advice to Aéropostale was to use quick replenishment for *all* product lines, not just graphic t-shirts, to avoid loss of sales and increase profits, and avoid inventory risk mark-downs stemming from large quantity orders from overseas vendors without sales market data. Mr. Mosteller's testimony was not, and could not be, refuted or contradicted. The government called no rebuttal witnesses. *See, e.g.*, Tr. 1966, 1975, 1991, 1995.

Finally, the government's suggestion that the amount of the civil settlement between Aéropostale and South Bay constitutes evidence of overpricing is unavailing (Govt. Ltr. at 13). It is well-settled that litigants settle disputes for a variety of reasons having nothing to do with the alleged merits of a lawsuit taking into consideration extrinsic matters such as legal fees, the stress of ongoing litigation, and cash flow, among other things. *See, e.g.*, Fed. R. Evid. 408 Advisory Committee's note. Here, Aéropostale was holding over $16 million in accounts

receivable to South Bay, an amount so huge that it threatened the life of South Bay.[6] To recoup its cash flow, South Bay was forced to discount its receivables to prevent a contentious litigation, legal fees and to preserve the cash flow of the business. Indeed, if it were true, as the government suggests, that South Bay vastly overcharged Aéropostale by exceeding a price of $3.50 per shirt, then so too did Mias – which sold T-shirts at prices comparable to the prices charged by South Bay. *See, e.g.*, Tr. 1294:12-19, 1756:1-23. The jury certainly did not find this to be the case.

## B. The South Bay Experimental Fleece Program

The government also claims that Aéropostale suffered a pecuniary, monetary loss as a result of the experimental fleece program with South Bay. The basis for this assertion is twofold: (1) South Bay generally was not the lowest cost producer of fleece, and (2) some deliveries were late. Again, and as is the case throughout its analysis, the government fails to offer any calculation or causation analysis showing how Aéropostale was damaged or sustained a pecuniary, monetary loss and the amount of such loss, if any.

The evidence at trial overwhelmingly established that Aéropostale did not always reject a vendor because of a bid that was over Aéropostale's target prices. *See, e.g.*, Tr. 1847-50, 1852-59, Finazzo Exhibits E2, F2.[7] Indeed, virtually every vendor delivered some orders higher than Aéropostale's target prices, and South Bay generally produced fleece products at or below Aéropostale's target prices. *See, e.g.,* Finazzo Exhibits E2, F2, and L2. And South Bay was not always the successful bidder. *See, e.g.,* Tr. 1829-31, 1833-34, Finazzo Exhibits M2, H2.[8]

---

[6] *See* Exhibit E to the Memorandum on Behalf of Defendant Douglas Dey with Respect to Restitution, Docket #320, at ¶ 3.
[7] Finazzo Exhibits E2, F2, L2 and M2 are attached as Exhibit A.
[8] Finazzo Exhibit H2 is attached as Exhibit B.

8

Various witnesses testified that late deliveries were not an uncommon problem with Aéropostale's other vendors. *See, e.g.,* Tr. 1939:15-25. Many of South Bay's delivery delays were not its fault, but were attributable to labor strikes and Aéropostale's intellectual property disputes. Tr. 301, 359. At worst, these are contractual in nature, and not something related to any "fraud." The government's analysis would turn virtually every underperformance or breach of contract into a "fraud." The government offers no calculation or reasoning that shows an actual, pecuniary loss measurable in money, as required under the guidelines.

Many witnesses testified that South Bay provided quality products and even better service. *See, e.g.,* Tr. 646:18-20, 764:7-10, 1219:12-17, 1263:5-11, 1754, 1760. One witness's subjective opinion about the quality of South Bay's fleece (Govt. Ltr. at 9) does not demonstrate any actual, pecuniary loss measurable in money.

## C. Choosing "His Own Interests Over Aéropostale"

The government asks the Court to assume that Aéropostale suffered a loss simply because Mr. Finazzo failed to disclose his interest – which the government claims corrupted the bidding process – something which the law does not permit. *See People v. Wolf*, 98 N.Y.2d 105, 114 (2002) (after surveying "the decisional law on kickbacks and employee bribery under the ... federal mail fraud statute," explaining that federal law "militate[s] toward requiring more than payment of a kickback to establish ... economic harm") *cf. McNally v. United States*, 483 U.S. 350, 360 (1987) (noting that although jury found that officer had accepted bribes it did not necessarily find that government would have paid lower prices but for bribery); *United States v. Gallant*, 537 F.3d 1202, 1238 (10th Cir. 2008) (a court cannot use a defendant's gain as a substitute for loss "unless the court has first attempted to determine with *some degree of certainty* the general amount of loss, actual or intended, that is attributable to the defendants'

criminal conduct and concluded that the defendants' gain 'correspond[s] to' that amount") (emphasis added).

The government fails to cite a single case in which any court found that the failure to disclose any conflict of interest by itself was a sufficient basis to find there had been a pecuniary loss readily measurable in money. The government ignores the recent decision in *United States v. Ghavami*, in which Judge Wood reiterates the well-settled principle that a non-disclosure that may affect a bidding process is not by itself adequate to establish a loss under the guidelines. *See* Sentencing Tr. at 9-10, No. 10-cr-1217 (S.D.N.Y. July 23, 2013).[9]

It is also well-settled, as various witnesses testified, that related party transactions are not per se wrong or above-market, and that many companies engage in them. Tr. 142-43, 372:23-25.

The government's argument is not only grounded in legal error, but also in a mis-description of the facts. For example, it offers out-of-context quotations of selected testimony given by Edward Slezak and Julian Geiger. *See* Govt. Ltr. at 13. But Geiger's and Slezak's guesses about how Aéropostale may have fared, financially, if Mr. Finazzo had disclosed his interest in South Bay, is pure speculation, not evidence. Indeed, Aéropostale's own Chief Financial Officer conceded that there was no evidence of overcharging: Aéropostale had "no way of knowing if [the prices paid to South Bay were] the best possible price[s] we could get for the t-shirts overall." Tr. at 137.

Perhaps most importantly, Geiger testified under oath before the U.S. Securities and Exchange Commission that Aéropostale did not incur any damages, that South Bay's prices were at market and that such was tested by independent third-party consultants. *See* Testimony

---

[9] Mr. Finazzo's opening memorandum also cited to the sentencing transcript in *United States v. Ghavami*, however the court was mistakenly identified as the Second Circuit rather than the Southern District of New York.

10

of Julian Geiger before the United States Securities and Exchange Commission, *In re Aéropostale, Inc.*, NY-7802, June 12, 2008, at 45-46, 51 (excerpts attached hereto as Exhibit C).

In short, the government's case that Aéropostale incurred a pecuniary loss measurable in money is built on nothing more that surmise, speculation and innuendo, which was properly rejected by the jury. The government offers no reason this Court should reach an opposite result for sentencing purposes.

## POINT II

### OTHER SENTENCING ISSUES

The government accuses Mr. Finazzo of "attempt[ing] to place the blame [for his conduct] on the advice he received" from Paul Conefry. Govt. Ltr. at 19. Mr. Finazzo, according to the government, has tried to "shift blame for this crime," merely by pointing to the undisputed evidence that Mr. Finazzo and Mr. Dey were repeatedly told by Conefry that their partnership caused "no harm" and therefore was "no foul." Govt. Ltr. at 19. But Conefry did say this, repeatedly. Contrary to the government's implication, Mr. Finazzo has never argued that this makes him blameless. Indeed, our opening memorandum repeatedly acknowledges that Mr. Finazzo failed to disclose to Aéropostale his interest in the profits of South Bay and that this was, undeniably, wrong. But at the same time, the fact that Mr. Finazzo turned to a professional about his relationship with Mr. Dey – and was told that the relationship was "no foul" – surely has a place in a balanced assessment of Mr. Finazzo's conduct.

The government is utterly dismissive of Doris Wilshere's testimony about the positive aspects of South Bay's performance. Govt. Ltr. at 17. Of course, the government had the opportunity to interview Wilshere before trial and cross-examined her at trial. Wilshere's testimony, favorable to Mr. Finazzo, was logical, not impeached and was consistent with that of other witnesses. The government points to no evidentiary support whatsoever for its negative

11

opinion about her credibility. Instead, it relies wholly on its unexplained assertion that Wilshere was a "close friend" of Mr. Finazzo. Govt. Ltr. at 17. However, Wilshere was no more "friendly" than many of the other witnesses.

In short, the government's position relies on cherry-picking the evidence while ignoring the portions of the testimony that undermine its argument.

## POINT III

### THE GOVERNMENT DOES NOT EXPLAIN ITS REASON FOR CHANGING ITS POSITION, ON THE APPLICABILITY OF A 4-POINT SECURITIES LAW ENHANCEMENT

In its November 14 submission, the government summarily asserts that the guideline calculation should include a four-point enhancement for violation of the securities laws. Govt. Ltr. at 3 (citing PSR ¶¶ 35-41). Yet, in its response to Mr. Finazzo's objections to the PSR, the government had previously expressed the *opposite* view. There, it recognized that possible enhancements for abuse of trust (U.S.S.G. § 3B1.3) and violation of the securities laws are, under the fraud guideline, *alternatives*, and it took the position that "a 2-point enhancement for abuse of position of trust under U.S.S.G. § 3B1.3, as set forth in PSR ¶ 26, is preferable [to the securities enhancement]." Govt. Ltr., Sept. 27, 2013, at 10-11. Accordingly, the government proffered a guideline calculation that included the abuse-of-trust enhancement and *excluded* the securities enhancement. *See id.* at 11.

Mr. Finazzo, relying on the fact that both parties agreed that abuse of trust, rather than the securities law enhancement, should be applied, did not brief this issue in his opening sentencing memorandum. Suddenly, the government appears to have changed its position, but without explaining the reasons for its position or its reason for changing that position. Respectfully, the government should not be heard, at this point, to argue for the applicability of

this guideline enhancement, given its prior express waiver of that argument when addressing objections to the PSR.

## POINT IV

**THE GOVERNMENT'S ARGUMENT THAT "GENERAL DETERRENCE" REQUIRES AN 11-YEAR SENTENCE IS CONCLUSORY, IGNORES THE OTHER GOALS OF SENTENCING, AND IS BASED ON THE SPECIOUS CLAIM THAT MR. FINAZZO IS "UNREPENTANT"**

Mr. Finazzo's opening memorandum discussed each of the statutory goals of sentencing, but the government, appearing to recognize that its recommended sentence is vastly longer than necessary to accomplish most of these goals, focuses largely on one of them, general deterrence. But even there, the government fails to explain why a sentence as long as 11 years is the minimum necessary to accomplish general deterrence. Moreover, the government utterly fails to address the evidence, discussed in our opening memorandum, that potential white collar offenders are primarily deterred by the perception of certainty of any custodial sentence, rather than its length. *See* Finazzo Sent. Mem., Nov. 7, 2013 at 34-35 ("Finazzo Sent. Mem."). In the end, the government's argument that such a sentence is necessary to accomplish the goal of general deterrence consists of nothing more than the government's assertion, devoid of explanation.

With little else to support its position, the government returns to its theme that Mr. Finazzo is "unrepentant and lacks remorse for his actions." Govt. Ltr at 21. But Mr. Finazzo *is* repentant, *is* remorseful, will say so at sentencing and has *never* said otherwise. Apparently, the government bases its claim on the simple fact that we, as Mr. Finazzo's counsel, have pointed out Paul Conefry's "no harm, no foul" statement and that Aéropostale benefited from its relationship with South Bay. Govt. Ltr at 21. The government's insistence to the contrary notwithstanding, there *was* considerable evidence at trial of how South Bay's willingness to

13

extend credit to Aéropostale and its ability to replenish Aéropostale's store shelves faster than any other competitor benefited Aéropostale. Pointing out those facts is not evidence of "lack of remorse," and rather, is appropriate sentencing advocacy geared toward a fair and balanced understanding of Mr. Finazzo's conduct and of its impact on Aéropostale.

## POINT V

### REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY

Mr. Finazzo's opening memorandum explained the basis for the two point reduction. It also criticized the government's September 27, 2013 submission to the Probation Department as opposing the adjustment based on unspecific "arguments and submissions" made by Mr. Finazzo without the government ever "identify[ing] the arguments or submissions it considers to foreclose the adjustment" or "counter[ing] the essential point that Mr. Finazzo proceeded to trial to challenge, as legally incorrect, the concept that Aéropostale's intangible right to control its decisions is a form of property under the mail and wire fraud statutes." Finazzo Sent. Mem. at 31. The only hint of a response that can be gleaned from the government's submission is its statement that Mr. Finazzo demonstrated his purported lack of acceptance of responsibility by pointing to evidence of the advice he was given by Paul Conefry – and to the benefits gained by Aéropostale from its business relationship with South Bay. But Mr. Finazzo does not have to agree with the government's arguments on these subjects in order to accept responsibility for his conduct. He had always been willing to plead guilty to Count 1, as Mr. Finazzo's counsel repeatedly conveyed to the government and as the government does not deny. He went to trial on counts 2 to 16 for two reasons. First, he did not believe that he intended to deprive Aéropostale of money. And the jury agreed. He can hardly be deprived of a guideline adjustment for taking a position with which the jury agreed. Second, Mr. Finazzo went

14

to trial on Counts 2 through 16 because his position is that the "right to control" corporate decision-making is a not a property right whose protection falls within the ambit of the wire/mail fraud statutes. In short, this is a classic case, in the words of Application Note 2 of § 3E1.1, of a defendant who proceeded to trial to make "a challenge to the applicability of a statute to his conduct."

## POINT VI

### RESTITUTION IS NOT WARRANTED

The Probation Department is correct in its conclusion that restitution may not be ordered in this case. *See* Addendum to PSR, Nov. 19, 2013 at 4. Nevertheless, given that the government continues to pursue the issue, we respond, briefly, to its argument.

As Mr. Finazzo's opening memorandum laid out, restitution may only be ordered upon proof by the government of actual losses. Although the government concedes, at it must, that a defendant's gain may not be substituted for the required proof of the victim's losses, it nevertheless maintains that, somehow, Aéropostale suffered losses in the *precise* amount of Mr. Finazzo's gain.

The government never quite explains how it arrives at its calculation of the purported loss, apart from identifying Mr. Finazzo's gain. In any event, since Aéropostale's losses are said to derive from the supposedly too-high price it paid to South Bay for products, primarily T-shirts, and since Aéropostale nevertheless made millions of dollars reselling those products, there are only two conceptual arguments that could theoretically be made in favor of a loss compensable as restitution. First, the government might argue that some other vendor was standing by, willing and able to provide Aéropostale with the same combination of goods and services provided by South Bay, at a specified lower cost. But there is no such evidence, largely because South Bay was unique. South Bay was one of only two known domestic manufacturers

15

of T-shirts and was able to replenish Aéropostale's stores with high demand products, faster. South Bay was also closer, geographically, to most of Aéropostale's stores, and took inventory risks that the other domestic manufacturer, Mias, did not. In any event, the price per shirt difference between South Bay and Mias was quite small, and the government has not offered a scintilla of evidence of the amount of theoretical loss attributable to that small price difference. The Court has no independent way to assess or calculate it.

Second, the only other theoretical argument would be that South Bay, itself, would have agreed to provide the same combination of goods and services to Aéropostale, at a much lower price, if its profits had not been shared with Mr. Finazzo. But the government lacks evidence for this claim. Although Mr. Geiger speculated about the prices Aéropostale would have paid if it knew of Mr. Finazzo's interest in South Bay, he twice acknowledged that this was something that was "in [his] mind." Also, importantly, Aéropostale's CFO acknowledged that there is "*no way of knowing* if [the prices paid to South Bay were] the best possible price[s]." Tr. at 137 (emphasis added). In this light, it is incongruent to assert, as the government does, that testimonial speculation is adequate substitute for proof, particularly given that there is genuinely "no way of knowing" whether Aéropostale actually would have paid less for T-shirts to South Bay, if Mr. Finazzo had never shared in South Bay's profits.

Should this court order restitution, the settlement payments made by both Mr. Finazzo and Mr. Dey should be credited. The government, again reversing a position it expressed previously, now claims that Mr. Finazzo's settlement payment to Aéropostale should not be credited, on the ground that it was "unrelated" to the losses the government claims that Aéropostale suffered from the criminal conduct. Govt. Ltr. at 25. But the government cannot

point to any losses that Mr. Finazzo purportedly caused Aéropostale to suffer that are "unrelated" to the allegations made in the criminal case. In any event, the government previously took the opposite position. In response to Mr. Finazzo's objections to the PSR, it agreed that "[u]pon proof" of the $5 million settlement payment, "the government respectfully submits that the Court could find, based on the terms of that payment, that $5 million should be deducted" from any restitution order issued. Govt. Ltr., Sept. 27, 2013, at 9-10. And in connection with the sentencing of Douglas Dey, the government stated that, subject to proof that the settlement payment was made, it "agrees that the $5 million amount should be deducted [from any restitution order]." Govt. Ltr., Oct. 31, 2013, at 21 n.4. The government fails to explain its sudden change in position and should be bound by its previous concession.

Dated: New York, New York
January 15, 2014

Respectfully submitted,

CARTER LEDYARD & MILBURN, LLP

By: _____
Robert J.A. Zito
Alan S. Lewis
Two Wall Street
New York, New York 10005
(212) 732-3200

*Attorneys for Christopher Finazzo*