UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,

      - against -                    **<u>MEMORANDUM & ORDER</u>**
                                           10-CR-457 (RRM) (RML)

CHRISTOPHER FINAZZO and
DOUGLAS DEY,

                       Defendants.
-------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

      Defendants Christopher Finazzo and Douglas Dey were convicted in connection with a kickback scheme perpetrated at the expense of Finazzo's former employer, Aéropostale. Dey pled guilty to one count of conspiracy to violate the Travel Act, in violation of 18 U.S.C. §§ 371 and 1952(a)(3). (*See* Doc. No. 148.) After a three-week trial, a jury found Finazzo guilty of conspiracy to commit mail and wire fraud, and to violate the Travel Act in violation of 18 U.S.C. §§ 371, 1341, 1343 and 1952(a)(3); fourteen counts of substantive mail fraud; and one count of substantive wire fraud. (*See* Doc. No. 260.) The jury also rendered a special forfeiture verdict in the amount of $25,790,822.94. (*See* Doc. No. 262.)

      Now before the Court are defendants' motions related to sentencing and forfeiture: (1) Dey's request for an evidentiary hearing, (2) both defendants' challenges to the amount of restitution sought by the government; and (3) Finazzo's motion to vacate the special forfeiture verdict as unconstitutionally excessive. For the reasons that follow, the Court finds: (1) no evidentiary hearing is required; (2) restitution is appropriate in the amount of the kickbacks received by Finazzo; and (3) no constitutional infirmity undermines the jury's forfeiture verdict.

## BACKGROUND

A full recitation of the facts and procedural history of this case is set forth in this Court's Memorandum and Order issued January 14, 2014 addressing Finazzo's motion to set aside the jury's verdicts as to guilt, familiarity with which is presumed. (*See* Doc. No. 343.)[1] From that Memorandum and Order, for the reader's benefit, the Court provides below its prior recitation of the trial evidence.

I.    The Evidence at Trial

  *A. Financial Interests in South Bay and its Affiliated Entities*

Finazzo's former accountant and cooperating government witness, Paul Conefry, testified about Finazzo's and Dey's joint business ventures. Shortly after Finazzo was hired by Aéropostale in 1996, Conefry met with Finazzo and Dey about a new business venture they were embarking upon together – South Bay. (Transcript of Trial Proceedings ("Tr.") at 821.) Finazzo and Dey planned that South Bay would do business with Aéropostale and other companies. (*Id.*) During this initial meeting, Conefry cautioned Finazzo and Dey about their plans because "if you have a relationship with a vendor as an employee of a company it could create a problem." (*Id.*) Finazzo stated in response that he did not think Aéropostale would "go for it." (*Id.*) Nevertheless, Finazzo and Dey agreed that South Bay would serve as a vendor to Aéropostale. Dey was the sole owner of South Bay. (Tr. at 824.) Finazzo, in turned, formed C&D Retail Consultants ("C&D") in part as a means to facilitate funneling of Aéropostale's business to South Bay. (*Id.*) Finazzo used his position at Aéropostale to direct business to South Bay, and South Bay's business grew rapidly. (*Id.* at 823.)

---

[1] Given the number of filings related to these issues, for clarity's sake the Court refers to each document exclusively by its docket number. Unless otherwise indicated, all citations to page numbers refer to the ECF pagination of the document.

Conefry was the accountant to both South Bay and C&D. (Tr. at 822.) In that capacity, Conefry directed payments from South Bay to C&D as instructed by Finazzo and Dey and pursuant to their agreement. (*Id.* at 825.) Over time, Dey and Finazzo agreed that Finazzo would receive fifty percent of South Bay's profits, paid as consulting fees from South Bay to C&D. (*Id.* at 826.) Conefry also testified that Finazzo and Dey jointly owned three corporations, Vertical Line Apparel, Inc., Vertical Line Apparel II, Inc., and Vertical Line Apparel III, Inc. (the "Vertical Line entities"). (*Id.* at 843.) The Vertical Line entities also served as vendors to Aéropostale. (*Id.* at 342.) Dey and Finazzo also jointly owned other South Bay-named entities, including South Bay Sports Plex, South Bay Ticketing, and South Bay Knitting.[2] (*Id.* at 844; *see also* Govt. Ex. 356.) Conefry prepared the tax returns for all of these entities as well. (Tr. at 844.)

Each year that Conefry prepared the taxes for South Bay and C&D, he cautioned Finazzo and Dey that, as South Bay's business with Aéropostale grew "bigger and bigger," Finazzo should disclose their relationship to Aéropostale, and Conefry warned that they needed to be very careful about categorizing the payments from South Bay to C&D as consulting fees because they were not. (Tr. at 830–33.) Around the time that Aéropostale was going public, another discussion to this effect occurred and Finazzo responded to Conefry that "it's gone along so far so we will just continue." (*Id.* at 832.) During a similar conversation, Finazzo at one point also said that he was going to be leaving Aéropostale soon and that it was "too late to do anything about it now." (*Id.* at 839.)

The former Chief Financial Officer of Aéropostale, Michael Cunningham, testified that Finazzo failed to disclose his ownership interest in South Bay or any related-party transactions

---

[2] South Bay Knitting owned ninety-nine percent of another South Bay entity, South Bay Peru. (Tr. at 844.)

with South Bay on his director and officer ("D&O") questionnaires and his related-party transactions questionnaires that Finazzo was required to complete on a regular basis for Aéropostale. (Tr. at 79–85.) For example, the related-party transaction questionnaires asked Finazzo whether he "had a material financial interest [more than any 10-percent interest in an entity that the company transacts business with] in a transaction or a proposed transaction to which Aéropostale was or is to be a party to?" (*Id.* at 90.) Finazzo consistently and falsely answered "No" to this question. (*Id.*)

Similarly, the General Counsel of Aéropostale, Edward Slezak, testified that Finazzo lied on his D&O questionnaires about his relationship with South Bay. On these questionnaires, Finazzo stated he received no bribes or kickbacks or other favorable treatment from third-party vendors and that he did not partake in any financial transaction with a third-party vendor. (Tr. at 406–19.) The former Chief Executive Officer of Aéropostale, Julian Geiger, testified as well that Finazzo never disclosed his financial interests in South Bay. (*Id.* at 1056.)

### B. The Graphic T-Shirt and Fleece Business

Geiger testified that Aéropostale started doing business with South Bay based on Finazzo's recommendation. (Tr. at 1010.) Aéropostale bought primarily graphic t-shirts and fleece products from South Bay. (*Id.* at 1011.) Geiger testified that from 2002 to 2006, Finazzo was responsible for vendor selection and vendor pricing for merchandise. (*Id.* at 1010.) Cunningham also testified that, as Chief Merchandising Officer, Finazzo was "responsible for the overall final price that was being negotiated with the vendors," including South Bay. (*Id.* at 99.) Cunningham testified that the "single most important factor in determining" Aéropostale's profitability is the cost it pays for its goods. (*Id.* at 97.)

As an example of the level of control Finazzo exercised over the graphic t-shirt business, Cunningham testified that Geiger suggested to Finazzo that he move twenty-five percent of the t-shirt business to overseas vendors in order to obtain a price lower by $1 to $1.50 per t-shirt, representing an approximately $5 million cost-savings to Aéropostale.  (Tr. 123, 125, 126.)  Finazzo said that he would look into it, but grew more and more agitated each time Geiger confronted him about it.  (*Id.* at 124–25.)  Geiger corroborated this testimony.  He believed that Aéropostale was paying about $5 per t-shirt produced domestically by South Bay and believed he could get t-shirts from overseas vendors for $3.50 each, recognizing it would take more time for overseas vendors to deliver product to the United States.  (*Id.* at 1040.)  He asked Finazzo to move twenty-five percent of the t-shirt business to overseas vendors, and Finazzo said he would do so.  (*Id.* at 1041.)  By moving that business overseas, Geiger estimated that Aéropostale would have earned an additional $6 million in profit.  (*Id.*)  Finazzo never moved twenty-five percent of the graphic t-shirt business overseas as directed.  (*Id.*)  Over time, as Geiger and pressed Finazzo on the issue, Finazzo became "agitated."  (*Id.* at 124.)  During one of the last meetings on moving to overseas t-shirt vendors, Cunningham recalled that Finazzo again became "agitated" and "said this meeting is over and walked out the door and slammed the door shut and the whole room vibrated."  (*Id.*)

Geiger also testified that, whenever Finazzo was questioned about the relatively low profit margins that Aéropostale earned on its graphic t-shirt business, Finazzo reacted strongly: "On many occasions, he would take his hands and hit them against the table and basically say why are people looking so closely at this?  At one point . . . he told me, I wasn't allowed to ask him any questions about graphic t-shirts for a month."  (Tr. at 1036.)  Geiger testified further that

while he was the Chief Merchandising Officer, Finazzo had the final say on the number of orders for graphic t-shirts that Aéropostale placed. (*Id.* at 1055–56.)

Additionally, many former and current employees of Aéropostale who worked under Finazzo during the relevant time period testified about his level of control over the graphic t-shirt business, specifically as it related to South Bay. For example, Jennifer Heiser, who reported directly to Finazzo, testified that she tried to place graphic t-shirt orders with vendors in Singapore but Finazzo discouraged her from doing so. (Tr. at 193.) Instead, she placed ninety-seven to ninety-nine percent of her graphic t-shirt orders with South Bay. (*Id.* at 192.) Similarly, John DiBarto, who ran the entire men's division at Aéropostale and reported directly to Finazzo, testified that Finazzo negotiated the prices for graphic t-shirts with South Bay. DiBarto stated he rarely attempted to negotiate prices with South Bay because "that was Chris' thing. He controlled production . . . [T]hat was his baby from the beginning, so we're really, you know, we did whatever he wanted" for graphic t-shirts. (*Id.* at 644–45, 652.) DiBarto further explained that "every now and then" his team would ask for discounted prices on graphic t-shirts from South Bay, but never sought an overall reduction in price of a dollar or more because when he tried to "mess with [the prices] a little bit, it wasn't worth it, Chris would get angry . . . . It caused a lot of stress." (*Id.* at 682–83.)

With respect to Finazzo's control over the fleece business, an employee of Aéropostale, Jinah Jung, who worked under Finazzo, offered testimony about the prices Aéropostale paid for South Bay fleece. Specifically, Jung testified about an e-mail she sent to Finazzo in February 2005, where she wrote:

> Hi, Chris. I just left you a voicemail regarding the South Bay woman's [sic] graphic fleece program for 450,000 units. Maria Peakes advised that you agreed upon $6.85, which I think is really high, because I know I can get it for a low $6 range. For 450,000 units, I feel that we can do better. I

will not argue for it if it's something you've already committed to. However, we could have saved approximately $300,000. Please advise if you'd still like to proceed with the $6.85, and I'll put it to bed. Thanks.

(Tr. at 605–06; Govt. Ex. 261.) Finazzo responded to Jung's email, stating, "Yes, that is the price I agreed with Doug [Dey] on. He did not make any money last holiday, and he is a valued partner, so good callout. As we get closer to holiday, we can discuss. This is his program." (Tr. at 607–08, Govt. Ex. 261.)

South Bay's graphic t-shirt business with Aéropostale was lucrative to both Finazzo and Dey. They carried out their agreement to split South Bay's profits on a fifty-fifty basis. An FBI agent, Michael Braconi, testified regarding the amount of money that Aéropostale paid to South Bay and the Vertical Line entities, and in turn the amount of money South Bay paid to C&D, over the course of Finazzo's employment at Aéropostale. First, Braconi testified that Aéropostale paid South Bay and the Vertical Line entities $267,078,261.41 between June 2002 and November 6, 2006, the day before Finazzo was terminated. (Tr. at 1516; Govt. Ex. 121.) During that same period, South Bay paid C&D $21,223,831.41. (Tr. at 1517; Govt. Ex. 122.) Payments from South Bay Apparel to the other South Bay-named entities totaled $2,959,520 during that same period. (Tr. at 1520; Govt. Ex. 124.) From January 2004 to November 6, 2006, South Bay paid the Vertical Line entities $6,174,463.60. (Tr. at 1519; Govt. Ex. 123.) The sum of the latter two amounts – payments from South Bay to other South Bay entities and to the Vertical Line entities – totaled $9,133,983.60. (Tr. at 1522; Govt. Ex. 125.) Half of that amount – or fifty percent of that amount – was $4,566,991.80. (*Id.*) Thus, the sum of the payments from South Bay to C&D and the payments from South Bay to other South Bay-named entities and the Vertical Line entities was $25,790,822.94. (Tr. at 1523; Govt. Ex. 127.)

*C. Finazzo's Termination*

Aéropostale learned about Finazzo's undisclosed interests in South Bay after undertaking an investigation into an allegation that Finazzo had instructed an Aéropostale employee to purchase an additional 100,000 units of product from a vendor who had supplied a hotel room in Las Vegas for Geiger's children. (Tr. at 1056.) During the investigation, Aéropostale obtained a copy of an email sent to Finazzo's work account from his personal attorney. The email, dated August 24, 2006, attached a list of Finazzo's assets that his attorney had prepared. (Tr. at 342; Govt. Ex. 356.) In the email, the attorney asked Finazzo to review the values listed in the attachment and indicated that she would produce "revised wills" based upon them. (*Id.*) The email attachment was entitled "Christopher Finazzo family assets" and below the title read, "Corporations (50 percent) interests." (*Id.*) The attachment then listed Finazzo's assets in which he held a fifty-percent interest. The named entities included the three Vertical Line entities, South Bay Knitting, South Bay Ticketing, South Bay Peru, and Sports Plex Inc. (Govt. Ex. 356.) Finazzo was terminated on November 7, 2006.

The termination meeting was recorded and played for the jury. Geiger and Slezak confronted Finazzo about his ownership in the South Bay-named entities and the Vertical Line entities. Attempting to explain, Finazzo stated that he lent money to Dey to set up a factory in Peru for South Bay Peru and that the Vertical Line entities were real estate holding companies and that he did profit from them. (Govt. Ex. 20A.) Finazzo also stated that he "never did anything that was against Aéropostale. I always had Aéropostale's best interest in mind." (*Id.*) Finally, Finazzo said that while he did not know what South Bay's profit structure was, South Bay was "competitive with everyone." (*Id.*) Nevertheless, Geiger explained that Finazzo was

being terminated for cause for having personal financial interests in, and serving as an officer of, entities affiliated with South Bay.  (*Id.*)

### D.  Finazzo's Financial Interests with South Bay and Related Entities

Many witnesses testified that it was important for Aéropostale to know about any financial or other interest that Finazzo had in South Bay and its related entities.  For example, Cunningham testified that Aéropostale had to know whether its employees had an ownership interest or a relationship with one of its vendors because the company has to "make sure that all employees are acting with the best interest of the company . . . .  If an individual is either getting money or has a significant ownership stake in a vendor . . . without disclosing it to us – we don't know, we don't have the opportunity to understand, are we getting the proper value for the money, or is it benefiting that individual in a way that we don't know?"  (Tr. at 80.)  He also stated that if an employee is "receiving a benefit and if that employee is also involved in transacting business with that vendor, the prices that we pay may not be the best price or the fair market value for that product or service."  (*Id.* at 85.)  Cunningham further testified that the company was specifically concerned about Finazzo's relationship with South Bay when it finally learned of it in 2006 because they did not know if Finazzo was "acting in the best interest [of] Aéropostale but in his own interest and therefore we had no way of knowing if this was the best possible price we could get for T-shirts overall."  (*Id.* at 137.)

Slezak testified that with a related-party transaction, the company is concerned because the employee may be on "both sides of a transaction," meaning the employee had a "conflict of interest."  (Tr. at 324.)  Aéropostale wanted to know about such conflicts of interest because "you want to make sure that the company is getting the best possible deal, the best benefit of the

bargain and if someone is on both sides of a transaction, you have to do an analysis to make sure you feel comfortable that the company is getting a good deal or a fair deal." (*Id.* at 324–25.)

As to Finazzo's specific interest in South Bay, Slezak also testified that Finazzo was in a clearly conflicted position because he directed "what we made, how much we made, who got it, you know, who got the orders, who made the product." (Tr. at 364.) "And then he is also acknowledging that he is profiting on the other side by getting profit, as he used here, from South Bay, South Bay entities, whatever it might be." (*Id.*) Slezak continued, "what I felt was that he was on both sides of those transactions. There is no way that we got – we as Aéropostale got the benefit of the bargain or got the best market prices or got the best, you know, engagement with our vendor that we could possibly get. Honestly, I felt that every penny that Chris ever got from South Bay should have been ours." (*Id.* at 365.)

Geiger further testified that "relationships such as these could easily reduce our profitability and how much money we made." (Tr. at 1070.) In Geiger's view, these related-party transactions jeopardized Aéropostale's ability to make an arm's length deal and maximize its profitability. (*Id.* at 1071.) Moreover, Finazzo profiting directly from the Vertical Line entities, which served as vendors to Aéropostale, "would directly diminish Aéropostale's ability to maximize its profits because monies were going elsewhere that could have gone to the company." (*Id.* at 1073.) To put a finer point on it, Geiger testified that "any profits that [Finazzo] would have gotten . . . would have accrued to the company increasing its profitability, the value to the shareholders and made Aéropostale stronger." (*Id.* at 1078.)

Notwithstanding the importance of disclosure, Geiger and others testified that related-party transactions in and of themselves are not necessarily problematic. For example, Slezak testified that:

> Related-party transactions can be okay if they are disclosed. If our board of directors, if it's raised to the right executives in the company, CEO, CFO, general counsel, things like that, to make an analysis and then our board approves it and say it's not detrimental to the company, maybe it's beneficial to the company, whatever, and you disclose it, it's okay. You know, the problem is that if you don't disclose it, you have what happened here.

(Tr. at 373.) Slezak then further explained that, when an employee discloses a related-party transaction to him, Slezak would analyze both sides of the transaction, talk to the parties on each side of the transaction, and "get a full understanding of and disclosure about all of the terms and conditions of this whatever transaction might be." (*Id.* at 404.) Then, he would present his findings to the other executive officers, who would in turn, if they so decided, present the terms of the transaction to the board of directors. (*Id.* at 405.) The board of directors would then decide whether to move forward with the transaction. (*Id.*) Slezak explained that "you'd want to have your full board sign off unanimously and say they felt comfortable with allowing this type of relationship to go forward." (*Id.*) Slezak then stated none of this process ever occurred with respect to Finazzo's relationship with South Bay. (*Id.*)

Similarly, Cunningham testified that, while related-party transactions are not criminal or inherently flawed, the fact that one exists "means it needs to be evaluated to ensure that there is nothing wrong about the transaction." (*Id.* at 142, 143.) Cunningham also testified that publicly traded companies often engage in related party transactions. (*Id.* at 143.)

## II. The Jury's Verdict As to Guilt

The jury found Finazzo guilty on all counts. (Doc. No. 260.) With respect to each mail fraud and wire fraud count and the related conspiracy counts, the jury was asked to render a special verdict indicating whether its verdict was "on the basis of intent to deprive Aéropostale of money" and/or "on the basis of Aéropostale's right to control use of its assets." (*Id.*) As to

conspiracy to commit mail fraud, the jury found Finazzo guilty on the basis of an intent to deprive Aéropostale of both money and its right to control its assets. (*Id.*) With respect to the conspiracy to commit wire fraud, and each substantive mail and wire fraud count, the jury found Finazzo guilty only on the basis of an intent to deprive Aéropostale of its right to control. (*Id.*)

III.    The Jury's Special Forfeiture Verdict

Following the jury's verdict as to guilt, the government presented additional evidence in support of its forfeiture allegations against Finazzo. The government called Michael Braconi, an FBI agent, who testified about Aéropostale's payments to the South Bay and the Vertical Line entities, as well as South Bay's payments to C&D during Finazzo's employment at Aéropostale. Agent Braconi testified that from June 2002 to November 6, 2006, Aéropostale paid South Bay and the Vertical Line entities a total of $267,078,261.41. (Tr. at 1516; Gov't Ex. 121.) During that same period, South Bay paid $21,223,831.41 to C&D, (Tr. at 1517; Gov't Ex. 122); $2,959,520 to the other South Bay-named entities, (Tr. at 1520; Gov't Ex. 124); and, from January 2004 to November 6, 2006, $6,174,463.60 to the Vertical Line entities. (Tr. at 1519; Gov't Ex. 123.) Dey and Finazzo stuck to their agreement to split the profits equally, and Finazzo's cut totaled $25,790,822.94. (Tr. at 1523; Gov't Ex. 127.) On April 29, 2013, the jury rendered a special forfeiture verdict specifying several specific assets deemed subject to forfeiture, and finding that $25,790,822.94 "constitute[d] or [wa]s derived from proceeds traceable to the offenses in the [i]ndictment" of which Finazzo was convicted. (Doc. No. 262.)

**DISCUSSION**

Although they overlap in certain respects, many of the outstanding issues related to restitution and forfeiture are somewhat involved and best addressed *seriatim*. Part I of this discussion quickly disposes of Dey's request for an evidentiary hearing as the concerns as raised

will not affect sentencing.  In Part II, the Court addresses more complex issues relating to restitution, concluding that it may be ordered as to both defendants under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, or in the alternative, under the Victim and Witness Protection Act, 18 U.S.C. § 3663, in the amount of the kickbacks received by Finazzo.  Finally, in Part III, the Court computes Finazzo's applicable Sentencing Guidelines calculation for purposes of sentencing and, using that Guideline calculation in part as required in its analysis, rejects Finazzo's constitutional challenge to the jury's forfeiture verdict.

I.  <u>Dey's Request for an Evidentiary Hearing</u>

Dey seeks, "[i]n addition to any restitution hearing required under 18 U.S.C. § 3664(e)," a hearing as to (1) "the allegation . . . that South Bay Apparel's receipt of orders and payments from Anchor Blue was part of any unlawful 'scheme'";[3] (2) "the government's claim that South Bay's prices were above-market for the goods and services South Bay provided"; (3) any claim "that the quality of South Bay's goods was inferior"; and (3) any claim "that delays in fleece shipments were excessive."  (Doc. No. 347 at 1.)  An evidentiary hearing is unnecessary as the Court does not intend to rely on any evidence against Dey related to the Anchor Blue scheme.  Moreover, as is evident by the Court discussion of the defendants' offense conduct throughout this Memorandum and Order, the Court does not rely on the characterizations of the evidence alleged by the government and about which Dey complains.

---

[3] Anchor Blue was a privately-held retail apparel company based in California, for which Finazzo served as the Senior Vice President of Merchandising and Executive Senior Vice President of Merchandising, Design, Production and Inventory Management between 2007 and his arrest in 2010.  (*See* Doc. No. 288 ¶¶ 14–15.)  The PSR states that "in approximately 2008, Finazzo introduced Dey, and accordingly, Dey's company South Bay, to the chief executive officer of Anchor Blue, as a potential vendor," and that Dey and Finazzo then reprised their kickback scheme.  (*Id.* ¶ 15.)  Dey denies this, arguing that "the evidence at trial of Mr. Finazzo does not establish the existence of any such scheme and Mr. Dey denies that there was any impropriety . . . ."  (Doc. No. 347 at 1.)

Moreover, it is important to note that as to Dey, the Court may rely on the evidence in the trial record when sentencing both defendants. *See United States v. Wisky-Mota*, 226 F. App'x 45, 46–47 (2d Cir. 2007) (rejecting a claim that the sentencing court erred by basing its sentence in part on evidence presented at a co-defendant's trial); *United States v. Granik*, 386 F.3d 404, 414 n.7 (2d Cir. 2004) (holding that a sentencing court may rely on any information known to it at sentencing); *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989) (rejecting a due process challenge to a sentencing court's reliance on evidence from a trial at which the defendant was not a party); *see also United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005) ("[T]he right of confrontation does not apply to the sentencing context and does not prohibit the consideration of hearsay testimony in sentencing proceedings.")

In addition, a district court is "not required, by either the Due Process Clause or the federal Sentencing Guidelines, to hold a full-blown evidentiary hearing in resolving sentencing disputes." *United States v. Phillips*, 431 F.3d 86, 93 (2d Cir. 2005) (quoting *United States v. Slevin*, 106 F.3d 1086, 1091 (2d Cir. 1996)); *United States v. Midyett*, No. 07-CR-874 (KAM), 2010 WL 1423951, at *2 (E.D.N.Y. Apr. 7, 2010). Rather, "[a]ll that is required is that the [C]ourt afford the defendant some opportunity to rebut the Government's allegations." *Phillips*, 431 F.3d at 93 (quoting *Slevin*, 106 F.3d at 1091); *see also United States v. Mena*, 342 F. App'x 656, 658 (2d Cir. 2009) (finding that "because [the defendant] was afforded an opportunity to rebut the government's allegations, including a specific invitation for [the defendant] to present testimony on the issue, the district court appropriately applied the enhancement without conducting a *Fatico* hearing").

Dey has received ample notice of all proposed sentence enhancements through his PSR and its addenda, and he has had multiple opportunities to respond through objections, at

hearings, in sentencing memoranda, and in letters to the Court. Those opportunities, of which he has taken full advantage, are sufficient to afford him the process to which he is due. *Cf. United States v. Guang*, 511 F.3d 110, 122 (2d Cir. 2007) (finding that the combination of the district court's observations of witnesses at trial, the PSR, letter briefs disputing the Probation Department's Guidelines calculation, and sentencing submissions afforded defense counsel an adequate opportunity to challenge proposed sentence enhancements); *United States v. Capri*, 111 F. App'x 32, 35 (2d Cir. 2004) (finding that the district court did not abuse its discretion in denying the defendant's request for a *Fatico* hearing as to a dangerous weapon enhancement because "[c]ounsel [had] opposed the enhancement in written submissions and in oral argument"). Likewise, in two hearings and voluminous submissions to the Court, Dey has offered comprehensive arguments on all relevant aspects of the issues pertaining to restitution. There is "no reason to question the reliability of material facts having in the [Court]'s view direct bearing on the sentence to be imposed," *United States v. Fatico*, 603 F.2d 1053, 1056 n.9 (2d Cir. 1979), nor "[a]ny dispute as to the proper amount or type of restitution," 18 U.S.C. § 3664(e), that necessitates further proceedings. Accordingly, no further evidentiary hearing is required.

## II. Restitution

The Court next turns to the issues pertaining to restitution. Aéropostale has requested restitution in a Victim Impact Statement submitted to the Probation Department. (*See* Doc. No. 293.) "The goal of restitution, in the criminal context, is 'to restore a victim, to the extent money can do so, to the position he [or she] occupied before sustaining injury.'" *United States v. Battista*, 575 F.3d 226, 229 (2d Cir. 2009) (quoting *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006)). Laudable though that goal may be, federal courts have no inherent power to

order restitution, *United States v. Pescatore*, 637 F.3d 128, 139 (2d Cir. 2011), and may do so only to the extent authorized by statute. *United States v. Varrone*, 554 F.3d 327, 333 (2d Cir. 2009) (quoting *United States v. Bok*, 156 F.3d 157, 166 (2d Cir. 1998)); *United States v. Cummings*, 189 F. Supp. 2d 67, 72 (S.D.N.Y. 2002). Additionally, the Court "may award restitution only for losses directly resulting from the 'conduct forming the basis for the offense of conviction.'" *United States v. Germosen*, 139 F.3d 120, 131 (2d Cir. 1998) (quoting *United States v. Silkowski*, 32 F.3d 682, 688 (2d Cir. 1994)). The government bears the burden of demonstrating the amount of any loss sustained by a victim, *see* 18 U.S.C. § 3664(e); *United States v. Reifler*, 446 F.3d 65, 122 (2d Cir. 2006), and all disputes as to the proper amount or type of restitution are resolved by a preponderance of the evidence. *United States v. Bahel*, 662 F.3d 610, 647 (2d Cir. 2011) (citation omitted); *United States v. Skowron*, 839 F. Supp. 2d 740, 743 (S.D.N.Y. 2012), *aff'd*, 529 F. App'x 71 (2d Cir. 2013).

Two statutes, the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, and the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663, are potentially applicable in this case. As its name implies, "[u]nder the MVRA, restitution is mandatory for certain crimes." *Battista*, 575 F.3d at 230; *see also United States v. Marino*, 654 F.3d 310, 319 (2d Cir. 2011) ("Most significantly, the MVRA partially superseded the VWPA insofar as it made restitution that was previously discretionary mandatory as to certain offenses . . . ."). In particular, the MVRA provides that "[n]otwithstanding any other provision of law . . . the court shall order . . . that the defendant make restitution" for "an offense against property under [Title 18] . . . including any offense committed by fraud or deceit" where "an identifiable victim or

victims has suffered a physical injury or pecuniary loss."[4]  18 U.S.C. § 3663A(a)(1), (c)(1)(A)–(B).

Because the purpose of the statute "is primarily to restore the victim to his or her prior state of well-being, and to that end to require federal 'criminal defendants to pay full restitution to the identifiable victims of their crimes,'" *United States v. Amato*, 540 F.3d 153, 156–57 (2d Cir. 2008) (quoting S. Rep. No. 104-179, at 12–13 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 925–26), "[r]estitution is required without regard to the defendant's economic circumstances, though terms of payment may take into account the financial needs of the defendant and his or her family." *United States v. Agate*, 613 F. Supp. 2d 315, 321 (E.D.N.Y. 2009) (citing 18 U.S.C. § 3664(f)(1)(A)).  The amount of restitution must be a "reasonable approximation of [a victim's] losses supported by a sound methodology." *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 1528 (2014)

The VWPA provides that "the [C]ourt, when sentencing a defendant convicted of an offense under [Title 18] . . . *may* order . . . that the defendant make restitution to any victim of such offense . . . ." *Id.* § 3663(a)(1)(A) (emphasis added).  Based upon a consideration of certain enumerated statutory factors, *see* 18 U.S.C. § 3663(a)(1)(B)(i)(I)–(II), the Court has discretion under the VWPA to order restitution.  *See Battista*, 575 F.3d at 230.  And unlike the MVRA, the VWPA does not ask whether a crime is an "offense against property." *Compare generally* 18 U.S.C. § 3663(a)(1)(A) *with* 18 U.S.C. § 3663A(c)(1)(A)(ii).

Those differences – the requirement under the MVRA that a crime be an offense against property and the discretionary nature of the VWPA based on enumerated statutory factors – are the key distinctions between the two statutes.  In all other relevant respects, "the provisions of

---

[4] Other provisions of the MVRA specify additional offenses for which restitution is mandatory, *see* 18 U.S.C. § 3663A(c)(1)(A)(i), (iii)–(iv), but no party suggests that they are implicated in this case.

the VWPA and the MVRA are nearly identical in authorizing an award of restitution."[5] *Battista*, 575 F.3d at 230 (quoting *United States v. Serawop*, 505 F.3d 1112, 1118 (10th Cir. 2007)) (internal quotation marks omitted). Both statutes are "intended to compensate victims only for losses caused by the conduct underlying the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 416 (1990); *United States v. Donaghy*, 570 F. Supp. 2d 411, 424 (E.D.N.Y. 2008), and explicitly limit restitution to the actual losses sustained by a victim or victims. *See* 18 U.S.C. §§ 3663(a)(1)(B)(i)(I) and 3663A(c)(1)(B); *see also United States v. Catoggio*, 326 F.3d 323, 326 (2d Cir. 2003) (noting that 18 U.S.C. § 3663A(c)(1)(B) requires a showing of physical injury or pecuniary loss to an identifiable victim); *United States v. Abbey*, 288 F.3d 515, 519 (2d Cir. 2002) (noting that 18 U.S.C. § 3663(a)(1)(B) requires a showing of actual loss). And both statutes utilize the same procedure for issuing and enforcing a restitution order. *See* 18 U.S.C. §§ 3663(d), 3663A(d).

Guided by these principles, and for the reasons discussed in the sections that follow, the Court finds that restitution must be ordered as to both defendants under the MVRA, and in any event, may be ordered as to both defendants in the Court's discretion under the VWPA.

### A.  *Applicability of the MVRA*

As noted above, the MVRA requires that the Court order restitution for any offense against property under Title 18 where an identifiable victim has suffered a pecuniary loss, which includes any offense committed by fraud or deceit.[6] *See Marino*, 654 F.3d at 316 (citing 18

---

[5] Notwithstanding the substantial similarities between the two statutes, the Second Circuit has emphasized that "[t]he MVRA and VWPA do not overlap." *Battista*, 575 F.3d at 231 n.3. "Rather, the MVRA makes restitution mandatory for the crimes it covers, and the VWPA enables discretionary restitution for non-MVRA crimes." *Id.* Nevertheless, district courts have considered the applicability of both provisions in the alternative where it is unclear which provision may apply. *See, e.g.*, *United States v. Donaghy*, 570 F. Supp. 2d 411, 422 (E.D.N.Y. 2008), *aff'd sub nom. United States v. Battista*, 575 F.3d 226 (2d Cir. 2009).

[6] Defendants challenge only the interpretation of "committed by fraud or deceit." As such, the dispute discussed herein does not relate to the scope of an "offense against property" under the MVRA, but rather to the proper meaning of "committed by fraud or deceit." *Cf. United States v. Skowron* ("*Skowron II*"), 529 F. App'x 71, 73 (2d

U.S.C. §§ 3663A(a)(1), (c)(1)). Thus, the first issue the Court must address is whether Finazzo and Dey were convicted of an offense against property within the meaning of the MVRA.

It is important to note at the outset that both Finazzo and Dey were convicted of conspiracy to violate the Travel Act, while Finazzo was convicted of additional crimes, including conspiracy to commit mail and wire fraud, and substantive counts of mail and wire fraud. The jury's special verdict further particularizes Finazzo's offense conduct. It found, for purposes of Finazzo's conviction for conspiracy to commit mail fraud, that Finazzo intended to deprive Aéropostale of both money and its right to control its assets. It further found, for purposes of both the substantive counts of mail and wire fraud, as well as the conspiracy to commit wire fraud, that Finazzo intended to deprive Aéropostale solely of its right to control its assets.

For purposes of fixing restitution, and as suggested by the Government, the Court will consider only defendants' convictions for conspiracy to violate the Travel Act, and Finazzo's conviction for mail fraud conspiracy on the theory that he intended to deprive Aéropostale of money. In doing so, the Court need not reach Finazzo's oft-repeated argument that his convictions predicated on an intent to deprive Aéropostale of its right to control do not constitute offenses against property within the meaning of the MVRA.[7]

Cir. 2013) (quoting *United States v. Bengis*, 631 F.3d 33, 40 (2d Cir. 2011)) ("A victim's pecuniary losses may be considered lost 'property' where the victim has been deprived of 'money to which it is entitled by law.'") (internal alteration omitted); *Battista*, 575 F.3d at 230–31 (noting that defendants Donaghy and Martino "never disputed before the district court the applicability of the MVRA to the offense for which they pleaded guilty . . . *because that offense must, by definition, be committed by fraud or deceit*") (emphasis added); *see also* S. Rep. 104-179, 18, *reprinted in* 1996 U.S.C.C.A.N. 924 (explaining Congress's intent to "restrict[] mandatory restitution requirements to criminal cases involving . . . a felony against property under title 18, including *any felony under title 18 committed by fraud or deceit* . . . .") (emphasis added).

[7] Even were the Court to embark on these inquiries, however, it is hardly clear that Finazzo would prevail. *See, e.g.*, *United States v. Cuti*, No. 08-CR-972 (DAB), 2013 WL 1953741, at *3 (S.D.N.Y. May 13, 2013) (discussing the MVRA and concluding that "offenses against property" excludes "ethereal interests" but may include "intangible property"); *Cummings*, 189 F. Supp. 2d at 74 (collecting cases and questioning whether restitution may be ordered under the MVRA for deprivations other than of tangible property). "While the interests protected by the mail and wire fraud statutes do not generally extend to intangible rights, they do extend to all kinds of property interests, both tangible and intangible." *United States v. Viloski*, No. 12-265-CR, 2014 WL 401074, at *3 (2d Cir. Feb. 4, 2014) (quoting *United States v. Carlo*, 507 F.3d 799, 801–02 (2d Cir. 2007) (internal alteration omitted)). The right to

19

With the inquiry focused in this way, the Court finds that the MVRA unquestionably applies to Finazzo's conviction for conspiracy to commit mail fraud with the intent to deprive Aéropostale of money. Conspiring to commit mail fraud falls comfortably within the scope of an offense against property under the MVRA. *Cf. Battista*, 575 F.3d at 230; *Donaghy*, 570 F. Supp. 2d at 421. Indeed, as Finazzo himself acknowledges, his convictions for "mail and wire fraud and a conspiracy [to commit those offenses] . . . are classically thought of as offenses against property."[8] (Tr. of Hr'g held May 8, 2014, at 21.)

Whether defendants' conspiracy to violate the Travel Act constitutes an offense against property requires closer examination.[9] For the reasons that follow, the Court concludes that it does.

The Travel Act imposes criminal liability upon "[w]hoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to . . .

---

[8] Counsel for Finazzo went on to state that "[t]he only argument that we have in this corner of the issue," (Tr. of Hr'g held May 8, 2014, at 21), concerned a challenge regarding the intangible nature of Aéropostale's right to control its assets, which the Court has already rejected on the ground that "the interests protected by the mail and wire fraud statutes . . . extend to all kinds of property interests, *both tangible and intangible*." *Carlo*, 507 F.3d at 801–02 (2d Cir. 2007) (citing *Carpenter v. United States*, 484 U.S. 19, 25 (1987)) (emphasis added). As the Court has observed on several occasions, the Second Circuit "ha[s] recognized that the property interests protected by the statutes include the interest of a victim in controlling his or her own assets." *Carlo*, 507 F.3d at 802; *accord United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998) (citing *United States v. Dinome*, 86 F.3d 277, 284 (2d Cir. 1996), and noting that "deny[ing] the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions" is a "concrete harm"). In any event, for purposes of restitution the Court will not consider Finazzo's convictions predicated on the right to control theory.

[9] On this point Dey takes the laboring oar, arguing that "the government offers no reason" why conspiracy to violate the Travel Act "is an 'offense against property' as defined by the MVRA," or "constitute[s] an 'offense committed by fraud or deceit,' [which is] included in the MVRA as an 'offense against property.'" (Doc. No. 357 at 4–5.) Finazzo "joins in Mr. Dey's arguments regarding restitution," and mentions only the appropriate measure of pecuniary loss and amount of any offsets in the brief paragraph he devotes to discussing restitution. (Doc. No. 358 at 9.) That echoes Finazzo's previous submission as to restitution. (*See* Doc. No. 329.)

---

promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity . . . ."  18 U.S.C. § 1952(a)(3).  The Travel Act conspiracy is predicated on the underlying state crimes of Commercial Bribing in the Second Degree, in violation of N.Y. Penal Law §§ 180.00 and 20.00,[10] and Commercial Bribe Receiving in the Second Degree, in violation of N.Y. Penal Law §§ 180.05 and 20.00.[11]  (*See* Doc. No. 62 at 7 ¶ 13(c).)

In determining whether defendants' conspiracy to violate the Travel Act constitutes an "offense against property" within the meaning of the MVRA, the central issue is whether defendants' conspiracy to violate the Travel Act was "committed by fraud or deceit" as that phrase is used in the statute.  *See* 18 U.S.C. § 3663A(c)(1)(A)(ii).  That question remains unresolved in the Second Circuit.  *See Battista*, 575 F.3d at 230–31.  Courts have disagreed as to whether "committed by fraud or deceit" refers to "the manner in which the defendant commits the offense," *Donaghy*, 570 F. Supp. 2d at 421, as the government urges, or instead requires the Court to look to "the *elements* of the offense" to determine whether an offense of conviction was "committed by fraud or deceit."  *United States v. Adorno*, 950 F. Supp. 2d 426, 429 (E.D.N.Y. 2013) (emphasis in original).  This is the focus of the parties' competing arguments.  For the reasons that follow, the Court concludes that the phrase "committed by fraud or deceit" refers to the manner in which a particular offense was committed.

---

[10] Under New York law, "[a] person is guilty of commercial bribing in the second degree when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs."  N.Y. Penal Law § 180.00 (McKinney's 2014).

[11] The prohibition against receiving commercial bribes is the corollary to section 180.00, and provides that "[a]n employee, agent or fiduciary is guilty of commercial bribe receiving in the second degree when, without the consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs."  N.Y. Penal Law § 180.05 (McKinney's 2014).

Any interpretation of a federal statute must begin with that statute's text.  *See United States v. Maynard*, 743 F.3d 374, 378–79 (2d Cir. 2014) (quoting *City of New York v. Permanent Mission of India to the United Nations*, 618 F.3d 172, 182 (2d Cir. 2010)).  Absent a different definition provided by Congress, a statute is accorded its plain or common-sense meaning.  *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000) (citing *United States v. Piervinanzi*, 23 F.3d 670, 677 (2d Cir. 1994); *Harris v. Sullivan*, 968 F.2d 263, 265 (2d Cir. 1992)).  The Court finds that the plain meaning of the phrase "any offense committed by fraud or deceit," 18 U.S.C. § 3663A(c)(1)(A)(ii), refers to the manner in which a particular offense was committed rather than the actual elements of that offense.[12]  *Cf. Donaghy*, 570 F. Supp. 2d at 421.  Simply put, saying "committed by fraud or deceit" is not the same as saying that an offense *contains as an element* fraud or deceit.  Indeed, where Congress intended to specify an element of a crime, it has done so explicitly.[13]  *See, e.g.*, 18 U.S.C. §§ 16(a) (defining a "crime of violence" as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another . . . ."), 3559 (defining "extortion" as an offense "that has as its elements the extraction of anything of value from another person by threatening or placing that person in fear of injury to any person or kidnapping of any person"); *cf. Taylor v. United States*, 495 U.S. 575, 600–01 (1990) ("Section 924(e)(2)(B)(i) defines 'violent felony' as any crime punishable by imprisonment for more than a year that 'has as an element' – not any crime that, in a particular case, involves – the use or threat of force.  Read in this context, the phrase . . . most

---

[12] No one argues here that either the Travel Act itself or the underlying state commercial bribery statutes contain an element of fraud or deceit.

[13] Additional support for the Court's reading can be found in the correspondingly broad definition of a "victim" in 18 U.S.C. § 3663A(a)(2), discussed *infra*; the fact that the MVRA already limits the class of offenses to which it applies; and "[t]he primary and overarching goal of the MVRA . . . to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being," *United States v. Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011) (quoting *United States v. Simmonds*, 235 F.3d 826, 831 (3d Cir. 2000)).

likely refers to the elements of the statute of conviction, not to the facts of each defendant's conduct."). No such statement is found in the MVRA.

The Court's reading is supported by recent case law in the Second Circuit. In *United States v. Zangari*, 677 F.3d 86 (2d Cir. 2012), a case on which the parties heavily rely, the Second Circuit applied the MVRA to a conviction for conspiracy to violate the Travel Act.[14] *See id.* at 89–91. While the Court of Appeals concluded that the district court had improperly calculated the *amount* of restitution under the MVRA, it did not question the *applicability* of the MVRA to the defendant's offense of conviction.[15] *Id.* at 93. Moreover, as in this case, the state law offenses underlying the Travel Act charge in *Zangari* were the very same offenses at issue here – *i.e.* Commercial Bribing in the Second Degree and Commercial Bribe Receiving in the Second Degree. *See United States v. Zangari*, No. 10-CR-255 (JG), Doc. No. 3 at 6–9 ¶ 15 (E.D.N.Y.). As noted, those offenses lack a fraud or deceit element, yet the Second Circuit endorsed an award of restitution under the MVRA.

The Court recognizes, of course, that the court in *Adorno* reached a different result. *See* 950 F. Supp. 2d at 427. But *Adorno* was decided on very different facts. In that case, the defendant pled guilty to a single substantive count of federal bribery. *Id.* The government offered no proof of fraud, deception, or loss to the victim.[16] *Id.* In short, *Adorno* involved a

---

[14] *Zangari* involved a complex scheme in which the defendant, a broker at Morgan Stanley (and later Bank of America), and a co-worker agreed to cause Morgan Stanley to enter into stock-loan transactions with two other financial institutions that caused those institutions to pay sham finder's fees to a straw stock-loan finder controlled by a third co-conspirator. 677 F.3d at 89. The sham fees then found their way back to the other conspirators through cash kickbacks paid by the stock-loan finder. *Id.*

[15] Despite the district court's error in calculating restitution, the Second Circuit ultimately affirmed the award under the MVRA because the defendant did not object to the calculation before the district court and failed to demonstrate that the error "seriously affect[ed] the fairness, integrity, and public reputation of judicial proceedings, such that . . . 'a miscarriage of justice would result.'" 677 F.3d at 96 (*quoting United States v. Young*, 470 U.S. 1, 15 (1985)) (internal alterations omitted).

[16] In *Adorno*, the victim did seek "repayment of the $100,000 bribe that [the defendant] admitted to soliciting and accepting from a contractor in exchange for providing future assistance" during his employment. 950 F. Supp. 2d at 427 n.1. But "[t]he government concede[d] that it ha[d] no evidence tending to show that [the defendant] inflated

defendant convicted solely of violating a statute that did not require proof of fraud or deceit, where any connection between that offense and fraud, deceit, or other property was questionable. Most significantly, unlike Finazzo and Dey, Adorno was not convicted of conspiracy. "[S]ince 'conspiracy is a crime distinct from its underlying predicate acts and purposes, and involves additional harms,' restitution may be awarded for a violation of the conspiracy statute even when it could not be awarded for the underlying predicates," *Cummings*, 189 F. Supp. 2d at 73 (quoting *United States v. Helmsley*, 941 F.2d 71, 101 (2d Cir. 1991)) (alterations omitted), and even if "the objects of the conspiracy to which [the defendant] pleaded guilty do not independently authorize restitution." *Cummings*, 189 F. Supp. 2d at 73.[17]

Here, defendants' Travel Act conspiracy was plainly committed in a fraudulent and deceitful manner, which renders it an offense against property within the meaning of the MVRA. Their scheme to generate secret profits through illegal kickbacks co-opted Aéropostale's ability to make strategic economic decisions, concealed crucial information about the true nature of significant transactions, and redirected business relationships to their own advantage – all of which were patently fraudulent and deceitful. The evidence at trial plainly exposed that fraud and deceit by demonstrating how the conspiracy contemplated, concealed, and comprised numerous misrepresentations and secret transactions. As examples, Finazzo knowingly and willfully placed himself in a clearly conflicted position, then lied repeatedly in multiple contexts

---

contract prices by the amount of the bribe," and the court found no support for the contention that the victim suffered a pecuniary loss in that amount. *Id.* That is not the case here, where the trial record contains such evidence of pecuniary loss to Aéropostale. As discussed more fully *infra*, Finazzo and Dey assert that the evidence offered by the government is *insufficient* to sustain the amount of restitution sought, but that, of course, is a different question that is also addressed later in more detail.

[17] Defendants also argue that the government's reliance on *Helmsley* is misplaced because the court in that case ordered restitution under the VWPA and did not address whether the defendant's crime constituted an offense against property. (Doc. No. 357 at 4 n.2) The Court need not address that argument, however, since it finds that defendants' offense conduct in this case renders their convictions offenses against property within the meaning of the MVRA.

and on multiple documents to conceal his illicit double-dealing. Finazzo and Dey concocted that plan together, and disguised their illicit payments that flowed through South Bay as consulting fees when in fact they were nothing of the kind. And Finazzo aggressively defended South Bay's dominant business relationship with Aéropostale so that he and Dey could continue to profit from their illicit scheme. This offense conduct amply establishes that defendants' scheme was replete with fraud and deceit.

Dey's own allocution underscores the deceitful nature of defendants' scheme. Dey admitted that he "understood and intended that sharing the profits of South Bay with Mr. Finazzo would influence him to help me get and keep some of the Aéropostale business," and that defendants "entered this arrangement without the consent of Aéropostale." (Tr. of Plea Hr'g held Sept. 27, 2012, at 33.) He conceded that, in furtherance of the conspiracy, he "caused funds to be sent from South Bay to a company owned and controlled by Mr. Finazzo," and "understood that [his] arrangement to share South Bay's profits with Mr. Finazzo was wrong." (*Id.*) Like the evidence at trial, Dey's allocution describes a crooked arrangement to secure business for South Bay by virtue of Finazzo's influence at Aéropostale, which was designed to generate profits for South Bay and a payday for Finazzo. The more South Bay (and Dey) profited, the more Finazzo profited. Dey's allocution also reaffirms the fact that defendants' conspiracy was concealed from Aéropostale, a vital element essential to achieving its goals.

The offense conduct underlying defendants' Travel Act conspiracy was marked by myriad misrepresentations, falsified documents, mischaracterized payments, and illicit agreements. It is thus abundantly clear from both the evidence offered at Finazzo's trial and Dey's allocution that defendants' offense conduct involved substantial fraud and deceit. As

such, defendants' convictions for conspiracy to violate the Travel Act are offenses against property within the meaning of the MVRA.

### B. *Fixing Restitution Under the MVRA*

The Court next turns to the requirements for fixing restitution under the MVRA. In this regard, the Court must answer two key questions. First, did Aéropostale suffer actual pecuniary harm that qualifies it as a victim of those offenses? And second, if so, is the amount of restitution sought by the government – here, the value of the kickbacks received by Finazzo – a reasonable measure of Aéropostale's actual pecuniary loss? Based on the evidence in the record and as discussed below, the Court answers both questions in the affirmative.

#### 1. *Pecuniary Harm*

Restitution for an offense against property may only be awarded to "an identifiable victim," 18 U.S.C. § 3663A(c)(1)(B); *see also Marino*, 654 F.3d at 316 (citing 18 U.S.C. §§ 3663A(a)(1), (c)(1)), which the MVRA defines as "persons who were directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, where the offense is conspiracy, any person directly harmed by the defendant's criminal conduct in the course of the conspiracy."[18] *Reifler*, 446 F.3d at 135 (quoting 18 U.S.C. § 3663A(a)(2)) (internal alterations, quotation marks, and emphasis omitted). "[I]n determining whether one qualifies as a victim, a sentencing court can only consider the offense or offenses for which the defendant was convicted." *Battista*, 575 F.3d at 231.

The government's argument regarding direct and proximate pecuniary harm to Aéropostale is fairly straightforward. It first points out that Finazzo had final authority over orders placed with South Bay, and that he negotiated the prices that Aéropostale paid South Bay

---

[18] The VWPA employs the same definition of a victim. *See Marino*, 654 F.3d at 317 (holding that the definition of "victim" under the MVRA "tracks identically" the definition of "victim" under the VWPA).

for merchandise.  Like most businesses, Aéropostale sought to reduce costs, increase its gross margin, and generate greater profits.  Despite being entrusted with the responsibility to secure the best deal from Aéropostale's vendors, Finazzo had a corrupt relationship with Dey, in which Finazzo directed orders to South Bay and agreed to split South Bay's profits with Dey.  This corrupt arrangement directly conflicted with Aéropostale's business objectives.  Additionally, because he would personally profit more by *increasing* the prices of goods purchased from South Bay, Finazzo was no longer motivated to seek lower prices for Aéropostale.

Moreover, drawing on testimony from several witnesses at trial, the government "highlighted particular examples in which Finazzo's conduct was influenced by the corrupt relationship such that Aéropostale suffered harm and paid higher prices for goods from South Bay."  (Doc. No. 355 at 6.)  Specifically, the government cites the testimony about Finazzo's refusal to place twenty-five percent of Aéropostale's t-shirt orders with overseas vendors, his directive to Jinah Jung to place more expensive fleece orders with South Bay, and his aggressive attempts to ensure a steady flow of orders to South Bay without regard for quality, price, or performance.  The government identifies each instance as an example of pecuniary harm, but urges that "[t]hese examples do not represent the entirety of harm suffered by Aéropostale."  (*Id.* at 7.)  Instead, the government argues that "[t]hey are merely instances of pecuniary harm experienced by the company during the 10-year long scheme," and that "[t]he true measure of the harm is the amount of the kickback payments Finazzo received during that time . . . ."  (*Id.*)

Based on these facts, it is clear that Aéropostale is a victim of defendants' offenses of conviction because it was directly harmed both by Finazzo's criminal conduct in the course of his conspiracy to commit mail fraud, and by defendants' criminal conduct in the course of their conspiracy to violate the Travel Act.  As discussed more fully *infra*, in connection with fixing the

amount of restitution, defendants' scheme inflated prices Aéropostale paid to South Bay for its products. And courts have found actual pecuniary harm for purposes of restitution where fraudulently extracted payments are the mechanism by which a perpetrator profits from a conspiracy. In *United States v. Paul*, 634 F.3d 668 (2d Cir. 2011), for example, the Second Circuit found that fraudulently-secured margin loans were "a significant part of the [defendant's] greater fraud," and that "brokerage houses would not have made the loans to [the defendant] had they known that the collateral for the loans was the stock he manipulated." *Id.* at 677. On that basis, the court concluded that "[t]he loss to the brokerage houses resulted from [the defendant]'s inducement of the loans, and it is for this loss that [the defendant] must provide restitution." *Id.* at 678.

Likewise, in *United States v. Archer*, 671 F.3d 149 (2d Cir. 2011), the Second Circuit held that clients' payments to an immigration lawyer convicted of visa fraud, "like the margin loans in *Paul*, were the mechanism through which [the defendant] profited from his conspiracy and, thus, were an integral part of the single scheme he devised." *Id.* at 172. Further, in *United States v. Skowron*, the court recognized that "[t]he necessary causal nexus unquestionably exist[ed]" where a subsidiary of the victim corporation was the "vehicle" or "mechanism" through which the defendant committed his crimes, and where those crimes deprived the corporation of the honest services of an employee, injured the corporation's reputation, wasted valuable resources, and caused the corporation to incur significant investigatory costs. 839 F. Supp. 2d at 744–45.

As in those cases, here the evidence demonstrates that Aéropostale suffered pecuniary harm well within the causal sphere of defendants' offense conduct. At bottom, defendants' offense conduct duped Aéropostale into paying millions of dollars in kickbacks to its own senior

executive. Finazzo's undisclosed kickbacks were drawn directly from Aéropostale's payments for South Bay's goods, and constituted the mechanism by which defendants profited from their conspiracy. Aéropostale "would not have made th[ose] payments to the defendant[s] had they known about the fraudulent scheme." *Paul*, 634 F.3d at 677; *Archer*, 671 F.3d at 171. And defendants' offense conduct also occasioned breaches of fiduciary duties by Finazzo, injury to Aéropostale's corporate reputation, and wasted resources – *e.g.*, through internal investigations, vendor modifications, litigation costs, and personnel changes. Aéropostale thus sustained pecuniary harm that flowed directly from defendants' conduct in the course of the conspiracies for which they were convicted. *Cf. United States v. Desnoyers*, 708 F.3d 378, 390 (2d Cir. 2013) (ordering restitution of payments for fraudulent tests that "were necessary to the overall scheme" even though they were not "integral to the offense of conviction" because the victims here would not have paid for the tests had they known they were fraudulent); *United States v. Ebrahim*, No. 12-CR-471 (JPO), 2013 WL 2216580, at *2 (S.D.N.Y. May 21, 2013) (finding that AT&T was directly and proximately harmed by "an employee and fiduciary" who "participated in a scheme 'to deprive AT&T of the exclusive use of its intangible property . . . .'") (internal citation omitted).

Defendants' arguments that their offense conduct did not result in pecuniary harm to Aéropostale are unavailing.[19] It is not, determinative that their conspiracy to violate the Travel Act was premised only on the payment of bribes or an agreement to split South Bay's profits. The proper inquiry is whether defendants' offense conduct in furtherance of that conspiracy – and, for Finazzo, the mail fraud conspiracy as well – caused Aéropostale to sustain a pecuniary loss. The answer is yes.

---

[19] Again Finazzo defers principally to the arguments advanced by Dey, stating only that "[t]he amount of payments to Mr. Finazzo is no more a measure of pecuniary loss for restitution purposes than it is for a Guidelines calculation." (Doc. No. 358 at 9.)

For example, *United States v. Bengis* demonstrates that the scope of harm contemplated under the MVRA is significantly broader than defendants urge here. There, the Second Circuit held that the Republic of South Africa was a victim entitled to receive restitution in connection with a conspiracy to illegally import lobsters to the United States. 631 F.3d at 40–41. The defendants in *Bengis* argued that "even if South Africa had a property right in the lobsters, it [wa]s not a victim of the conspiracy because the conspiracy to which the defendants pleaded guilty did not involve the illegal harvesting of the lobsters" and concerned only "their importation to the United States with the knowledge that the lobsters had been obtained in violation of South African law."[20] *Id.* at 40. The Second Circuit disagreed. Acknowledging that "the conspiracy to which the defendants pleaded guilty did not involve the illegal harvesting of the lobsters," the court explained that the defendants' "conspiracy to conceal their illegal trade in lobster deprived South Africa of money it was due," *id.*, and "facilitated" illegal conduct in South Africa "by providing access to the United States market and enabled the poaching to go undetected by the South African government." *Id.* at 41.

Drawing the parallel here, Finazzo and Dey directly harmed Aéropostale through their criminal conduct in the course of their conspiracy because their agreement to exchange bribes and split South Bay's profits deceived Aéropostale into forgoing other business transactions, inflated the prices Aéropostale paid to South Bay for its products, and caused Aéropostale unwittingly to pay millions of dollars in kickbacks to its own senior executive. In short, the government has sufficiently demonstrated that defendants' criminal conduct caused Aéropostale to sustain actual pecuniary harm. The question then becomes to what extent. In that regard, the

---

[20] In particular, the defendants pled guilty to conspiracy to violate the Lacey Act, which prohibits "any person . . . to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce . . . any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law," 16 U.S.C. § 3372(a)(2)(A), and to conspiracy to commit smuggling in violation of 18 U.S.C. § 371. *See Bengis*, 631 F.3d at 36. Two defendants also pled guilty to substantive violations of the Lacey Act. *Id.*

Court must consider whether the value of the kickbacks and received by Finazzo is a reasonable measure of the actual pecuniary loss Aéropostale sustained.  *See Zangari*, 677 F.3d at 93; *Gushlak*, 728 F.3d at 196.

2.      *Kickbacks as a Reasonable Measure of Loss*

As explained above, "a restitution order must be tied to the victim's actual, provable, loss."[21]  *Zangari*, 677 F.3d at 91 (internal citations omitted); *Marino*, 654 F.3d at 319–20.  However, the Second Circuit has also "construe[d] 'value' as used in the MVRA to be a flexible concept to be calculated by a district court by the measure that best serves Congress's statutory purpose."  *Boccagna*, 450 F.3d at 115.[22]  The MVRA thus "requires only a reasonable approximation of losses supported by a sound methodology," *Gushlak*, 728 F.3d at 196, and allows for the "exercise of discretion by sentencing courts in determining the measure of value appropriate to [a] restitution calculation in a given case."  *Boccagna*, 450 F.3d at 114; *United States v. Marsh*, 820 F. Supp. 2d 320, 344 (E.D.N.Y. 2011).  When making that determination, "the preponderance standard must be applied in a practical, common-sense way."  *Gushlak*, 728 F.3d at 196 (quoting *United States v. Savoie*, 985 F.2d 612, 617 (1st Cir. 1993)).  "So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution."  *Savoie*, 985 F.2d at 617 (quoting *United*

---

[21] The VWPA also requires that a restitution award compensate a victim only for an actual pecuniary loss.  *See* 18 U.S.C. § 3663(a)(1)(B)(i)(I); *Abbey*, 288 F.3d at 519.

[22] Although *Boccagna* concerned valuations of real property, for which "the law recognizes a number of reasonable measures of property value," 450 F.3d at 115, the principle articulated by the Second Circuit in that case is equally applicable in cases involving other types of property.  *See, e.g.*, *Qurashi*, 634 F.3d at 703 (citing *Boccagna* and stating that "[i]f sentencing courts are required to compensate victims for the full amount of each victim's losses, there is no reason to exclude losses that result from the deprivation of the victim's ability to put its money to productive use") (internal quotation omitted); *United States v. Newsom*, 399 F. App'x 625, 627 (2d Cir. 2010) (citing *Boccagna* in the context of a conspiracy to commit securities and mail fraud based on a failure to disclose sales commissions).

*States v. Hand*, 863 F.2d 1100, 1104 (3d Cir. 1988)); *see also Gushlak*, 728 F.3d at 196 (same); *United States v. Kerekes*, 531 F. App'x 182, 184 (2d Cir. 2013) (same).

For the reasons discussed *infra* in this section, the Court finds that the amount of the kickbacks paid to Finazzo are a reasonable measure of the actual pecuniary loss sustained by Aéropostale. At the outset, however, the Court notes that in fixing loss for purposes of restitution, a defendant's "ill-gotten gains" and a "victim's actual loss" are not interchangeable. *Zangari*, 677 F.3d at 93.[23] But neither that principle nor the acknowledgment that "a court's power to order restitution is limited to actual loss," *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000) (citing *Germosen*, 139 F.3d at 130), prohibits using the amount of the kickbacks received by Finazzo as a reasonable *measure* of the loss in this case.

Defendants' arguments to the contrary are incorrect and based on an overly broad reading of the limitation in *Zangari*. The Second Circuit has emphasized that the term "actual loss" is used to "distinguish the sorts of losses cognizable in restitution proceedings from those cognizable under the United States Sentencing Guidelines, which additionally recognize 'intended loss.'" *Gushlak*, 728 F.3d at 195 (quoting *Germosen*, 139 F.3d at 130). The term

---

[23] "The circuit courts of appeals are in general agreement that the defendant's gain is not an appropriate measure of the victim's actual loss in MVRA calculations." *United States v. Fair*, 699 F.3d 508, 513 (D.C. Cir. 2012) (collecting cases); *see also United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012), *cert. denied*, 134 S. Ct. 78 (2013) ("The purpose of restitution under the MVRA is to compensate victims for losses, not to punish defendants for ill-gotten gains. An award of restitution greater than a victim's actual loss exceeds the MVRA's statutory maximum."); *United States v. Fu Sheng Kuo*, 620 F.3d 1158, 1165 (9th Cir. 2010) (holding that "the calculation methods [for restitution] under [section] 3663 do not include a defendant's ill-gotten gains"); *United States v. Gallant*, 537 F.3d 1202, 1247 (10th Cir. 2008) ("Unlike loss under the Guidelines, the MVRA requires proof of actual loss and does not allow alternative metrics, such as gain."); *United States v. Harvey*, 532 F.3d 326, 341 (4th Cir. 2008) (holding that restitution "must be based on sufficient evidence of the amount of actual loss incurred" and that "[p]rofit gained by the defendants may not be used in its stead"); *United States v. Chalupnik*, 514 F.3d 748, 754 (8th Cir. 2008) (stating that "the *amount* of restitution that may be awarded is limited to the victim's provable actual loss" and thus "while the fact that a defendant profited from the crime without causing actual loss to an identifiable victim may be an appropriate reason to increase his punishment," any "[r]estitution to MVRA victims must be based on the amount of loss *actually caused* by the defendant's offense") (emphases in original); *United States v. George*, 403 F.3d 470, 474 (7th Cir. 2005) ("Restitution must be based on the victim's loss rather than the offender's gain."); *United States v. Badaracco*, 954 F.2d 928, 942–43 (3d Cir. 1992) (noting that "gross gain is a valid measure of the loss attributable to this offense for purposes of guideline sentencing" but stating that "a restitution order, in contrast, must be limited to the amount of [the victim]'s loss").

prohibits "loss calculations that incorporate hypothetical or speculative losses" and "those that arbitrarily fall short" of the full amount of a victim's loss, but it does not adopt a "one-size-fits-all standard" or require that loss calculations be "mathematically precise." *Gushlak*, 728 F.3d at 195. The standard for loss remains "a flexible concept to be calculated by a district court by the measure that best serves Congress's statutory purpose." *Boccagna*, 450 F.3d at 115.

Moreover, *Zangari* itself recognized that "there may be cases where there is a direct correlation between gain and loss, such that the defendant's gain can act as a *measure* of – as opposed to a *substitute* for – the victim's loss."[24] 677 F.3d at 93 (citing *Berardini*, 112 F.3d at 609–10) (emphases in original). The court explicitly acknowledged that, in *Zangari*, the "analysis might be different" if the parties that had *actually paid* the sham finder's fees, which were eventually distributed as kickbacks, had been identified as victims. *Id.* at 94 n.9. If those parties had come forward, the court acknowledged, there may well have been "some correlation between (a) the sham finder's fees they paid . . . and (b) the kickbacks . . . paid to [the defendant]." *Id.* Citing *Zangari* and employing an analogous rule against substituting gain for loss, the District of Columbia Circuit has explained this distinction as requiring "some approximation of actual loss . . . in order to assess whether the defendant's gain serves as a reasonable estimate of the loss." *Fair*, 699 F.3d at 513 (citing *Zangari*, 667 F.3d at 93–94). In this case and as discussed more fully below, a "practical, common-sense" application of the preponderance standard leads to the conclusion that the kickbacks paid to Finazzo are a reasonable measure of Aéropostale's loss. *Gushlak*, 728 F.3d at 196.

---

[24] *Zangari* cited *United States v. Berardini*, 112 F.3d 606 (2d Cir. 1997), as an example of direct correlation between loss and gain. There, the defendant pled guilty to participating in a year-long fraudulent telemarketing conspiracy and "acknowledge[d] that during that period he grossed approximately $39,271 in [fraudulent] sales to customers he called." *Id.* at 608. The district court ordered the defendant to pay restitution in that amount, and the Second Circuit affirmed. *Id.* at 608–10.

Second Circuit case law supports the Court's conclusion. In *United States v. Newsom*, for example, the defendant was convicted at trial of two counts of conspiracy to commit securities and mail fraud and two substantive counts of securities fraud, all of which stemmed from the defendant's failure to disclose commissions that his company would receive in connection with the sale of interests in certain companies. 399 F. App'x at 626. Initially, the district court ordered restitution in the amount of $499,989.64, which reflected the purchase price of the securities the defendant had sold. *Id.* at 626–27. The Second Circuit reversed, finding that "the district court erred in not deducting from the purchase price the actual value of the instruments." *Id.* at 627 (quoting *United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008)). On remand, the district court ordered restitution in the amount of the sales commissions received (and fraudulently concealed) by the defendant. 399 F. App'x at 627. The defendant appealed again.

This time, however, the Second Circuit affirmed. *Id.* Like Finazzo and Dey, the defendant in *Newsom* "principally argue[d] that the amount of the undisclosed commissions" – the secret profits from Newsom's crime – "was not a reasonable estimate of the actual loss to investors caused by the fraud." *Id.* The Second Circuit disagreed, stating that it was "satisfied that the district court acted well within its discretion in ordering [the defendant] to pay restitution based on the amount of the undisclosed commissions." *Id.* Proceeding under the MVRA and recognizing that a district court's determination of the proper amount of restitution may "not only lack certainty[,] but may indeed be based on mere probabilities, expectations, guesswork, even a 'hunch,'" *id.* (quoting *United States v. Atkinson*, 788 F.2d 900, 902 (2d Cir. 1986)), the court held that the district court's "valuation method . . . accurately (and reasonably) reflects the nature of the fraud in this case, which centered on hiding exorbitantly high commission rates so

as to induce investors to buy securities at an inflated price." 399 F. App'x at 628. The court also stated that the district court's calculation "reflects the fact that the fraud in question related to how the investors' money would be spent, rather than the inherent value of a particular asset or liability," and that "[b]y pegging actual loss to the amount of the undisclosed commissions, the court ensured that [the defendant] was held liable for the loss caused by his fraud, *i.e.*, the non-disclosure of the excessive commissions." *Id.*

The same approach was followed in *United States v. Niebuhr*, 456 F. App'x 36 (2d Cir. 2012), where the defendant was convicted of one count of securities fraud and one count of conspiracy to commit securities fraud, commercial bribery, and wire fraud. *Id.* at 38. The defendant in *Niebuhr* also argued on appeal that "the district court erred in measuring restitution by reference to the amount of the hidden, excessive commissions that [the defendant] charged his victims."[25] *Id.* at 39. Again, the Second Circuit flatly rejected that contention. *Id.* (citing *Newsom*, 399 F. App'x at 628).

Recognizing that gain may not be substituted for loss for purposes of restitution, the Court finds that the kickbacks received by Finazzo are a reasonable measure of Aéropostale's actual pecuniary loss. The essence of defendants' offense conduct in the course of their conspiracy was a series of transactions – spread over a decade – in which Finazzo, with full knowledge and cooperation by Dey, directed business to South Bay in exchange for secret kickbacks cloaked as consulting fees and funneled through a shell corporation. Like the undisclosed commissions in *Newsom* and *Niebuhr*, the kickbacks received by Finazzo accurately and reasonably capture the character of the fraud in this case, which relied on extracting

---

[25] Notably, following an audit by the National Association of Securities Dealers ("NASD"), the defendant's brokerage firm "recharacterized the commissions as trading profits and created a new trading account to track the hidden commissions." *United States v. Rutkoske*, 506 F.3d 170, 173 (2d Cir. 2007); *see also Niebuhr*, 456 F. App'x at 39.

substantial hidden profits from the amounts Aéropostale paid to South Bay. "[P]egging actual loss to the amount" of the illicit kickbacks ensures that defendants are held liable for the loss caused by their fraud. *Newsom*, 399 F. App'x at 628. The Court therefore finds that the kickbacks paid to Finazzo are a reasonable measure of Aéropostale's loss.

The decisions of courts in other circuits, while not controlling, lend further support to the Court's conclusion. In *United States v. Sleight*, 808 F.2d 1012 (3d Cir. 1987), for example, the Third Circuit affirmed an order of restitution in the amount of kickbacks the defendant had received in the course of a scheme to defraud his employer.[26] *Id.* at 1015, 1022. Based on testimony from the corporate victim's president, the district court found that the kickbacks the defendant had received represented amounts to which the victim was entitled because those amounts "should have accrued to [the victim] in the form of lower prices . . . ." *Id.* at 1017. The court rejected the "argument that there was only an 'intangible loss'" and described its award as "something akin to the concept of lost profits. We're talking about money which the employer was entitled to make which he did not make. It didn't know that it was available to it. It was satisfied because it didn't know any better." *Id.* The Third Circuit affirmed, finding that the kickbacks "were part and parcel of the transactions which the jury found constituted the scheme to defraud" and there was an "ample basis in the record to conclude that [the victim] suffered a loss" in the amount of those kickbacks. *Id.* at 1018.

The parallels to the instant case are again apparent. Like Finazzo and Dey, Sleight argued that "evidence that the price paid by [the victim] was at the market price or lower support[ed] his contention that there was no loss . . . ." *Id.* The Third Circuit rejected that

---

[26] Sleight was ordered to pay restitution pursuant to the Federal Probation Act, 18 U.S.C. § 3651. *See* 808 F.2d at 1014. As such, the court did not consider either the MVRA (which had not yet been passed) or the VWPA (which was not yet effective). The court did note, however, that the same "legal and constitutional principles" applied under both the Federal Probation Act and the VWPA. *Id.* at 1017.

assertion, explaining that the argument failed to acknowledge that the defendant "w[as] able to purchase [products] at a price lower than market," and that his "obligation as an officer and employee" was to purchase goods for his employer "at the best price available, even below market when possible." *Id.* at 1017–18. More importantly, Sleight's argument that the victim suffered no loss ignored the fact that the defendant "failed to take advantage of the opportunity" to buy goods for his employer "at the price actually available, but instead *structured the purchases so that he personally could make a profit on the transactions*." *Id.* at 1018 (emphasis added). Since "[t]he kickbacks were [the defendant]'s share of the profits," the court concluded that they fairly represented the victim's loss. *Id.* It also went on to note that because "[t]he offense . . . is a scheme to defraud, and each count is simply an act in furtherance of the unitary scheme[,] . . . establishing that a single count caused a specific loss would be difficult. It is the overall scheme that is central to all the counts and gives rise to the victims' financial loss." *Id.* at 1018 (quoting *United States v. Woods*, 775 F.2d 82, 88 (3d Cir. 1985)).

The Eleventh Circuit reached a similar conclusion in *United States v. Vaghela*. There, the defendant was convicted of conspiracy to defraud the United States, and of soliciting and receiving kickbacks for Medicare referrals to a laboratory. 169 F.3d at 731. At sentencing, the district court ordered the defendant to make restitution for the "full amount" that the government had paid for the lab work. *Id.* at 736. On appeal, the defendant urged that the government had received at least some value in return for its lab payments, and argued that he should instead be required to make restitution in "the amount [he] received in illegal kickbacks in exchange for the referrals."[27] *Id.* Implicit in the defendant's argument, of course, is the recognition that no value accrued to the government in return for the *kickback* payments. The Eleventh Circuit agreed,

---

[27] In *United States v. Liss*, 265 F.3d 1220 (11th Cir. 2001), the Eleventh Circuit noted that "[a]ll of the parties in *Vaghela* apparently assumed that a loss resulted from the offense conduct." *Id.* at 1232. That observation is beside the point here, as the Court has found by a preponderance of the evidence that Aéropostale suffered a pecuniary loss.

concluding that it was reasonable to assume that the government "was overcharged in the amount of the kickbacks, and that the loss [the government] suffered was equivalent to that amount" because the defendant and his co-conspirator "would not have participated in the kickback scheme if it was not profitable." *Vaghela*, 169 F.3d at 736. Without belaboring the facts in this case, a similar conclusion follows here as well.

To counter, Finazzo and Dey argue that, even if Aéropostale suffered a pecuniary loss, that loss is not properly measured by the amount of the kickbacks because the government failed to offer evidence of inflated prices. (Doc. No. 357 at 6.) In particular, defendants repeatedly insist that the differences in South Bay's business model render it incomparable to other possible vendors.[28] Defendants' myopic focus on the particulars of South Bay's business model misses the point, however. There is no question that Aéropostale received goods and services from South Bay that in fact had value.[29] But defendants fail to rebut the crucial point that a portion of every payment Aéropostale made went toward generating secret kickbacks for Finazzo. As the government demonstrated, any increase to the prices of goods purchased by Aéropostale attributable to the *kickbacks* was not justified by any features of South Bay's business model. And those kickbacks, drawn from South Bay's profits, benefitted only Finazzo and Dey. *Cf. United States v. O'Malley*, 364 F.3d 974, 980 (8th Cir. 2004) (holding that the amount of loss

---

[28] It is worth noting here that the court in *Boccagna* "decline[d] to hold that, as a matter of law, district courts may only use fair market value in making the property calculations contemplated by 18 U.S.C. § 3663A(b)(1)(B)," given that "the MVRA does not, *in haec verba*, require a district court to value property only by reference to fair market value, and because other measures of value may, in appropriate circumstances, provide a more accurate measure of the 'full amount' of a victim's loss . . . ." 450 F.3d at 116–17. In light of courts' invocation of *Boccagna* in contexts outside the valuation of real property, it is not clear that fair market value is the only permissible measure of the loss in this case. *See, e.g.*, *Newsom*, 399 F. App'x at 627 (citing *Boccagna* in the context of securities and mail fraud); *United States v. Scott*, 321 F. App'x 71, 72 (2d Cir. 2009) (stating, in a case concerning lost investment earnings, that "when determining the appropriate amount of restitution, district courts must choose a valuation method that best accomplishes this purpose"); *United States v. Ageloff*, 809 F. Supp. 2d 89, 100 (E.D.N.Y. 2011), *aff'd sub nom. Catoggio*, 698 F.3d 64 (2d Cir. 2012) (citing *Boccagna* in connection with a securities fraud scheme and concluding that "[c]ertainly the victims are entitled to the return of the money they were fraudulently induced to hand over").

[29] The government does argue and the evidence did show, however, that the *quality* of the goods and services provided to Aéropostale was not as impressive as defendants suggest. (*See, e.g.*, Doc. No. 355 at 6.)

suffered by the victim of a kickback conspiracy "should have included all [of] the funds retained by all of the co-conspirators as a result of their fraudulent scheme"); *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 928 (9th Cir. 2001) (finding that "it is not unreasonable to assume that a natural result of paying kickbacks is inflation of the charges in order to make the scheme profitable for the payer of the kickbacks"); *Vaghela*, 169 F.3d at 736 (holding that it was "not unreasonable to assume that [the government] was overcharged in the amount of the kickbacks, and that the loss [the government] suffered was equivalent to that amount" since the person paying the kickbacks "would not have participated in the kickback scheme if it was not profitable"). In short, there is a direct correlation between the prices Aéropostale paid, the profits South Bay accrued, and the kickbacks Dey paid to Finazzo from those profits.

Moreover, the government *did* offer evidence that Aéropostale paid inflated prices for merchandise it obtained from South Bay. The record at trial contains clear evidence of several instances in which Finazzo, pursuant to his covert arrangement with Dey, ensured that business flowed to South Bay at the expense of Aéropostale's bottom line. This evidence includes Jinah Jung's testimony that she was required to pay more for subpar products from South Bay, even when other cheaper merchandise was available, as well as Geiger's testimony that Finazzo failed to transfer business to cheaper vendors overseas. Based on that evidence, the government maintains that "[t]he kickbacks . . . when placed in the context of Finazzo's complete control of South Bay's business, the higher prices, the disastrous delivery delays, the lack of accountability and lack of competition, all of which harmed Aéropostale, represent [a] 'reasonable approximation of losses supported by a sound methodology.'" (*Id.* at 8 (quoting *Gushlak*, 728 F.3d at 196).) Viewed in the context of the overall scheme, the evidence in the record is sufficient to establish by a preponderance of the evidence that defendants' scheme prevented

Aéropostale from ensuring that it obtained the best possible prices, and caused Aéropostale to sustain harm in the amount of the kickbacks.

In the face of this evidence, defendants attempt to argue, in the alternative, that the government has not adduced *enough* proof of price inflation. While the government's evidence does not offer a comprehensive accounting of price and cost throughout the ten years that Finazzo and Dey operated their kickback scheme, the government is not required to deliver such an exhaustive or detailed accounting of a victim's loss. *Cf. Kerekes*, 2012 WL 3526608, *3 ("It would undercut the stated purpose of the MVRA to determine that because the [g]overnment cannot prove losses as to all of the taxpayers and has used conservative estimates rather than undertaking the complex and costly project that a full calculation of the loss – if even possible – would entail, the IRS is not entitled to restitution."). As the First Circuit has recognized, "[t]he law cannot be blind to the fact that criminals rarely keep detailed records of their lawless dealings, totaling up every column and accounting for every misbegotten dollar." *Savoie*, 985 F.2d at 617. The government was required only to present evidence sufficient to show by a preponderance that the amount of the kickbacks paid to Finazzo is a "reasonable approximation" of Aéropostale's loss. *Gushlak*, 728 F.3d at 196. It has done so here.

The bare suggestion that Aéropostale might still have transacted business with South Bay had Finazzo's secret stake been disclosed is equally unavailing. (*See, e.g.*, Doc. No. 329 at 7 n.2.) Defendants cannot refute the government's case simply by speculating about events that *might* have transpired had they never engaged in any deception. The fact remains that Finazzo repeatedly misrepresented his relationship with Dey, dominated vendor selection to steer business to South Bay, and illegally concealed the substantial secret profits that he derived from Aéropostale's transactions with South Bay, all in an effort to line his own pockets.

Finally, to the extent Finazzo and Dey argue that the difficulty in precisely determining the amount of Aéropostale's loss militates in favor of dispensing with restitution entirely, their contention must be rejected. Both the MVRA and the VWPA provide that restitution need not be awarded where its calculation is so complex as to outweigh the need to compensate any victims.[30] *See* 18 U.S.C. §§ 3663A(c)(3)(B), 3663(A)(1)(B)(ii); *see also Adorno*, 950 F. Supp. 2d at 431 (declining to award restitution in light of "issues both as to the cause and the amount of the [victim]'s losses"). But nothing in those statutes "require[s] the district court to surrender whenever one or more complex issues of causation or loss calculation appear," *Gushlak*, 728 F.3d at 192. And the Second Circuit has observed that, even under the VWPA, "the purpose of the restitution provision is to require restitution *whenever possible*." *United States v. Porter*, 41 F.3d 68, 70 (2d Cir. 1994) (citing *United States v. Atkinson*, 788 F.2d 900, 903 (2d Cir. 1986)) (emphasis added); *see also Catoggio*, 326 F.3d at 328 (finding that restitution was proper in an "admittedly complex case" where "the district court, although aware of the difficulties involved in ordering restitution in th[e] case, did not consider the process too burdensome"); *Donaghy*, 570 F. Supp. 2d at 421 (calculating restitution despite numerous complicated legal and factual issues).

Indeed, other courts have engaged in far more extensive proceedings and significantly more complex calculations before ordering restitution. *See generally Gushlak*, 728 F.3d at 192 (affirming a restitution award that took eighteen months, four different restitution submissions by the government, and expert testimony to calculate). The calculation of the appropriate amount of restitution in this case is not so complex or burdensome to suggest that it cannot be fixed.

---

[30] This provision reflects Congress's recognition that "the less direct an injury is, the more difficult it becomes to ascertain the amount of . . . damages attributable to [a] violation." *Reifler*, 446 F.3d at 135 (quoting *Holmes*, 503 U.S. at 269).

For the foregoing reasons, the Court concludes that Aéropostale sustained a pecuniary loss directly attributable to defendants' criminal conduct in the amount of $25,790,822.94, representing the amount of the kickbacks paid to Finazzo over the course of defendants' illegal scheme, which is the reasonable measure of the loss incurred by Aéropostale for the purposes of restitution under the MVRA.

C.    VWPA

In the alternative, the Court concludes that the VWPA supports restitution as to both defendants in the amount of $25,790,822.94. *Cf. Donaghy*, 570 F. Supp. 2d at 421–23 (determining the applicability of the MVRA and, in the alternative, the VWPA). As noted above, restitution under the VWPA is discretionary and not limited to offenses against property. However, all of the considerations analyzed above in connection with the MVRA – including the standards to be applied, the definitions employed, and the elements evaluated – are the same under the VWPA. *See Marino*, 654 F.3d at 317; *Battista*, 575 F.3d at 230. In exercising its discretion under the VWPA, however, the Court must also "consider the amount of the loss sustained by the victim as a result of the offense, the defendant's financial resources, the financial needs and earning ability of the defendant and the defendant's dependents, and other factors the court deems appropriate." *Id.* at 230; *see also* 18 U.S.C. § 3663(a)(1)(B)(i)(I)–(II). "Courts are statutorily required to consider the[se] enumerated restitution factors, but not to make detailed factual findings as to each factor." *United States v. Stevens*, 211 F.3d 1, 6 (2d Cir. 2000); *Donaghy*, 570 F. Supp. 2d at 421.

The amount of the loss sustained by Aéropostale as a result of defendants' criminal conduct is discussed in detail *supra*. Given the magnitude of the harm to the victim of defendants' scheme, it suffices to say that this factor militates in favor of ordering restitution.

Furthermore, Finazzo's financial difficulties do not excuse him from paying restitution.[31] "Although the financial resources of the defendant are one of the mandatory section 3663(a) considerations, even a defendant with no present ability to pay can still be ordered to do so pursuant to section 3663." *Donaghy*, 570 F. Supp. 2d at 421–22; *see also Porter*, 41 F.3d at 70 ("Even an indigent defendant may be subject to the duty to pay restitution when and if funds are eventually acquired."). "[I]n the absence of a defendant showing a restricted future earnings potential by a preponderance of the evidence, it is entirely reasonable for a district judge to presume future earnings in ordering restitution." *United States v. Ben Zvi*, 242 F.3d 89, 100 (2d Cir. 2001) (citing 18 U.S.C. § 3664(e)). Given the nature and scope of the scheme, the fact that Finazzo retains significant earning potential, and the amount of loss to Aéropostale, the Court concludes that his financial condition does not preclude restitution.

The remaining VWPA factors also weigh in favor of ordering restitution. First, the financial needs and earning ability of defendants and their families do not preclude a restitution award. Finazzo's wife, a retired business analyst, has actively sought to assert her rights to a share of her husband's substantial remaining assets. Finazzo's children are all grown, independent, and gainfully employed. (*See* Doc. No. 295 ¶¶ 68–69.) Dey is divorced, with two children that have graduated college and entered the workforce. (*See* Doc. No. 288 ¶ 51; Doc. No. 369 at 2.) And Dey has already provided for the financial well-being of his family. (*See* Doc. No. 288 ¶ 51.) Second, although the Court must consider "such other factors as the court deems appropriate," 18 U.S.C. § 3663(B)(i)(II), defendants do not argue – and the Court does not find –any other considerations that militate against ordering restitution. As such, in the alternative, restitution may be ordered against both defendants in the amount of $25,790,822.94.

---

[31] Dey does not argue that his financial circumstances should excuse him from making restitution for his crime.

### D. Joint and Several Liability

Because Finazzo and Dey were co-conspirators, each may be required to make restitution for acts committed by the other in furtherance of the conspiracy. *See United States v. Boyd*, 222 F.3d 47, 50 (2d Cir. 2000) (holding that a sentencing court may "order a single defendant to pay restitution for all losses caused by the actions of that defendant as well as by the actions of that defendant's co-conspirators, or, in its discretion, to allocate restitution proportionately among culpable parties); *Donaghy*, 570 F. Supp. 2d at 423. The Court has discretion to "make each defendant liable for payment of the full amount of restitution," or instead "apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h); *see also United States v. Nucci*, 364 F.3d 419, 422 (2d Cir. 2004) (citing *United States v. Tzakis*, 736 F.2d 867, 871 (2d Cir. 1984)) ("It has long been the law of this circuit that the restitution obligation may be ordered to be joint and several."); *Agate*, 613 F. Supp. 2d at 323. Joint and several liability may be imposed, "payable by all convicted co-conspirators in respect of damage suffered by all victims of a conspiracy, regardless of the facts underlying counts of conviction in individual prosecutions." *Gushlak*, 728 F.3d at 202 n.7 (quoting *Boyd*, 222 F.3d at 50–51) (internal quotation marks omitted).

Given the comparable levels of knowledge, participation, and profit in this case, Finazzo and Dey should be held liable jointly and severally for the full amount of restitution owed to Aéropostale. Both defendants participated fully in the scheme to accord South Bay handsome profits and to funnel substantial kickbacks to Finazzo – an illicit endeavor that both concocted from the outset and knew to be a violation of the law. *Cf. Tzakis*, 736 F.2d at 871 (holding that, because the defendant "was convicted . . . for a conspiracy encompassing the entire fraudulent

scheme," he could "be required to make restitution for damage caused to all of the scheme's victims" even if his role in the scheme was "comparatively minimal"). Defendants jointly retained Conefry to falsely characterize those sums as consulting fees, and defendants equally split the profits from their illegal venture. The scheme would not have been possible without the participation of both Finazzo and Dey. Irrespective of Finazzo's additional transgressions as a fiduciary of Aéropostale, the active participation of both defendants in all aspects of the scheme warrants the imposition of joint and several liability for the full amount of restitution. *See United States v. Nachamie*, 121 F. Supp. 2d 285, 298 (S.D.N.Y. 2000), *aff'd*, 5 F. App'x 95 (2d Cir. 2001) (noting that a court is not required to apportion restitution based on lesser degrees of culpability).

### E. Offset for Settlements

Finazzo and Dey also argue that, in the event the Court does award restitution, certain amounts should be deducted for settlements paid directly to Aéropostale. In particular, Finazzo asserts that he is entitled to an offset of $5 million, (Doc. No. 358 at 9), and Dey urges that he is entitled to an offset of $8 million. (Doc. No. 357 at 12–13.) The government opposes any deduction for Finazzo. (*See* Doc. No. 355 at 11.) The government agrees, without explanation, that Dey is entitled to an offset, but disputes a portion of the amount sought by Dey. (*Id.*) Based on the evidence in the record, the Court will accord Finazzo an offset in the amount of $5 million, and Dey an offset in the amount of $7.1 million.

Restitution may not result in a double recovery for a victim. *See United States v. Fore*, 169 F.3d 104, 110 (2d Cir. 1999); *Cummings*, 189 F. Supp. 2d at 79. Thus, "[i]n fashioning a restitution order, a pre-existing civil settlement is properly considered by the Court . . . as an

offset against the calculation of total loss to the victim." *United States v. Hamburger*, 414 F. Supp. 2d 219, 224 (E.D.N.Y. 2006).

With respect to Finazzo, the government repeatedly emphasizes that, at the time it reached the settlement with Finazzo, Aéropostale had no knowledge of the kickback scheme. As an initial matter, the Court notes that this assertion represents a significant change in the government's position. In its initial objections to Finazzo's PSR, the government stated that "[u]pon proof to the Court that the defendant paid Aéropostale the sum of $5 million as part of a civil settlement, the government respectfully submits that the Court could find, based on the terms of that payment, that $5 million should be deducted from the $25,790,822.94 owed to Aéropostale as restitution." (Doc. No. 307 at 9–10.) In its later submissions, however, the government "contends that the $5 million . . . should not be deducted from the restitution order because it was unrelated to the merchandise provided by South Bay to Aéropostale, and additionally because Aéropostale was unaware of the kickback scheme at the time of the settlement agreement." (Doc. No. 355 at 11.)

The government's new position is curious given that it has never challenged an offset for Dey's settlement with Aéropostale, to which Aéropostale agreed with knowledge of largely the same facts.[32] Moreover, the very documents that the government submitted undermine its position because they establish that Finazzo's settlement did relate to conduct relevant to this case. For example, a letter from Aéropostale dated November 27, 2007, sent in the course of the mediation leading to the settlement between the company and Finazzo following his termination, states that

---

[32] Indeed, Dey's settlement with Aéropostale was consummated in December 2006 – long before any payments were due under the settlement between Finazzo and Aéropostale. (*See* Doc. No. 320 at 51.)

> Critical to Finazzo's misconduct were his undisclosed interests in certain of Aéropostale's suppliers. The financial harm caused by that conduct is what constituted Aéropostale's claim for damages. That harm, Finazzo's misconduct in his relationships with certain Vendors and his deliberate failure to make appropriate and required disclosures support his firing for cause.

(Doc. No. 355-1 at 3.)[33] Whether or not Aéropostale knew *all* of the relevant facts at the time it consummated its settlement with Finazzo, the evidence clearly demonstrates that Aéropostale knew enough to be aware of Finazzo's illicit dealings with South Bay.

In any event, the government offers no legal reason why Aéropostale's knowledge of the facts at the time of the settlement with Finazzo is determinative, nor does it explain why proof that the payment was applied to Aéropostale's losses is crucial. Indeed, the government does not cite a single statute or case in support of either proposition. (*See* Doc. No. 355 at 11–12.) In the absence of any authority to the contrary, and in light of the fact that the settlement was related in part to the offense conduct here, the Court will accord Finazzo an offset in the amount of $5 million.

Dey seeks an offset of $8 million based on his settlement with Aéropostale. The government submits that the Court should offset only $7.1 million and exclude the remaining $900,000, which the parties agree is attributable to Aéropostale' attorneys' fees. The Court will accord Dey an offset in the amount of the $7.1 million on which the parties agree. As discussed in the next section, the Court will not impose restitution for attorneys' fees and other expenses as requested by Aéropostale and as such, the Court will not offset that portion of Dey's settlement related to attorneys' fees. To do otherwise would reduce the amount of restitution awarded for Aéropostale's loss directly and proximately caused by defendants' offense conduct with monies

---

[33] This letter was attached as an exhibit to the declaration of Marc G. Schuback, the current Senior Vice President, General Counsel, and Secretary of Aéropostale. (*See* Doc. No. 355-1.) The letter goes on to state that Finazzo's "scheme," in which he "abused his position and damaged Aéropostale by causing it to pay inflated prices for merchandise," is "described in detail in the principal submission." (*Id.* at 3.) The Court has not been provided with that submission.

paid by Dey to Aéropostale for additional harms – those ostensibly arising out of Aéropostale's efforts in connection with the investigation and prosecution of this action – that the Court concludes it cannot calculate.   Thus, it is of no moment here that Dey chose to recompense Aéropostale for those additional harms as part of his civil settlement.

   *F.   Aéropostale's Request for Attorneys' Fees and a Portion of Finazzo's Salary*

   In connection with sentencing, Aéropostale requests additional restitution for attorneys' fees and related expenses, as well as twenty percent of the salary paid to Finazzo during the relevant period.

   The Court has discretion under the MVRA to include certain attorney's fees as part of a restitution award.  18 U.S.C. § 3663A; *see also Amato,* 540 F.3d at 160–62; *United States v. Gupta*, 925 F. Supp. 2d 581, 584 (S.D.N.Y. 2013), *aff'd*, 2014 WL 1193411 (2d Cir. Mar. 25, 2014).  A victim may also seek restitution of fees under the VWPA.  *See* 18 U.S.C. § 3663(b)(4). The Court applies the same standard under both statutes.  *Battista*, 575 F.3d at 233.  But "[a]ny attorney's fees to be included under this provision must be tied to the investigation and prosecution of the criminal case."  *United States v. Levis*, No. 08-CR-181 (TPG), 2011 WL 497958, at *2 (S.D.N.Y. Feb. 10, 2011) (citing *Battista*, 575 F.3d at 233).  Such fees may be awarded only if the Court finds "by a preponderance of the evidence, that such expenses were necessary; that they were incurred while participating in the investigation, prosecution, or attendance at proceedings regarding the offense; that they were incurred by a 'victim' as defined by the Act; and that they do 'not require unduly complicated determinations of fact.'"  *Gupta*, 925 F. Supp. 2d at 584 (quoting *Amato,* 540 F.3d at 160); *see also* 18 U.S.C. § 3663A(b)(4).

   As Finazzo correctly noted in opposing the fee request,  Aéropostale failed to provide documentation that would enable the Court to determine whether such fees should be awarded.

(*See* Doc. No. 329 at 7–8.)  As for the Government, "other than noting that legal fees incurred by the victim can be considered by the Court in fashioning a restitution order, the government t[ook] no position as to whether Aéropostale is entitled to restitution of attorney's fees," (Doc. No. 307 at 10), because it "d[id] not possess the necessary information."   (Doc. No. 335 at 25.)  At the hearing held January 17, 2014, the Court plainly noted that without further documentation, the Court could not consider Aéropostale's request and directed the government to submit additional briefing on these issues.  (*See* Tr. of Hr'g held Jan. 17, 2014, at 58–59.)  In its supplemental submission, however, the government states only that "[t]he case law cited by Aéropostale in support of its requests indicates that courts have previously awarded restitution for a defendant's salary and legal fees" and added that "[b]ased on communications with company counsel, the government understands that Aéropostale is willing to provide additional information and documents in support of its position if the Court deems it necessary."  (Doc. No. 355 at 11 n.4.)

To date, the Court has not received any documentation – billing records, itemized lists of expenses, explanatory affidavits, or the like – determine whether attorneys' fees are recoverable in this case.  As such, it cannot assess Aéropostale's general request for fees and expenses.  *Compare, e.g.*, *Cuti*, 2013 WL 1953741, at *6 (awarding restitution for a victim's legal fees based on the government's showing that the fees were related to the victim's participation in the criminal prosecution); *Donaghy*, 570 F. Supp. 2d at 430 (same).

Aéropostale also seeks recovery of a portion of a defendant's salary which can be awarded in an appropriate case.  *See, e.g.*, *Skowron II*, 529 F. App'x at 74; *Bahel*, 662 F.3d at 649.  In this case, however, even Aéropostale admits that it is unable "calculate exactly [w]hat portion of Finazzo's work days was spent on behalf of A[é]ropostale as opposed to South Bay . .

. .” (Doc. No. 293 at 4.) As such, the Court is left without facts or a sound methodology on which to substantiate any such award.

III.     Forfeiture

The Court next turns to Finazzo's challenge to the jury's forfeiture verdict. Following its deliberations as to Finazzo's guilt, and after hearing additional evidence solely on the issue of forfeiture, the jury rendered a special forfeiture verdict finding that (1) $25,790,822.94 "constitute[d] or [wa]s derived from proceeds traceable to the offenses in the [i]ndictment" of which Finazzo was convicted, and (2) certain specific property was subject to forfeiture.[34] (Doc. No. 262.)

Where a defendant is convicted of an offense authorizing forfeiture, the Court must order the forfeiture as part of the defendant's sentence in accordance with the Federal Rules of Criminal Procedure. 28 U.S.C. § 2461(c). The Court has entered a Preliminary Order of Forfeiture.[35] (*See* Doc. No. 291.) That order becomes final at sentencing or earlier if the defendant so agrees. Fed. R. Crim. P. 32.2(b)(4)(A).

---

[34] The jury also found that the following properties were subject to forfeiture: (1) any and all property, real or personal, of Vertical Line Apparel, Inc., Vertical Line Apparel II, Inc., and Vertical Line Apparel III, Inc.; (2) the real property and the premises known as 300 Burman Boulevard, Calverton, New York; (3) the real property and premises known as 400 Burman Boulevard, Calverton, New York; (4) the real property and premises known as 600 Burman Boulevard, Calverton, New York; (5) the real property and premises known as 400 David Court, Calverton, New York; and (6) all funds up to $300,000, including any and all accrued interest, currently on deposit or transferred through TD Ameritrade Account No. 955146300. (*See* Doc. No. 262 at 2–3.) Prior to trial, defendants entered into two stipulations with the government that permitted the sale of 300 Burman Boulevard and 400 David Court in Calverton, New York, and provided that Finazzo's fifty percent interest in the net proceeds would be deposited with the United States Marshals Service in the Eastern District of New York, in interest bearing accounts. (*See* Doc. Nos. 87, 157.)

[35] "The court must enter the [preliminary order of forfeiture] without regard to any third party's interest in the property. Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c)." Fed. R. Crim. P. 32.2(b)(2). Finazzo's wife filed such a petition on October 3, 2013. (*See* Doc. No. 311.) At the hearing held May 8, 2014, the government advised that it had reached an agreement resolving those third-party claims, and would be filing a stipulation of settlement shortly. (Tr. of Hr'g held May 8, 2014, at 28.) On June 9, 2014, the Court So Ordered a stipulation filed by the parties that resolved the third-party claim. (*See* Doc. No. 372.)

However, Finazzo now challenges the jury's forfeiture verdict as unconstitutionally excessive, in violation of the Eighth Amendment to the United States Constitution.[36] (*See generally* Doc. Nos. 275-1, 285.)  The government argues that the Eighth Amendment does not apply in this case because the forfeiture of the "proceeds traceable to the crimes of conviction for which the jury returned a verdict of guilty" is not punitive and "only seeks to ensure that a defendant is denied his ill-gotten gains."  (*See* Doc. No. 280 at 14–16.)  Assuming, *arguendo*, that the Eighth Amendment applies, *see Bajakajian*, 524 U.S. at 331–32 (noting that *in personam* criminal forfeitures "have historically been treated as punitive, being part of the punishment imposed for felonies and treason"); *Viloski*, 2014 WL 401074, at *6 (remanding for evaluation under the Eighth Amendment a forfeiture of laundered funds); *United States v. Jalaram, Inc.*, 599 F.3d 347, 352 (4th Cir. 2010) (holding that "forfeiture of criminal proceeds does indeed constitute punishment to which the Excessive Fines Clause applies"), Finazzo has failed to establish a constitutional violation.

### A. Analysis Under the Excessive Fines Clause

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality," and "[t]he amount of the forfeiture" sought by the government "must bear some relationship to the gravity of the offense that it is designed to punish." *Bajakajian*, 524 U.S. at 334 (citing *Austin*, 509 U.S. at 622–23); *United States v. Castello*, 611 F.3d 116, 120 (2d Cir. 2010).  "[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense."  *Bajakajian*, 524 U.S. at 334.

---

[36] The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. CONST. amend. VIII.  "Not all forfeitures . . . are fines subject to the Excessive Fines Clause."  *von Hofe v. United States*, 492 F.3d 175, 182 (2d Cir. 2007).  "Only if the forfeiture may be characterized, at least in part, as punitive will it be considered a fine for purposes of the Excessive Fines Clause."  *Id.* (citing *Austin v. United States*, 509 U.S. 602, 621–622 (1993)); *see also United States v. Bajakajian*, 524 U.S. 321, 331–32 (1998).

The defendant bears the burden of showing that a forfeiture is unconstitutionally excessive, *Castello*, 611 F.3d at 120 (citing *United States v. Jose*, 499 F.3d 105, 108 (1st Cir. 2007); *United States v. Ahmad*, 213 F.3d 805, 816 (4th Cir. 2000)), and Finazzo has failed to carry that burden here.

"[I]f the value of forfeited property is within the range of fines prescribed by Congress, a strong presumption arises that the forfeiture is constitutional." *United States v. 817 N.E. 29th Drive, Wilton Manors, Fla.*, 175 F.3d 1304, 1309 (11th Cir. 1999) (cited by *Varrone*, 554 F.3d at 332). Although the maximum statutory fine in this case is $4 million,[37] *see* 18 U.S.C. § 3571(b)(3), the Second Circuit has held that courts should instead look to the maximum sentence and fine recommended under the federal Sentencing Guidelines. *See Castello*, 611 F.3d at 123 (stating that "the relevant metric is the top of the Guidelines for the fine and for imprisonment"). Thus, the Court must first calculate the Guideline applicable to Finazzo's crimes of conviction. It does so here both for the analysis pursuant to *Bajakajian,* as well as for sentencing.

### 1. Finazzo's Guidelines Calculation

The ultimate responsibility to calculate the applicable Guidelines range rests with the Court at the time of sentencing. *See United States v. Fernandez*, 443 F.3d 19, 29 (2d Cir. 2006) (citing *United States v. Crosby*, 397 F.3d 103, 111 (2d Cir. 2005)). District courts are "statutorily obliged" to "consider" the Guidelines, "which necessarily means they must determine the Guidelines range applicable to a particular defendant." *United States v. Garcia*,

---

[37] In relevant part, 18 U.S.C. § 3571(b) provides that "an individual who has been found guilty of an offense may be fined . . . for a felony, not more than $250,000." *See id.* § 3571(b)(3). Section 3571(b) also cross-references section 3571(d), which provides that "the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss" where "any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant . . . ." *Id.*; *see also* U.S.S.G. § 5E1.2, Application Note 2 ("As an alternative maximum, the court may fine the defendant up to the greater of twice the gross gain or twice the gross loss."). This is the provision invoked by the Probation Department. (*See* Doc. No. 288 ¶ 109.) The parties agree, however, (*see* Doc. Nos. 351, 352, 364), that the maximum statutory fine in this case is $250,000 on each count, or $4 million in the aggregate. *See Blakely v. Washington*, 542 U.S. 296, 303 (2004); *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *United States v. Pfaff*, 619 F.3d 172 (2d Cir. 2010).

413 F.3d 201, 220 n.15 (2d Cir. 2005) (quoting *Crosby*, 397 F.3d at 111) (internal quotation marks omitted).  Consequently, the applicable Guidelines range, calculated with the assistance of the Probation Department's Pre-Sentence Report ("PSR"), is the starting point for any sentencing proceeding.  *See United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 48 (2007)).  Disputed issues relevant to determining the applicable Guidelines range are resolved by a preponderance of the evidence.  *See United States v. Salazar*, 489 F.3d 555, 557 (2d Cir. 2007).

In Finazzo's PSR (*see* Doc. No. 295.), the Probation Department calculates Finazzo's Total Offense Level as follows:

### Counts 1(a), 1(b), and 2–16:

**Base Offense Level:** The guideline for the violation of 18 U.S.C. § 371 (Counts 1(a) and 1(b)) is 2X1.1(a), which directs the use of the base offense level from the guideline for the substantive offense, plus any applicable adjustments from such guideline.  The substantive offense (Conspiracy to Commit Mail Fraud and Wire Fraud) is a violation of 18 U.S.C. §§ 1341 and 1343, and the applicable guideline is 2B1.1(a)(1).  The guideline for violations of 18 U.S.C. 1341 and 1343 (Counts 2 through 16) is 2B1.1(a)(1).  Therefore, the base offense level is 7.     **7**

**Specific Offense Characteristics:**

Increased by 22 levels, pursuant to Guideline 2B1.1(b)(1)(L), to account for $27,001,677.58 in commercial bribes.     **+22**

Increased by 4 levels, pursuant to Guideline 2B1.1(b)(18)(A), on the basis that the offense involved a violation of the securities laws.     **+4**

**Victim Related Adjustment:** None.     **0**

**Adjustment for Role in the Offense:** None.     **0**

**Adjustment for Obstruction of Justice:** None.     **0**

**Adjusted Offense Level (Subtotal):** **33**

## Count 1(c):

    **Base Offense Level:** The guideline for this violation of 18 U.S.C. § 371 is 2X1.1(a), which directs the use of the base offense level from the guideline for the substantive offense plus any applicable adjustments from such guideline. Because the substantive offense (Commercial Bribery) is a violation of 18 U.S.C. § 1952(a)(3), the applicable guideline is 2B4.1(a), which establishes a base offense level of 8. **8**

    **Specific Offense Characteristics:**

    Increased by 22 levels, pursuant to Guideline 2B1.1(b)(1)(L), to account for $27,001,677.58 in commercial bribes. **+22**

    **Victim Related Adjustment:** None. **0**

    **Adjustment for Role in the Offense:** None. **0**

    **Adjustment for Obstruction of Justice:** None. **0**

    **Adjusted Offense Level (Subtotal):** **30**

## Multiple Count Adjustment:

    Counts 1(a), (b), and (c), through 16, are grouped under the rules of Guideline 3D1.2(b).

|  | Units |
|---|---|
| Counts 1–16 Adjusted Offense Level....................33 | 1 |

**Total Number of Units:** **1**

**Greater of the Adjusted Offense Levels Above:** **33**

**Increase in Offense Level:** **0**

| | |
|---|---|
| **Combined Adjusted Offense Level:** | **33** |
| **Chapter Four Enhancement:** None. | **0** |
| **Acceptance of Responsibility:** None. | **0** |
| **Total Offense Level:** | **33** |

The parties, however, do not quite agree with these calculations. Two disputes are relatively minor. First, rather than the four-point enhancement for violations of the securities laws under section 2B1.1(b)(18)(A) applied by Probation, both parties suggest that a two-point enhancement for abuse of trust under section 3B1.3 is warranted. (*See* Doc. Nos. 275-1 at 9; 307 at 10–11.) For the reasons set forth by the parties, the Court finds the two-point abuse of trust enhancement appropriate.

Second, although Finazzo was convicted following a jury trial, he suggests that he is eligible for a two-point reduction for acceptance of responsibility pursuant to section 3E1.1(a). (*See* Doc. No. 302 at 15–16.) The government disagrees. (*See* Doc. No. 307 at 11.) The Court will not apply the reduction. "This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, Application Note 2. This is not one of the "rare situations [in which] a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial." *Id.*; *cf. United States v. Nouri*, 711 F.3d 129, 146 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 309 (2013); *United States v. Broxmeyer*, 699 F.3d 265, 284 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2786 (2013). Thus, the Court will not accord Finazzo a reduction for acceptance of responsibility.

The bulk of the disagreement over Finazzo's Guideline calculation concerns the proper loss amount. The government urges that the proper measure of loss under the standards applicable to fixing loss for purposes of the Guidelines is $25,790,822.94, the amount that Finazzo received in kickbacks from South Bay. Similar to his arguments in connection with restitution, but based on the applicable Guidelines principles, Finazzo urges that there was no loss to Aéropostale and therefore no loss amount for the purposes of the Guidelines.[38] (Doc. No. 275-1 at 9–10.) Using zero as a loss amount, Finazzo calculates his Total Offense Level at nine. (*See id.*; Doc. No. 302 at 13–15.) For the reasons that follow, and set forth fully below, the Court finds Finazzo's Total Offense Level to be 31, finding him responsible for a loss amount of $25,790,822.94.

Under the Guidelines, "loss" is defined as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, Application Note 3(A). "Actual loss" is further defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," which includes "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* § 2B1.1, Application Notes 3(A)(i) and (iv). Applying these principles, the Court finds for purposes of the Guidelines that Aéropostale sustained an actual pecuniary loss in the amount of $25,790,822.94, which is the sum of the kickbacks paid to Finazzo over the course of the defendants' scheme.

---

[38] In a letter spontaneously submitted long after the last hearing, Finazzo again argued no loss could have resulted from his conspiracy convictions because a "mere agreement" cannot cause "actual pecuniary loss" under the Guidelines. (*See* Doc. No. 370 at 1.) That is simply incorrect. *See, e.g.*, *United States v. Turk*, 626 F.3d 743, 748–51 (2d Cir. 2010) (affirming an enhancement based on loss amount for a defendant convicted of a single count of conspiracy to commit mail and wire fraud); *United States v. Levenson*, 314 F. App'x 347, 348 (2d Cir. 2008) (affirming a seventeen-level enhancement driven by a loss amount of between $40 and $80 million for a defendant convicted of mail fraud and conspiracy to commit mail fraud and wire fraud); *see also Cummings*, 189 F. Supp. 2d at 73 (quoting *Helmsley*, 941 F.2d at 101) (observing that "restitution may be awarded for a violation of the conspiracy statute even when it could not be awarded for the underlying predicates").

It is important to note at the outset that the principles for determining loss for purposes of the Guidelines differ from those applicable to imposing restitution. *Germosen*, 139 F.3d at 130 ("An amount-of-loss calculation for purposes of sentencing does not always equal such a calculation for restitution.") That is because "the MVRA is intended to compensate victims, while sentencing enhancements for loss amount under the Guidelines are predicated on the notion that fraudsters who cause more monetary harm are more culpable and should therefore generally be given longer terms of imprisonment." *Niebuhr*, 456 F. App'x at 39. As the Second Circuit has observed, "because a defendant's culpability will not always equal the victim's injury, an amount-of-loss calculation for purposes of sentencing does not always equal such a calculation for restitution." *Id.* at 39 (quoting *United States v. Catherine*, 55 F.3d 1462, 1464–65 (9th Cir. 1995); *Germosen*, 139 F.3d at 130) However, the two calculations can be "closely related." *United States v. Copus*, 110 F.3d 1529, 1537 (10th Cir. 1997) (cited by *Germosen*); *see also Niebuhr*, 456 F. App'x at 38 (quoting *Copus*, 110 F.3d at 1537) ("While calculating the 'loss amount' for Guidelines purposes and the 'victims' losses' for restitution purposes are obviously 'closely related' inquiries, they are not identical.").

Nevertheless, "the quantity and quality of evidence the district court may rely upon to determine the amount of loss is the same in both contexts," *Germosen*, 139 F.3d at 130 (citing *Copus*, 110 F.3d at 1537; *United States v. Henoud*, 81 F.3d 484, 490 (4th Cir. 1996)). Moreover, the Court need only make a "reasonable estimate of the loss" under the Guidelines. U.S.S.G. § 2B1.1, Application Note 3(C); *accord United States v. Lacey*, 699 F.3d 710, 719–20 (2d Cir. 2012); *Viloski*, 2014 WL 401074, at *6.

The record evidence is replete with examples of how Finazzo not only intended loss, but caused actual loss. The Court will not belabor the trial evidence. The government in its

Sentencing Memorandum painstakingly recounts the evidence on this point, and on which the Court relies. (*See* Doc. No. 334 at 4–13.) Simply put, it is readily apparent that Finazzo's conduct significantly undermined Aéropostale's ability to make strategic economic decisions, manage its relationship with its vendors, secure merchandise at the most advantageous prices, and generate the most profits. It is equally clear that this harm was reasonably foreseeable. Finazzo actively prevented Aéropostale from obtaining merchandise from vendors other than South Bay, even when it was available at lower prices. For instance, Jennifer Heiser and John DiBarto described how Finazzo's control over vendor selection caused Aéropostale to purchase more expensive merchandise and obtain lower quality products. Jinah Jung recounted how Finazzo's actions on behalf of South Bay caused Aéropostale to incur a loss of approximately $300,000 on a single order. And Geiger estimated that Finazzo's refusal transfer a percentage of t-shirt orders from South Bay to overseas vendors may have cost Aéropostale between $5 million and $6 million. These examples, in concert with the other evidence presented at trial, amply establish that pecuniary harm to Aéropostale was reasonably foreseeable.

To be clear, in fixing the loss amount for purposes of the Guideline calculation as the value of Finazzo's kickbacks, the Court is not substituting gain for loss. While the Guidelines provide for this calculus, *see* U.S.S.G. § 2B1.1, Application Note 3(B); Viloski, 2014 WL 401074, at *6 (affirming the substitution of the defendants' gain for a measurement of loss under the Guidelines because the loss could not reasonably be determined and basing that gain on "the amount funneled directly and indirectly" in kickbacks from one defendant to another), here, the Court has found that the loss to Aéropostale can, indeed, reasonably be measured as the value of the kickbacks for Guidelines purposes. The Court thus rejects Finazzo's alternative argument that any loss to Aéropostale cannot be determined.

Based on this analysis, the Court fixes Finazzo's Guideline calculation as follows:

**Counts 1(a), 1(b), and 2–16:**

> **Base Offense Level:** The guideline for the violation of 18 U.S.C. § 371 (Counts 1(a) and 1(b)) is 2X1.1(a), which directs the use of the base offense level from the guideline for the substantive offense, plus any applicable adjustments from such guideline. The substantive offense (Conspiracy to Commit Mail Fraud and Wire Fraud) is a violation of 18 U.S.C. §§ 1341 and 1343, and the applicable guideline is 2B1.1(a)(1). The guideline for violations of 18 U.S.C. 1341 and 1343 (Counts 2 through 16) is 2B1.1(a)(1). Therefore, the base offense level is 7.     **7**

> **Specific Offense Characteristics:**

> Increased by 22 levels, pursuant to Guideline 2B1.1(b)(1)(L), because the total loss amount exceeds $20,000,000.[39]     **+22**

> Increased by 2 levels, pursuant to Guideline 3B1.3, for abuse of a position of trust.     **+2**

> **Victim Related Adjustment:** None.     **0**

> **Adjustment for Role in the Offense:** None.     **0**

> **Adjustment for Obstruction of Justice:** None.     **0**

> **Adjusted Offense Level (Subtotal):**     **31**

**Count 1(c):**

> **Base Offense Level:** The guideline for this violation of 18 U.S.C. § 371 is 2X1.1(a), which directs the use of the base offense level from the guideline for the substantive offense plus any applicable adjustments from such     **8**

---

[39] It is irrelevant here that Probation's calculation used $27,001,677.58 as the loss amount, which includes additional loss for purposes of the Guidelines that is predicated on relevant conduct during Finazzo's employment at Anchor Blue. Both calculations exceed $20 million and therefore yield the same increase under the Guidelines. *See* U.S.S.G. § 2B1.1(b)(1)(L) and (M). For the same reason, the Court need not consider any losses beyond those incurred by Aéropostale. *Cf. United States v. Corsey*, 723 F.3d 366, 375 (2d Cir. 2013) (finding that "[t]he District Court was free to prioritize efficiency over an exercise in futility" and stating that the Second Circuit "ha[s] never held that a court commits procedural error where it bypasses a minefield of tricky determinations and still arrives at the correct Guidelines recommended sentencing range" because "[t]o do so would be the equivalent of docking a test grade even though a student found a quicker route to the right answer").

guideline. Because the substantive offense (Commercial Bribery) is a violation of 18 U.S.C. § 1952(a)(3), the applicable guideline is 2B4.1(a), which establishes a base offense level of 8.

**Specific Offense Characteristics:**

Increased by 22 levels, pursuant to Guideline 2B1.1(b)(1)(L), because the total loss amount exceeds $20,000,000.                                                        **+22**

**Victim Related Adjustment:** None.                          **0**

**Adjustment for Role in the Offense:** None.                **0**

**Adjustment for Obstruction of Justice:** None.             **0**

**Adjusted Offense Level (Subtotal):**                       **30**

## Multiple Count Adjustment:

Counts 1(a), (b), and (c), through 16, are grouped under the rules of Guideline 3D1.2(b).[40]

|                                          | Units |
|------------------------------------------|:-----:|
| Counts 1–16<br>Adjusted Offense Level.....................31 | 1 |
| **Total Number of Units:** | **1** |
| **Greater of the Adjusted Offense Levels Above:** | **31** |
| **Increase in Offense Level:** | **0** |
| **Combined Adjusted Offense Level:** | **31** |
| **Chapter Four Enhancement:** None. | **0** |
| **Acceptance of Responsibility:** None. | **0** |
| **Total Offense Level:** | **31** |

---

[40] Because the Court rejects Finazzo's arguments as to the loss amount under the Guidelines, it is unnecessary to address his argument regarding the grouping analysis. (*See* Doc. No. 358 at 6–9.)

Accordingly, the Court finds that Finazzo's Total Offense Level to be 31. There is no dispute that Finazzo falls within Criminal History Category I. Thus, the Guidelines range for imprisonment is 108–135 months, recommends a minimum fine of $15,000 and maximum fine of $150,000 on each count.[41] U.S.S.G., ch. 5, Pt. A; *id.* § 5E1.2(c)(3). Because Finazzo was convicted of sixteen counts, the cumulative range of fines for all of the counts combined is $240,000–$2,400,000.

Since the forfeiture sought by the government in this case is neither within nor near that range, the Court "cannot presume that the amount of forfeiture is permissible under the Eighth Amendment." *Varrone*, 554 F.3d at 331–32 (citing *United States v. Sherman*, 262 F.3d 784, 795 (8th Cir. 2001)). Instead, it must "evaluate[] the *Bajakajian* factors [and] ma[k]e factual findings regarding those factors." *Varrone*, 554 F.3d at 331–32; *see also 817 N.E. 29th Drive*, 175 F.3d at 1309. The Court now turns to that analysis.

### B. Application of Bajakajian Factors

In *Bajakajian*, the Supreme Court identified several considerations that bear on whether a forfeiture is unconstitutionally excessive. *See* 524 U.S. at 337–39. The Second Circuit has distilled those considerations into four factors:

> [1] "the essence of the crime" of the defendant and its relation to other criminal activity, [2] whether the defendant fit[s] into the class of persons for whom the statute was principally designed, [3] the maximum sentence and fine that could have been imposed, and [4] the nature of the harm caused by the defendant's conduct.

*Varrone*, 554 F.3d at 331 (quoting *United States v. Collado*, 348 F.3d 323, 328 (2d Cir. 2003)); *see also Garza-Gonzalez*, 512 F. App'x at 60; *United States v. Elfgeeh*, 515 F.3d 100, 139 (2d Cir. 2008). Application of these factors is flexible, and the government need not definitively

---

[41] The other sentencing options set forth in Part D of Finazzo's PSR are also available.

prevail on each and every one to obtain full forfeiture.  *See Elfgeeh*, 515 F.3d at 139 ("Although the record is silent as to the fourth factor, the other three reveal that the order . . . is not disproportional."); *United States v. Rudaj*, No. 04-CR-1110 (DLC), 2006 WL 1876664, at *8 (S.D.N.Y. July 5, 2006) ("[t]aking all of these four factors together" and finding a forfeiture was not excessive even though one factor arguably favored the defendants).  Under the requisite analysis, the Court finds that the special forfeiture verdict is not constitutionally excessive.

       1.     *Essence of the Crime and its Relation to Other Criminal Activity*

First, the essence of Finazzo's crimes and their relation to other criminal activity weigh heavily in favor of forfeiture.  *See Varrone*, 554 F.3d at 331.  Finazzo was convicted of conspiracy to commit mail fraud, wire fraud, and to violate the Travel Act; fourteen counts of mail fraud; and one count of wire fraud.  The evidence introduced at trial laid bare myriad misrepresentations, falsified documents, concealed sums, mischaracterized payments, and secret agreements – demonstrating pervasive fraud and deceit.  Finazzo's scheme lasted years, and netted $25 million in illicit kickbacks.  Finazzo conceived, orchestrated, and handsomely profited from his criminal conduct by abusing his position of trust to steer business to South Bay, often against the direction of his superiors and the recommendations of his subordinates.  The serious and extensive nature of Finazzo's offenses thus militates strongly in favor of forfeiture.

Finazzo attempts to draw parallels between the "comparatively mild" offense conduct in *Bajakajian* itself and his own criminal conduct, characterizing both as a "failure to report conduct that, if reported, would not be criminal."  (Doc. No. 275-1 at 6.)  This case is a far cry from *Bajakajian*.  Finazzo's panoply of convictions and their underlying conduct are worlds apart from Bajakajian's singular failure to report.  Here, Finazzo's extensive fraud spanned years and

resulted in his unlawful acquisition of over $25 million covert kickbacks.  He also deprived

Aéropostale of "potentially valuable economic information," *United States v. D'Amato*, 39 F.3d

1249, 1257 (2d Cir. 1994) (quoting *United States v. Wallach*, 935 F.2d 445, 462 (2d Cir. 1991)),

causing considerable pecuniary harm to the company.  In contrast, *Bajakajian* concerned a

failure to report that was "unrelated to any other illegal activities," "affected only one party . . .

in a relatively minor way," did not involve fraud, and "caused no loss." *Id.* at 338–39.  Indeed,

in *Bajakajian* "under the Sentencing Guidelines, the maximum sentence that could have been

imposed on [the defendant] was six months, while the maximum fine was $5,000," indicating a

"minimal level of culpability." *Id.* at 338–39.  Any analogy to the facts of this case strains

credulity.

Finazzo also continues to insist that *any* forfeiture is excessive because he was convicted

of depriving Aéropostale of the right to control its assets, not money.  (*See* Doc No. 275-1.)  This

argument ignores the jury's special verdict convicting Finazzo of Conspiracy to Commit Mail

Fraud with the intent to deprive Aéropostale of money, as well as his conviction for his Travel

Act conspiracy. [42]

Simply put, as evidenced by his convictions, the jury found that Finazzo abused his

position of trust and influence within Aéropostale, intentionally concealing interested

transactions that generated great personal profits at his employer's expense.  He conspired to

defraud Aéropostale of both money and intangible property, secretly accepted substantial

kickbacks, and deprived Aéropostale of its right to control its assets.  That criminal conduct was

---

[42] As noted with restitution, it does not ineluctably follow that Aéropostale suffered no pecuniary loss.  A deprivation of the right to control is unquestionably a serious crime, cognizable under the fraud statutes, for which criminal penalties – including forfeiture – may be imposed.  *See D'Amato*, 39 F.3d at 1257 (quoting *Wallach*, 935 F.2d at 462).  Finally, the inquiry under the first *Bajakajian* factor would permit the Court to consider even "acquitted conduct" when evaluating the essence of the offense.  *Castello*, 611 F.3d at 122 n.5 (citing *Bajakajian*, 524 U.S. at 338; *Varrone*, 554 F.3d at 331; *United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005)).

extensive, fraudulent, serious, highly profitable, and extremely damaging to Aéropostale.  As

such, the gravity of Finazzo's offenses tips decidedly in favor of finding that the forfeiture

verdict is not excessive.

### 2. Class of Persons for Whom the Statutes Were Principally Designed

Second, Finazzo falls comfortably within the class of persons for whom the statutes in

question were principally designed.  *See Varrone*, 554 F.3d at 331.  The Travel Act is

"concerned with a broad spectrum of 'unlawful activity' . . . [and] is, in short, an effort to deny

individuals who act for such a criminal purpose access to the channels of commerce."

*Erlenbaugh v. United States*, 409 U.S. 239, 246 (1972).  Similarly, the mail and wire fraud

statutes are designed to prevent the use of interstate communications facilities – the mails and

wires – to affect a broad range of fraudulent schemes to obtain money or property through false

pretenses, representations, or promises.[43]  *See Pasquantino*, 544 U.S. at 353; *Parr v. United*

*States*, 363 U.S. 370, 389 (1960).  As demonstrated at trial, Finazzo engaged in an extended

course of conduct designed to profit from interested business dealings; concealed his adverse

interests from his employer by lying on numerous occasions, in multiple documents, and by

routing funds through various corporations; and profited significantly at the expense of his

employer.  Those actions fall well within the heartland of fraudulent conduct prohibited by the

above provisions.

Additionally, *Sekhar v. United States*, 133 S. Ct. 2720 (2013), is not controlling here.

(*See* Doc. No. 285 at 8–9.)  In *Sekhar*, the Supreme Court reversed a conviction for the attempted

---

[43] Contrary to Finazzo's urging, the mail and wire fraud statutes are not "essentially larceny statutes."  (Doc. No. 285 at 9.)  Rather, "[t]he mail fraud statute criminalizes use of the mails in furtherance of a 'scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . . ."  *D'Amato*, 39 F.3d at 1256 (quoting 18 U.S.C. § 1341).  The wire fraud statute has similar aims.  *See Reifler*, 446 F.3d at 95 ("In interpreting [section] 1343, we look not only to cases decided under that section but also to cases involving 18 U.S.C. § 1341, the mail fraud statute, as [section] 1341 uses the same relevant language in prohibiting the furtherance of fraudulent schemes by use of the mails.").

extortion of the general counsel of the New York State Comptroller's Office, holding that attempting to compel a person to recommend that an employer approve an investment does not constitute "obtaining of property from another" under the Hobbs Act, 18 U.S.C. § 1951(b)(2). *See* 133 S. Ct. at 2723. But *Sekhar* concerned extortion, which the Hobbs Act defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* at 2725 (quoting 18 U.S.C. § 1951(b)(2)) (emphasis omitted). Because "obtaining property requires 'not only the deprivation but also the acquisition of property,'" the Court held that "property extorted must therefore be transferable – that is, capable of passing from one person to another."[44] *Sekhar*, 133 S. Ct. at 2725 (quoting *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393, 404 (2003)) (emphasis omitted). The upshot of *Sekhar* was that the "intangible property right [of a general counsel] to give his disinterested legal opinion to his client free of improper outside interference" is not property that can be *extorted*. 133 S. Ct. at 2724–25, 2727 (internal citation omitted). That holding has no application to Finazzo or to this case. Rather, as *Dinome* and subsequent cases make clear, a prosecution for mail and wire fraud may be premised on a right to control theory. *See* 86 F.3d at 283; *accord Carlo*, 507 F.3d at 801–02; *Rossomando*, 144 F.3d at 201 n.5.

In sum, Finazzo's conduct is aptly characterized as an extensive scheme to defraud that employed the instrumentalities of interstate commerce. That is the kind of conduct that the Travel Act, the mail fraud statute, and the wire fraud statute are "principally designed" to combat. *Bajakajian*, 524 U.S. at 338. Further, "[r]ather than being [a] minor or accidental

---

[44] And even *Sekhar* left open the possibility that some forms of intangible property might be able to be extorted, observing, for example, that "[i]t may well be proper under the Hobbs Act for the [g]overnment to charge a person . . . who obtains 'goodwill and customer revenues' by threatening a market competitor." 133 S. Ct. at 2725 n.2 (quoting *United States v. Zemek*, 634 F.2d 1159, 1173 (9th Cir. 1980)).

participant[] in the fraud," Finazzo was "found guilty of plotting the entire scheme." *United States v. Vilar*, No. 05-CR-621 (RJS), 2010 WL 1491859, at *2 (S.D.N.Y. Apr. 7, 2010), *adhered to on recons.*, 2010 WL 3447222 (S.D.N.Y. Aug. 26, 2010). This factor therefore weighs in favor of full forfeiture.

### 3. Maximum Sentence and Fine Under the Guidelines

Third, the special forfeiture verdict is not grossly disproportionate to the maximum sentence and fine recommended under the Guidelines. *See Varrone*, 554 F.3d at 331; *Castello*, 611 F.3d at 123. As indicated above, the maximum fine recommended under the Guidelines is $2.4 million, while the maximum recommended sentence is 135 months. Thus, the forfeiture sought here is roughly ten times the maximum monetary penalty recommended under the Guidelines. But that is not the end of the inquiry. As the Second Circuit has emphasized, a forfeiture that exceeds the maximum fine is "not necessarily constitutionally excessive." *Varrone*, 554 F.3d at 333 n.4 (quoting *Bajakajian*, 524 U.S. at 336–37) (internal alteration omitted). Even for a defendant in Criminal History Category I, the Guidelines recommend a significant period of incarceration – 108 to 135 months – which denotes the seriousness of Finazzo's crimes. *Cf. Bajakajian*, 524 U.S. at 350 (finding a crime with an authorized term of sixty months' imprisonment and the imposition of a fine to be "serious").

"[T]he ultimate question before the [C]ourt is how 'the amount of the forfeiture compares to the gravity of the defendant's offense.'" *Id.* In the context of this case, the Court finds that the amount of the forfeiture is proportional to the gravity of Finazzo's crime.[45] Finazzo engaged

---

[45] The government seeks solely to disgorge the profits that Finazzo obtained during his perpetration of the scheme. The fact that those illicit profits greatly exceed the standard fine contemplated by the Guidelines hardly renders his crime *less* severe. And as Justice Kennedy noted in *Bajakajian*, the Guidelines provide that "[f]orfeiture is to be imposed upon a convicted defendant as provided by statute" *in addition* to any fine. 524 U.S. at 351 (Kennedy, J., dissenting) (citing U.S.S.G. § 5E1.4). It is thus appropriate to remember that "[t]he fine [] supplements the forfeiture; it does not replace it." *Id.* In evaluating the gravity of Finazzo's offense, it may be more accurate to look to the recommended term of imprisonment. *Cf. Castello*, 611 F.3d at 123 (finding that "the third factor weigh[ed] in

in a complicated fraudulent scheme that spanned many years and netted huge gains. In the course of perpetrating that scheme, he broke numerous laws and routinely abused a position of trust. Although the forfeiture here clearly exceeds the maximum recommended fine, the Guideline ranges for imprisonment and purposes of a fine recommend substantial penalties that underscore the seriousness of Finazzo's crimes of conviction. On balance, the Court concludes that this factor weighs in favor of sustaining the forfeiture verdict.[46]

### 4. *Nature of the Harm Caused*

Fourth, the proposed forfeiture amount is not grossly disproportionate to the harm caused by Finazzo's conduct.[47] Quantifying the harm caused by illegal conduct is often difficult. *See Bajakajian*, 524 U.S. at 336 (noting that "any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise"). It does not follow, however, that the harm to Aéropostale is hopelessly "hypothetical, unmeasurable and speculative." (Doc. No. 285 at 10.) The evidence at trial established that the harm to Aéropostale was both significant and substantial, a conclusion fortified by the fact that Finazzo was convicted of multiple violations. *See Castello*, 611 F.3d 124. Based on that evidence, the Court has found that $25,790,822.94 is a reasonable approximation of the loss Aéropostale suffered. The nature of the harm caused is

---

favor of full forfeiture" where the Guidelines range of imprisonment was "far greater" than the statutory maximum despite the fact that "the maximum Guidelines fine" was a "small fraction of the $12 million" sought by the government).

[46] Even if the Court were to find that this factor favored Finazzo, success on a single factor is insufficient to demonstrate that the forfeiture is excessive. *Cf. Elfgeeh*, 515 F.3d at 139 ("Although the record is silent as to the fourth factor, the other three reveal that the order. . . is not disproportional."); *Rudaj*, 2006 WL 1876664, at *8 (observing that "[t]he only factor that remotely tips in the defendants' favor [wa]s a comparison to the Guidelines fine" and holding that "[t]aking all of these four factors together, the forfeiture . . . [wa]s not grossly disproportionate to the gravity of the defendants' offense").

[47] With respect to his conspiracy conviction, Finazzo argues that "[i]f Aéropostale suffered any harm, it resulted not from mere agreement, but rather, from the criminal conduct that occurred as a product of that agreement." (Doc. No. 285 at 9 (emphasis omitted).) For the reasons explained at length in connection with restitution, that argument is meritless. In any event, Finazzo's substantive convictions for mail and wire fraud provide ample additional proof of the harm in this case.

therefore real, serious, and reasonably quantifiable.  As such, the fourth factor weighs in favor of full forfeiture.

### C. Finazzo's Proposed Additional Factors

Finally, Finazzo points out that *Bajakajian* "did not say that the factors it identified were necessarily exclusive."  (Doc. No. 275-1 at 13.)  He urges the Court to incorporate other considerations, including (1) any financial benefits that accrued to Aéropostale from its relationship with South Bay; (2) the $5 million settlement with Aéropostale; and (3) the risk that the forfeiture verdict could bankrupt him.[48]  (*Id.* at 9–10.)  The government responds that these arguments are "wholly irrelevant and inapposite to well-established Second Circuit law."  (Doc. No. 280 at 24.)  The Court agrees.

First, any profits Aéropostale may have earned do nothing to reduce the amount of a forfeiture award, which is punitive and not remedial.  *See United States v. Peters*, 732 F.3d 93, 101 (2d Cir. 2013) (noting that "[c]riminal forfeiture is a form of punishment" and, "[a]s such, it is distinct from restitution or other remedial actions, which are intended to return the victim and the perpetrator to the status quo").  Such profits do not bear on the Court's proportionality determination.  The sole question here is whether the special forfeiture verdict is grossly disproportionate to Finazzo's illegal conduct.  *See Bajakajian*, 524 U.S. at 322; *United States v. Warshak*, 631 F.3d 266, 331 (6th Cir. 2010).  Moreover, it is not necessary that Aéropostale have suffered financial ruin for the government to disgorge Finazzo of his criminal proceeds.

Finazzo's $5 million settlement with Aéropostale is also irrelevant under the *Bajakajian* analysis.  It is axiomatic that "civil actions instituted to remedy or recoup financial losses . . . and

---

[48] Finazzo also appears to suggest that unspecified "collateral consequences" and the "attendant publicity" of his conviction render the assets he "currently possesses even more important to him."  (Doc. No. 275-1 at 14.)  That argument is unpersuasive.  Suggesting that Finazzo is entitled to keep the proceeds of his illegal conduct merely because he will suffer negative public consequences as a result of his convictions is hardly consistent with the goals of forfeiture.

actions taken to achieve retribution or deterrence in order to uphold public justice . . . are separate and distinct." *United States v. Morgan*, 51 F.3d 1105, 1113 (2d Cir. 1995). Finazzo offers no authority for the proposition that a private settlement is relevant to the Eighth Amendment analysis of a forfeiture of criminal proceeds sought by the government. *Compare, e.g.*, *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 260 (1989) (holding that "the Excessive Fines Clause does not apply to awards of punitive damages in cases between private parties"). As explained above, the settlement with Aéropostale is relevant to restitution, where the purpose is to "compensate victims for their losses." *Pescatore*, 637 F.3d at 138. But forfeiture and restitution serve very different purposes. *See Peters*, 732 F.3d at 101. The imposition of both in the same case may be proper. *See United States v. Torres*, 703 F.3d 194, 202–03 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2782 (2013).

Finally, the potential impact of the forfeiture on Finazzo's finances is not a factor to be considered under the *Bajakajian* analysis. On this score, Finazzo cites a single case that held that "a court should also consider whether forfeiture would deprive the defendant of his or her livelihood." *United States v. Levesque*, 546 F.3d 78, 83 (1st Cir. 2008). In contrast, the Eleventh Circuit, for example, "do[es] not take into account the personal impact of a forfeiture on the specific defendant in determining whether the forfeiture violates the Eighth Amendment." *United States v. Dicter*, 198 F.3d 1284, 1292 (11th Cir. 1999) (citing *817 N.E. 29th Drive*, 175 F.3d at 1311).

The Second Circuit appears to take the latter approach. "Mandatory forfeiture is concerned not with how much an individual has[,] but with how much he received in connection with the commission of the crime." *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010) (quoting *United States v. Casey*, 444 F.3d 1071, 1077 (9th Cir. 2006)). "A contrary

interpretation could have the undesirable effect of creating an incentive for an individual involved in a criminal enterprise to 'rid[] himself of his ill-gotten gains to avoid the forfeiture sanction." *Awad*, 598 F.3d at 78–79 (quoting *United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006)). Rather, a focus on how much a defendant gained instead "ensures that there is a mechanism by which the government may 'disgorge their ill-gotten gains, even those already spent.'" *Awad*, 598 F.3d at 79 (quoting *Casey*, 444 F.3d at 1074). As in *Awad*, the forfeiture statute applicable here "does not contain any language limiting the amount of money available in a forfeiture order to the value of the assets a defendant possesses at the time the order is issued." 598 F.3d at 79 (quoting *United States v. Vampire Nation*, 451 F.3d 189, 201 (3d Cir. 2006)) (internal quotations omitted). The Court thus concludes that the potential economic consequences to Finazzo as a result of the forfeiture are not an additional factor that must be weighed under *Bajakajian*.[49]

The burden of demonstrating that a forfeiture is excessive and therefore unconstitutional rests with the defendant. *Castello*, 611 F.3d at 120. In this case, Finazzo has failed to carry that burden. Based on the *Bajakajian* analysis, the Court finds that the special forfeiture verdict is not grossly disproportional to the gravity of Finazzo's offenses. Accordingly, the jury's forfeiture verdict does not violate the Eighth Amendment.

---

[49] Even if the Court were to consider the potential consequences, they would not change the outcome. Finazzo's papers merely cite to the declaration of Special Agent Christopher Delzotto to support his claim that forfeiture would render him bankrupt. (*See* Doc. No. 275-1 at 14.) But Delzotto's declaration states only that, "together with other agents involved in the investigation, [Delzotto] made a diligent effort to locate additional traceable proceeds to the [o]ffenses subject to forfeiture," and does not purport to provide an exhaustive account of Finazzo's personal assets. (Doc. No. 265-1 ¶ 10.) Finazzo has also provided additional financial information in his objections to the addenda to the PSR. (*See* Doc. Nos. 340, 363.) Those calculations, however, are premised on numerous favorable assumptions concerning property valuations, appropriate exclusions, and marital allocations. And again, Finazzo provided no documentation for his figures. Thus, the Court is left largely with self-serving assertions of insolvency. *Cf. United States v. One Residential Prop. Located at 325 Skyline Circle, Fallbrook, California*, 534 F. Supp. 2d 1163, 1169 (S.D. Cal. 2008) (rejecting a claimant's assertions that the court should consider the potential effects on his financial condition in addition to the *Bajakajian* factors because those assertions were "not credible and unsupported by the record").

**CONCLUSION**

For the foregoing reasons, (1) Dey's request for an evidentiary hearing is denied, (2) defendants' challenges to the amount of restitution are rejected and restitution shall be ordered at sentencing consistent with this opinion, and (3) Finazzo's motion to vacate the special forfeiture verdict as unconstitutionally excessive is denied.

The Court shall sentence each defendant on the dates currently scheduled.

SO ORDERED.

Dated: Brooklyn, New York
August 1, 2014

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge